**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: December 29, 2017.**

_____
**CRAIG A. GARGOTTA**
**UNITED STATES BANKRUPTCY JUDGE**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 15-51396-CAG |
| | § | |
| PRIMERA ENERGY, LLC, | § | CHAPTER 11 |
| Debtor. | § | |
| | § | |
| FREDERICK PATEK; | § | |
| GERALDINE PATEK; | § | |
| JASPER COMPISE; | § | |
| WILLIAM CRAWFORD; | § | |
| MICAHEL COVINGTON; | § | |
| RICK GRIFFEY; | § | ADVERSARY NO. 15-05047-CAG |
| ED MCPHERSON; | § | |
| DIETER JANSEN; | § | |
| QUACKENBUSH PETROLEUM LLC; | § | |
| JAMES REILEY; | § | |
| BETTY REILEY; | § | |
| RICK REILEY; | § | |
| VINCENT J. GILLETTE; | § | |
| MARJORIE A. GILLETTE; | § | |
| THOMAS J. GILLETTE; | § | |
| EDWARD A. GILLETTE; | § | |
| SHARON WALLS; | § | |
| BUDDY WALLS; | § | |
| DC OIL COMPANY, INC.; | § | |
| BUFORD SALMON; | § | |
| LILLIAN SALMON; | § | |
| JOSEPH HART; | § | |

| | |
|---|---|
| BRIAN HUBER; | § |
| DAVID DAVALOS; | § |
| DANIEL DAVALOS; | § |
| FREDERICK JOHNSTON; | § |
| MILAN KNEZOVICH 11; | § |
| FOUNTAINGATES INVESTMENT GROUP; | § |
| JAMES PETERS; and | § |
| BROC YAKEL, | § |
| Plaintiffs, | § |
| | § |
| V. | § |
| | § |
| BRIAN K. ALFARO; | § |
| KING MINERALS, LLC; | § |
| SILVER STAR RESOURCES, LLC; | § |
| 430 ASSETS, LLC, A MONTANA LLC; | § |
| KRISTI MICHELLE ALFARO; | § |
| BRIAN AND KRISTI ALFARO, AS | § |
| TRUSTEES OF THE BRIAN AND KRISTI | § |
| ALFARO LIVING TRUST; and | § |
| ANA AND AVERY'S CANDY | § |
| ISLAND, LLC, | § |
| Defendants. | § |

## MEMORANDUM OPINION

This Memorandum Opinion resolves the above-referenced adversary proceeding in which the Court conducted a six day trial on April 10-13 & 17-18, 2017, before taking the matter under advisement. The Court has reviewed the entire record before it; including all admitted exhibits and the weight of testimony and credibility of all witnesses. Additionally, the Court has carefully considered all evidentiary objections raised and sustained in making its findings of fact.

### CONTENTS

Procedural Background .................................................................................................................. 7

Jurisdiction, Authority and Venue ................................................................................................ 9

Relief Requested ........................................................................................................................... 11

Parties' Contentions ...................................................................................................................... 12

    I.    Plaintiffs' Contentions ...................................................................................................... 12

    II.   Defendants' Contentions ................................................................................................... 16

Evidence Presented ....................................................................................................................... 18

I.    Preliminary Injunction Hearing and Exhibits ................................................................ 18

II.   Trial and Exhibits ............................................................................................................ 18

III.   Witnesses and Credibility .............................................................................................. 19

    A.   Plaintiffs .................................................................................................................... 19

        1.   James Peters ......................................................................................................... 19

        2.   Richard David Collins .......................................................................................... 19

        3.   James "Buford" Salmon ....................................................................................... 19

        4.   William L. Crawford ............................................................................................. 20

        5.   Daniel Davalos ...................................................................................................... 20

        6.   David Davalos ....................................................................................................... 20

        7.   James Reiley .......................................................................................................... 20

        8.   Rick Reiley ........................................................................................................... 21

        9.   Betty Reiley .......................................................................................................... 21

        10.  Dieter Jansen ........................................................................................................ 21

        11.  Vincent J. Gillette ................................................................................................ 21

        12.  Brian Huber .......................................................................................................... 22

        13.  Sharon Walls ........................................................................................................ 22

        14.  Rick Griffey ......................................................................................................... 22

        15.  Marjorie A. Gillette .............................................................................................. 23

        16.  Thomas J. Gillette ................................................................................................. 23

        17.  Edward A. Gillette ................................................................................................ 23

    B.   Non-Plaintiff Investors .............................................................................................. 23

        1.   Louis Hinojosa ..................................................................................................... 23

        2.   Alma Guerra-Gillette ........................................................................................... 24

        3.   Orlando Guerra ..................................................................................................... 24

    C.   Defendants ................................................................................................................. 24

        4.   Brian Alfaro .......................................................................................................... 24

        5.   Kristi Alfaro ......................................................................................................... 25

    D.   Employees ................................................................................................................. 25

        1.   Michael Covington .............................................................................................. 25

        2.   Cody Reyes ........................................................................................................... 26

        3.   Megan Blair .......................................................................................................... 26

        4.   Sonia Jimenez ....................................................................................................... 26

        5.   Timothy Hundley ................................................................................................. 26

6. Edgar Perez-Mendez .................................................................................. 27

7. Justin Rodriguez ........................................................................................ 27

E. Vendors ............................................................................................................ 27

1. Alphonse Seger ......................................................................................... 27

2. Cliff Davis ................................................................................................. 27

F. Experts .............................................................................................................. 28

1. Michael Perkins ......................................................................................... 28

2. Michael Turner .......................................................................................... 28

IV. Factual Findings ...................................................................................................... 29

A. Corporation and Trust Formation ................................................................... 29

B. Well Drilling and Distributions ..................................................................... 29

1. Montague Legacy ....................................................................................... 29

2. Screaming Eagle ........................................................................................ 30

3. Blackhawk Buda ........................................................................................ 30

C. State Court Activities ...................................................................................... 30

1. Tejas Tubular Suit ..................................................................................... 30

2. Acute Safety Suit ....................................................................................... 31

3. Key Energy Suit ........................................................................................ 31

4. Unit Texas Drilling Suit ............................................................................ 31

5. Energy Fishing Suit ................................................................................... 31

6. Platinum Energy Suit ................................................................................ 31

7. Qwik Pipe Suit .......................................................................................... 31

8. American Oilfield and Tejas Transport Suit ............................................. 31

9. Brennan Short Suit ..................................................................................... 32

D. Plaintiffs .......................................................................................................... 32

1. Questions Asked to Plaintiffs .................................................................... 32

2. The Governing Writing .............................................................................. 33

3. James Peters ............................................................................................... 33

4. Richard David Collins ............................................................................... 36

5. James "Buford" Salmon ............................................................................. 38

6. William L. Crawford .................................................................................. 40

7. David Davalos ............................................................................................ 40

8. Daniel Davalos ........................................................................................... 42

9. Rick Reiley ................................................................................................. 43

10. James Reiley .................................................................................. 45

11. Betty Reiley .................................................................................. 47

12. Dieter Jansen ............................................................................... 49

13. Vincent J. Gillette ........................................................................ 51

14. Brian Huber .................................................................................. 55

15. Sharon Walls ................................................................................ 57

16. Rick Griffey .................................................................................. 59

17. Marjorie A. Gillette ...................................................................... 61

18. Thomas J. Gillette ........................................................................ 62

19. Edward A. Gillette ........................................................................ 64

20. Michael Covington ....................................................................... 64

21. Megan Blair .................................................................................. 70

E. Defendants ........................................................................................ 72

   1. Brian Alfaro—Preliminary Injunction Hearing Testimony ................... 72

     a. Testimony Regarding Primera's Investment Process........................... 73

     b. Testimony Specific to the Screaming Eagle 4H Well .......................... 75

     c. Testimony Regarding the FINRA Investigation and Contract Statements ......... 77

     d. Testimony Regarding the Investment Process .................................... 77

     e. Testimony Regarding the Gillette Group ........................................... 81

     f. Testimony Regarding Commissions, Management Fee, and Vendor Payments 82

   2. Brian Alfaro—Trial Testimony ......................................................... 84

     a. Testimony Regarding the Subscription Agreement and PPM ................. 84

     b. Testimony Regarding Bankruptcy Filing and TRO ............................ 84

     c. Issues with Investments and Wells ................................................... 85

     d. Testimony Regarding Alfaro's Personal Financials............................. 86

     e. Testimony Regarding Silver Star Resources ...................................... 87

   3. Kristi Alfaro .................................................................................. 87

F. Primera Employees and Michael Turner ................................................ 90

   1. Justin Rodriguez............................................................................ 90

   2. Michael Perkins ............................................................................ 90

   3. Edgar Perez-Mendez ..................................................................... 92

   4. Tim Hundley ................................................................................. 95

   5. Sonia Jimenez ............................................................................... 95

   6. Cody Reyes ................................................................................... 96

7. Michael Turner .................................................................................................. 96

V. Miscellaneous Evidence Presented ............................................................................ 98

Analysis of Plaintiffs' claims .......................................................................................... 99

I. Common Law Fraud and Fraud in the Inducement ........................................... 99

A. Breach of Contract or Fraudulent Inducement? ........................................... 99

1. May Plaintiffs' Recover Under Fraudulent Inducement? ..................... 100

2. Does the Statute of Fraud Preclude Plaintiffs' Claims Based on Oral Representations? ............................................................................................. 105

B. Plaintiffs' Fraud Claims ............................................................................... 108

1. Material False Representations ............................................................. 110

a. Use of investor funds for well drilling and completion as allocated in the Contracts .................................................................................................. 111

b. Management Fees ............................................................................... 111

**c.** Commission-based Payments ........................................................... 112

2. Knowledge of Falsity or Reckless Assertion ....................................... 113

a. Use of Investor Funds for Well Drilling and Completion ................. 113

b. Management Fees ............................................................................... 116

c. Commission-Based Payment .............................................................. 116

3. Intent to Induce Reliance ...................................................................... 119

4. Actual and Justifiable Reliance Causing Injury .................................. 119

a. Did the Contracts Contain "Red Flags" That Should Have Put Plaintiffs on Notice to Make Further Inquiries? ............................................................ 135

C. Fraud-in-the-inducement ............................................................................. 137

II. Fraud in a Real Estate Transaction .................................................................. 138

III. Negligent Misrepresentation .......................................................................... 140

IV. Deceptive Trade Practices Act ....................................................................... 144

A. The Working Interest ................................................................................... 145

B. Operator Services ........................................................................................ 147

V. Violation of Texas Securities Laws .................................................................. 150

VI. Conversion ..................................................................................................... 152

A. Personal Property Comprising the Screaming Eagle 1H Well .................... 152

B. Rights to a Proportionate Right of the Production of Oil, Gas, and Other Minerals from the Screaming Eagle 1H well ........................................................................... 153

C. Rights to Investments in the Working interests ........................................... 154

VII. Texas Uniform Fraudulent Transfer Act Claims .......................................... 155

A.   Plaintiffs' Texas Uniform Fraudulent Transfer Act Claims ....................................... 155

B.   Plaintiff's TUFTA Remedies ................................................................ 168

   1.   Constructive Trust ..................................................................... 169

   2.   Equitable Lien ......................................................................... 172

VIII.  Unjust Enrichment ...................................................................... 174

IX.   Money Had and Received .................................................................. 175

X.  Civil Conspiracy ........................................................................ 176

Remedies ................................................................................... 178

A.  Damages ............................................................................... 178

B.  Constructive Trust ..................................................................... 180

Conclusion ................................................................................. 181

## PROCEDURAL BACKGROUND

Plaintiffs commenced this action by filing their lawsuit styled *Frederick Patek, Geraldine Patek, Jim Gregory, Cal Curtner, Lisa Simpson, Jasper Campise, Karen Smith, William Crawford, Mike Covington, Marc Keese, Mike McPherson, Ed McPherson, Wesley Crow, Dieter Jansen, Quackenbush Petroleum, James Reiley, Betty Reiley, Rick Reiley, Greg Shilts and Jana Shilts and on behalf of All Other Similarly Situated Investors of Defendants' "Screaming Eagle," "Montague Legacy" and "Buda Well" Investments vs. Brian K. Alfaro, Primera Energy, LLC, Alfaro Oil and Gas, LLC and Alfaro Energy, LLC*, in the 288th District Court for Bexar County on April 24, 2015 (the "State Court Action").

In the State Court Action, Plaintiffs sought and obtained a temporary restraining order ("TRO") against Brian Alfaro ("Alfaro"), Primera Energy, LLC ("Primera"), Alfaro Oil and Gas, LLC ("Alfaro O&G") and Alfaro Energy, LLC ("Alfaro Energy") on April 28, 2015. The TRO expired on May 12, 2015, and on May 19, 2015, Plaintiffs filed a motion to extend the TRO. On May 22, 2015, the TRO was extended to June 1, 2015. On June 2, 2015, the state court judge entered a temporary injunction against Defendants Alfaro, Primera, Alfaro O&G and Alfaro

Energy.[1]

On June 3, 2015, Primera filed for relief under Title 11 of the U.S. Code commencing Bankruptcy Case No. 15-51396 (the "Bankruptcy Case"). On June 19, 2015, Alfaro, Primera, Alfaro O&G, Alfaro Energy, King Minerals, LLC ("King") and Silver Star Resources, LLC ("Silver Star") removed the State Court Action to this Court, commencing this Adversary Proceeding No. 15-05047 (the "Adversary"). Also on June 19, 2015, Plaintiffs filed their Second Amended Petition in the State Court Action adding King and Silver Star as Defendants.

On July 13, 2015, Jason Searcy was appointed chapter 11 trustee for the estate of Primera in the Bankruptcy Case. On August 11, 2015, Plaintiffs filed their Application for Temporary Restraining Order and Temporary and Permanent Injunctions (Adv. ECF No. 22) (the "Application") in this Adversary, seeking relief against Alfaro, Primera, Alfaro O&G, Alfaro Energy, King and Silver Star. On August 14, 2015, Plaintiffs filed their Third Amended Complaint (ECF No. 29) in this Adversary adding the following Defendants in their Third Amended Complaint: 430 Assets, LLC ("430 Assets"); Kristi Michelle Alfaro ("Kristi Alfaro"); Brian Alfaro and Kristi Alfaro, as trustees for the Brian and Kristi Alfaro Living Trust ("Living Trust"); and Ana and Averys Candy Island, LLC ("Candy Island").

The Court held a hearing on the Application over the following five days: August 28, 2015; September 1, 2015; September 2, 2015; September 4, 2015; and September 15, 2015. The Court issued its Order Denying Plaintiffs' Application for Preliminary Injunction (ECF No. 98) on October 28, 2015. In its Order, the Court specifically noted that the Order only referenced those Defendants who were named in the Application to the Court and excluded those Defendants who

---

[1] The state court judge also appointed a receiver, Lamont Jefferson, for Alfaro O&G and Alfaro Energy. Mr. Jefferson took the position that as receiver for Alfaro O&G and Alfaro Energy that he was not authorized or required to represent Alfaro O&G and Alfaro Energy in this adversary proceeding. As such, the Court allowed Defendants' counsel to represent them.

had been added in later amended Complaints. Thus, the Order referred only to Defendants Alfaro, Primera, Alfaro O&G and Alfaro Energy.

On March 21, 2016, Plaintiffs filed their Fourth Amended Complaint. Prior to trial, the Court also issued two Orders Granting, in Part, and Denying, In Part, Defendants' Motions to Dismiss (ECF Nos. 165 and 327). Pursuant to the Court's Orders on the Motions to Dismiss, the Court dismissed the following: (1) Plaintiffs' TUFTA claims against King and Candy Island; and (2) Plaintiffs' claims for breach of fiduciary duty against all Defendants.

The parties proceeded to trial on the following remaining claims: (1) common law fraud and fraud in the inducement; (2) fraud in a real estate transaction; (3) negligent misrepresentation; (4) Deceptive Trade Practices Act ("DTPA") claims; (5) violations of the Texas Securities Act; (6) conversion; (7) Texas Uniform Fraudulent Transfer Act ("TUFTA") claims against all Defendants but King and Candy Island; (8) unjust enrichment/disgorgement; (9) money had and received; and (10) civil conspiracy. The Court conducted a six-day trial before taking the matters under advisement. Not all of Plaintiffs testified, apparently relying on the evidence adduced at trial to support their claims for relief. After presentation of their evidence, Plaintiffs rested and Defendants asked for a directed verdict, asserting that the Plaintiffs had not met their burden of proof. The Court denied Defendants' oral request for a directed verdict. Thereafter, Defendants rested without offering any controverting evidence or argument. Trial was concluded on April 18, 2017, and the Court allowed the parties to submit post-trial briefs.

## JURISDICTION, AUTHORITY AND VENUE

As a preliminary matter, it is necessary for this Court to examine its subject-matter jurisdiction and constitutional authority to enter a final order on Plaintiffs' claims. Federal courts have an ongoing duty to examine their subject matter jurisdiction, whether the issue is raised by

the parties or *sua sponte* by the court. ***MCG, Inc. v. Great W. Energy Corp.,*** 896 F.2d 170, 173 (5th Cir. 1990).

In ***Stern v. Marshall***, the United States Supreme Court held that a bankruptcy court must have *both* statutory and constitutional authority to enter final judgment on certain state law claims. ***Stern v. Marshall***, 564 U.S. 462, 487 (2011) (finding that the bankruptcy court lacked the "judicial Power of the United States" under Article III of the United States Constitution to enter final judgment on a state law counterclaim). The United States Supreme Court again weighed in on the issue of constitutional authority of the bankruptcy court in ***Executive Benefits Insurance Agency v. Arkinson***, 134 S. Ct. 2165 (2014). In an unanimous opinion, the Supreme Court reaffirmed its holding in ***Stern*** and further explained that ***Stern*** claims—which are those claims where the bankruptcy court maintains statutory authority to enter final judgment but lacks the constitutional authority to do so—may be heard by the bankruptcy judge, who must in turn submit proposed findings of fact and conclusions of law to the district court for *de novo* review and entry of judgment. ***Id***. at 2173; *see* 28 U.S.C. § 157(c)(1) (2015).

Thereafter, the United States Supreme Court determined that parties could consent to bankruptcy court adjudication of ***Stern*** claims without raising constitutional concerns. ***Wellness Int'l Network, LTD, et al. v. Sharif***, 135 S. Ct. 1932 (2015). The Supreme Court held that litigants may submit to bankruptcy court adjudication through express or implied consent. ***Id***.

Here, Plaintiffs and Defendants all consent to entry of final order and judgment by the Bankruptcy Court. *See* Joint Pre-Trial Order (ECF No. 290). As such, this Court maintains subject matter jurisdiction and constitutional authority to enter the final order and judgment in this case.

### RELIEF REQUESTED

Plaintiffs seek recovery for both past and future damages in the form of a judgment against Defendants. Specifically, Plaintiffs seek the following:

(a)    Out of pocket damages;

(b)    Actual damages;

(c)    Benefit of the bargain damages;

(d)    Damages for mental anguish pursuant to § 17.50(a)(3) of the Texas Business and Commerce Code;

(e)    Treble damages pursuant to § 17.50(b)(1) of the Texas Business and Commerce Code;

(f)    Exemplary damages;

(g)    Attorneys' fees, expert witness fees, costs for copies of depositions and costs of court pursuant to § 27.01 of the Texas Business and Commerce Code;

(h)    Pre- and post-judgment interest;

(i)    Restitution;

(j)    Disgorgement;

(k)    Equitable relief;

(l)    Appropriate injunctive relief;

(m)    Constructive trust;

(n)    Receivership; and

(o)    Such other and further relief to which Plaintiffs may be entitled at law or in equity.

Defendants seek entry of a take-nothing judgment in Defendants' favor on all of Plaintiffs' claims for money damages and attorneys' fees. Defendants further seek an award of all costs incurred by Defendants and sanctions for alleged violations of Federal Rule of Civil Procedure 11 (incorporated by Federal Rule of Bankruptcy Procedure 7011).

## PARTIES' CONTENTIONS

### I.  **Plaintiffs' Contentions**

Plaintiffs contend that Alfaro served as the Chief Executive Officer ("CEO") and sole Managing Member and alter ego of Defendants (1) Primera, (2) Alfaro O&G, (3) Alfaro Energy, (4) King, (5) Candy Island, (6) 430 Assets, and (7) Silver Star, all of which operated out of a single office in San Antonio, Texas. Plaintiffs also assert that (1) King, (2) Silver Star, (3) Candy Island, (4) 430 Assets, (5) Kristi Alfaro and (6) Living Trust received funds from the fraudulent activities of Alfaro, individually and as the head of Defendants Primera, Alfaro O&G and Alfaro Energy.

Plaintiffs assert that from 2010 to 2012, Alfaro O&G sold all but one unit in the Montague 1H and 2H wells. Thereafter, in April 2012, the Financial Industry Regulatory Authority ("FINRA") disbarred Alfaro O&G and Alfaro, and ordered restitution be made to the investors of ten previous ventures marketed and sold by Pinnacle Partners and Alfaro O&G. Plaintiffs further contend that, in April 2013, Alfaro Energy dissolved, with Alfaro O&G changing its name to "Alfaro Energy, LLC" the next day. Plaintiffs argue that this name change was not made for marketing purposes, but rather to skirt around FINRA's Order against Alfaro O&G. Plaintiffs assert that Alfaro O&G n/k/a Alfaro Energy marketed and sold the Montague Legacy ventures and Screaming Eagle ventures, and held title to working interests and overriding royalty interests in these projects. Plaintiffs contend that, due to FINRA's Order, Primera came into existence in 2012.

Plaintiffs also contend that Alfaro operated a boiler room, where registered representatives placed thousands of cold calls each week to solicit investments in Alfaro's captive oil and gas drilling joint ventures. Plaintiffs assert that Alfaro failed to disclose to investors that none of the joint ventures offered through his companies had ever been profitable for anyone other than Alfaro himself and the entities that Alfaro owned and controlled. Plaintiffs argue that Alfaro made false representations to potential investors over the phone and, at times, told investors over the phone that there was no drilling risk. Plaintiffs contend that Alfaro trained his salesmen on how to sell the investments and helped them to close sales. Plaintiffs assert that they are individuals and entities who invested millions of dollars in certain wells with Alfaro, Primera, Alfaro O&G and Alfaro Energy. Plaintiffs argue that these businesses profited purely from selling interests to investors. Plaintiffs further contend that—as the owner, president and sole member of Primera, Alfaro O&G and Alfaro Energy—Alfaro was the only person with the authority to make executive decisions for the entities. Plaintiffs assert that such executive decisions included: (1) setting the salaries for himself and his non-sales employees; (2) setting the compensation for his salesperson employees; (3) electing whether and/or when to pay vendor invoices, (4) electing whether to take owner draws for himself; (5) setting the minimum investment to be raised in order to drill a well and receive a profit from doing so; and (6) electing how investor funds would be allocated. Plaintiffs assert that investors expected their money to go to drilling and completing their intended wells and to paying vendors for their services.

Plaintiffs contend that Alfaro failed to disclose that his oil and gas prospects included substantial additional costs: (1) to cover overhead; (2) to compensate the boiler room employees; and (3) to fund Alfaro's lifestyle. Plaintiffs contend that Alfaro misused customer funds: (1) to meet obligations for previous offerings; (2) to cover his own personal expenses; and (3) to make

13

cash payments to himself personally. Plaintiffs contend that the investors entrusted their funds to Alfaro with the belief that such funds would be used for drilling and production in the wells in which they invested. Plaintiffs contend that Alfaro instead used the funds for personal expenditures and for business purposes unrelated to the wells in which investors invested. Plaintiffs contend that these fraudulent sales, misrepresentations and omissions of material facts caused significant harm to his investors. Further, Plaintiffs assert that, at times, Alfaro solicited additional funds from existing investors for alleged unanticipated costs which were over and above the true costs or that were not actually incurred at all. Plaintiffs further contend that none of the investors who contributed additional funds were informed that their money was actually used to pay Alfaro's outstanding debts to various operators, Alfaro's unrelated business expenses, and Alfaro's personal expenses.

Plaintiffs contend that Alfaro, individually and as the sole member of Primera, Alfaro O&G, and Alfaro Energy, transferred investors' monies to the following entities: (1) 430 Assets for the purchase of a Lamborghini and Range Rover; (2) Silver Star for the purchase of an oil and gas asset in Montague County; (3) Alfaro Energy to pay for expenses related to other offerings; (4) Living Trust to purchase real estate and pay the mortgages, taxes and expenses on such real estate; and (5) King and Candy Island to shield investors from getting their investments back.

Plaintiffs contend that Alfaro's actions are particularly egregious given the fact that he marked up many of those offerings, took millions of dollars for unrelated business and personal purposes from investors' funds, and still failed to pay vendors what he owed. Plaintiffs contend that many of the misrepresentations Alfaro made to Plaintiffs were intentional, and the remainder were at least reckless. Plaintiffs contend that they incurred substantial loss, which losses were virtually assured at the time of their investments.

Plaintiffs contend that the process repeated itself until Alfaro had diluted the investment pool so much for his own personal use and benefit that (1) there was no more money to complete the Screaming Eagle 6H well, (2) millions of dollars of unpaid vendor costs on previous wells turned into lawsuits and multiple mineral liens, and (3) investors' production checks ceased as a result of the wells either being shut in due to nonpayment to vendors and/or funds being used to partially satisfy the outstanding obligations on previous wells. Plaintiffs contend that the sales of the joint venture interests were fraudulent. Plaintiffs further contend that Plaintiffs received little or no return for their investments.

Plaintiffs contend that the interests purchased by Plaintiffs in the Montague Legacy and Screaming Eagle 1H wells were marketed and sold as joint ventures. Thereafter, the wells were sold as purported working interests in all other following wells. Plaintiffs argue that this change, however, was a complete sham because no investor ever received a working interest for their investment, ultimately allowing the wells to be sold free and clear upon the appointment of the Trustee for Primera in the Bankruptcy Court.

Plaintiffs contend that Plaintiffs' investments are already a complete loss. Once a receiver was appointed in the state court but before the receiver could post bond, Alfaro placed Primera into bankruptcy, ensuring that investors would be last in line to recoup funds from the sale of the wells in which Plaintiffs invested due to Alfaro's fraudulent actions.

II.     **Defendants' Contentions**

Defendants argue that Plaintiffs sued Defendants for at least ten causes of action relating to Plaintiffs' investments in various oil and gas ventures promoted by only two of the entity Defendants—namely Alfaro O&G and Primera—and allegedly, by Alfaro personally. Defendants assert that, prior to 2013, two entities existed—Alfaro Energy and Alfaro O&G. Defendants assert that, from 2010 to 2011, Alfaro O&G sold all but one unit in the Montague 1H and 2H wells. Thereafter, in April 2013, Alfaro Energy—which Defendants argue was not involved in any way in Plaintiffs' working interests—dissolved, and Alfaro O&G changed its name to "Alfaro Energy, LLC" for marketing purposes. Defendants assert that Alfaro O&G was in existence prior to 2010. Defendants further contend that Primera came into existence in 2012, sold the one remaining unit in the Montague 2H well, and became the sole marketer of the relevant oil and gas working interests from that date forward.

Defendants contend that the other entity Defendants in the lawsuit—King; Silver Star; 430 Assets; Candy Island; and Living Trust—were brought into this adversary proceeding by Plaintiffs solely because Alfaro is a member or participant in those businesses and not because of anything those Defendants actually did or failed to do relating to the subject oil and gas ventures. Defendants contend that Kristi Alfaro was sued in her personal capacity and in her capacity as trustee of the Living Trust solely because she is the wife of Alfaro. Defendants assert that Plaintiffs concede that Kristi Alfaro never spoke to any of the Plaintiffs, nor any investor; yet, she remains a defendant in this case. Defendants contend that the interests purchased by Plaintiffs, from any of the Defendants, were working interest percentage ownership interests and, at no time, was a joint venture or partnership ever formed between any of the Defendants and any of the Plaintiffs.

Defendants also contend that all claims by every Plaintiff against all Defendants are without merit, factually or legally, and urges the court to enter a take-nothing judgment in favor of all Defendants. Specifically, Defendants contend that none of the Defendants engaged in securities fraud because, *inter alia*, the investments in which Plaintiffs invested are not "securities" as that term is defined in Texas law. Further, Defendants assert that none of the Defendants made any false statements of material fact to, or withheld any information from, any of the Plaintiffs at any time. Defendants argue that Plaintiffs did not reasonably rely on anything which any Defendant said to them before investing in the ventures other than the express statements of fact contained in the investment documents, all of which Defendants contend were both accurate and complete. Defendants contend that Plaintiffs have not proximately suffered any harm of damages from anything Defendants did or said, or failed to say and for which Defendants had an affirmative duty to speak. Defendants assert that the investments made by Plaintiffs did not involve the sale or lease of qualifying "goods or services" and thus, the Texas DTPA does not apply to the transactions. Lastly, Defendants assert that they earned the fees they were paid and in which Plaintiffs claim some type of interest or right to reimbursement.

Defendants contend that, at best, Primera may have breached contracts with Plaintiffs— but Plaintiffs have not asserted such cause of action. Further, Defendants assert that they did not have a fiduciary relationship with any of the Plaintiffs at any time; they did not commit negligent acts against any of the Plaintiffs; and they did not fraudulently induce Plaintiffs into entering into any contracts. Defendants further assert that there have been no fraudulent transfers involving any of the Defendants at any time; Defendants have not been unjust enriched by Plaintiffs; Defendants have received no monies from Plaintiffs that they were not legally entitled to receive; and Defendants have converted no property belonging to Plaintiffs.

**EVIDENCE PRESENTED**

I.  **Preliminary Injunction Hearing and Exhibits**

Under Federal Rule of Civil Procedure 65 and incorporated by Federal Rule of Bankruptcy Procedure 7065, the Court must consider the evidence received during the hearing on a Motion for Preliminary Injunction. The rule states, "Even when consolidation is not ordered, evidence that is received on the motion [for preliminary injunction] and that would be admissible at trial becomes part of the trial record and need not be repeated at trial." Thus, this Court will consider all testimony and exhibits received on the Motion for Preliminary Injunction.

The Court conducted a five day hearing on the Application (Adv. ECF No. 22) before taking that matter under advisement. The hearing on the Application was concluded on September 15, 2015. The Court admitted Plaintiffs' Exhibits ("Prelim. Pl. ") 1, 13, 19, 23, 39, 40 (sealed) and 42-45. The Court also admitted Defendant's Exhibits ("Prelim. Def.") Aa-Ap, Aq, D, H, K (page 13 only), N and O. The Court denied the Application. (Adv. ECF No. 94).

The Court shall address the evidence received from witnesses at the hearing on the Application along with its analysis of all trial witnesses.

II.  **Trial and Exhibits**

The Court conducted a six day bench trial before taking the matters under advisement. Trial was concluded on April 18, 2017, and the court allowed the parties to submit post-trial briefing. The Court admitted Plaintiffs' Exhibits ("Trial Pl.") (Bates Nos. 3318-3324), 5, 7, 10, 11, 14, 27 (Bates No. 4284), 29 (Bates Nos. 4290-4291), 36, 37-1 (Bates Nos. 4451, 4117), 38, 40, 41 (Bates No. 9562) [sealed], 48 (Bates Nos. 5328-5334), 49, 50 (Bates Nos. 5353-5486), 51-52, 61 [sealed], 64, 67, 70 [sealed], 71-72, 74 (Bates Nos. 5128-5292), 75 (Bates Nos. 8750-8818), 76 (Bates Nos. 8862-8935), 77 (Bates Nos. 9004-9071), 89, 91, 94-95, 102 [Audio recordings], 113 (Bates Nos.

1698-1729, 1731-1737, 1739-1745, 1748-1750, 1845, 1897, 1903, 1905-1909, 1923, 1936, 1960, 2112-2114), 125 (Bates Nos. 6709, 6711-6712), 129 (Bates Nos. 2343, 2368, 2384-2385, 2427-2428, 2713-2714, 2724-2726, 2791, 2841, 6646-6647), and 131-136. The Court also admitted Defendants' Exhibits ("Trial Def.") 1-65 and 67-137.

### III. Witnesses and Credibility

#### A. Plaintiffs

##### 1. James Peters

James Peters ("Peters") is a personal investor in Primera. Peters invested approximately $122,000 in the Screaming Eagle 3H well and $105,000 for the Screaming Eagle 4H well. Peters testified regarding his investments, his conversations and interactions with Alfaro, and the documents he read while investing in both wells. The Court finds Peters was a credible witness.

##### 2. Richard David Collins

Richard David Collins ("Collins") is a business investor in Primera through DC Oil Company, Inc. ("DC Oil"), in which he and his wife are the sole owners. DC Oil invested $430,820 in the Screaming Eagle 4H and 6H wells. Collins testified regarding the DC Oil investments, his conversations and interactions with Alfaro, his conversations and interactions with Primera employees, and the documents he read during the investment process. The Court finds Collins was a credible witness.

##### 3. James "Buford" Salmon

James "Buford" Salmon ("Salmon") is an eighty-one-year-old personal investor in Primera. Salmon invested $6.3 million in sixteen wells over the span of eight-to-nine years, including: Montague Legacy 1H and 2H; Screaming Eagle 1H, 2H, 3H, 4H and 6H; and the Black Hawk Buda. Salmon testified regarding his investments, his conversations and interactions with

Alfaro, and the documents he read during investing. The Court finds Salmon credible but limited in knowledge.

### 4.      William L. Crawford

William L. Crawford ("Crawford") is an eighty-five-year-old personal investor in Primera. Crawford invested $989,854 in the following five wells: Legacy 1 and 2; Screaming Eagle 1H, 2H and 3H. Crawford testified regarding his investments, his conversations and interactions with Alfaro, and the documents he read during investing. The Court finds Crawford credible but his testimony was limited.

### 5.      Daniel Davalos

Daniel Davalos ("Daniel") is a retired personal investor in Primera. Daniel invested approximately $30,000 in the Screaming Eagle 6H well. Daniel testified regarding his investment and the documents he read during the investment process. The Court finds Daniel's testimony to be inconsistent at times and limited.

### 6.      David Davalos

David Davalos ("David") is a personal investor in Primera. He is also the son of another Plaintiff, Daniel Davalos. David testified that he invested approximately $25,000 with Primera in the Screaming Eagle 4H well. David testified regarding his investment, his conversations and interactions with Alfaro, and the documents he read during investing. The Court finds David was a credible witness.

### 7.      James Reiley

James Reiley ("James") is a seventy-three-year-old personal investor in Primera. He is also the father and husband of two other Plaintiffs, Rick Reiley and Betty Reiley, respectively. James has invested approximately $100,000 total in Screaming Eagle 2H and 3H wells androughly

$11,000 for a pipe repair. He testified regarding his investment, his conversations and interactions with Alfaro and Primera representatives, and the documents he read during investing. The Court finds James was a credible witness.

8.      Rick Reiley

Rick Reiley ("Rick) is a fifty-four-year-old personal investor in Primera. He is also the son of two other Plaintiffs, James Reiley and Betty Reiley. Rick invested approximately $150,000 total in the Screaming Eagle 2H and 3H wells. Rick testified regarding his investment, his conversations and interactions with Alfaro and Primera representatives, and the documents he read during investing. The Court finds Rick was a credible witness.

9.      Betty Reiley

Betty Reiley ("Betty") is a seventy-four year old personal investor in Primera, along with her husband James. She is also the mother of another Plaintiff, Rick Reiley. Betty testified that she and her husband James invested approximately $111,000 in the Screaming Eagle 2H and 3H wells. Betty testified regarding her investments, her conversations and interactions with Alfaro and Primera representatives, and the documents she read during investing. The Court finds Betty was a credible witness.

10.     Dieter Jansen

Dieter Jansen ("Jansen") is a seventy-three-year-old personal investor in Primera.. Jansen invested $50,000 in the Screaming Eagle 3H well. Jansen testified regarding his investment, his conversations and interactions with Alfaro and other Primera employees, and the documents he reviewed while investing with Primera. The Court finds Jansen was a credible witness.

11.     Vincent J. Gillette

Vincent J. Gillette ("Vincent") is a personal investor with Primera. Vincent invested roughly $300,000 in the Screaming Eagle 2H, 3H, and 4H wells. He testified regarding his investment, interactions and meetings he had with Alfaro and other Primera employees, and the documents he reviewed before and after investing with Primera. The Court finds that Vincent was a credible witness.

### 12.    Brian Huber

Brian Huber ("Huber") is a sixty-five-year-old personal investor with Primera. Huber testified that he invested approximately $150,000 to $160,000 in six wells: the Montague Legacy 1 and 2A and the Screaming Eagle 1H, 2H, 3H, and 4H wells. Huber testified to his investment with Primera, interactions he had with Alfaro and other Primer employees, and the documents that he reviewed throughout the investment process. The Court finds that Huber was a credible witness.

### 13.    Sharon Walls

Sharon Walls ("Walls") is a personal investor in Primera along with her husband. She is also the sister of another Plaintiff, Vincent J. Gillette. She and her husband invested approximately $350,000 in the Screaming Eagle 2H, 3H, 4H and the Buda Black Hawk. Walls was an original plaintiff in the State Court Action. She testified regarding her investment, her interaction with Alfaro and other Primera employees, and the documents reviewed before investing with Primera. The Court finds that Walls was a credible witness.

### 14.    Rick Griffey

Rick Griffey ("Griffey") is a personal investor in Primera. He invested approximately $210,412 in the Screaming Eagle 4H and 6H wells. Griffey testified regarding his investment, his interactions with Alfaro, and the documents he reviewed during the investment process. The Court finds that Griffey was a credible witness.

### 15.    Marjorie A. Gillette

Marjorie A. Gillette ("Marjorie") is a seventy-eight-year-old personal investor in Primera. Marjorie is the mother of another Plaintiff, Vincent J. Gillette. Marjorie testified regarding her investments in the Screaming Eagle 2H, 3H and 4H wells, her interactions with Alfaro, and the documents she reviewed during the investment process. The Court finds Marjorie was a credible witness.

### 16.    Thomas J. Gillette

Thomas J. Gillette ("Thomas") is a personal investor in Primera. He is the brother of Vincent J. Gillette and the son of Marjorie A. Gillette. Thomas testified that he invested $378,000 in the Screaming Eagle 2H, 3H, 4H and the Black Hawk Buda wells. Thomas testified regarding his investment, his interactions with Alfaro and other Primera employees, and the documents he reviewed throughout the investment process. The Court finds Thomas was a credible witness.

### 17.    Edward A. Gillette

Edward A. Gillette ("Edward") is a personal investor in Primera. He is the brother of Vincent J. Gillette and Thomas J. Gillette and the son of Marjorie A. Gillette. Edward testified that he invested over $300,000 in the Screaming Eagle 2H, 3H, and 4H wells. Edward testified regarding his investment, his interactions with Alfaro and other Primera employees, and the documents he reviewed before investing in Primera. The Court finds Edward was a credible witness.

### B.    Non-Plaintiff Investors

### 1.    Louis Hinojosa

Louis Hinajosa ("Hinojosa") was called to testify at the Preliminary Injunction Hearing on March 28, 2015. He was not called to testify at trial. Hinojosa is a personal investor in the

Screaming Eagle 3H well. Hinojosa is not a Plaintiff in the current case. He testified about his investment with Primera, his interactions with Primera employees and Alfaro, and the documents he reviewed during the investment process. The Court finds Hinojosa was a credible witness.

### 2. Alma Guerra-Gillette

Alma Guerra-Gillette ("Alma") along with her husband Edward A. Gillette, are personal investors in Primera. She and her husband invested approximately $400,000 in the Screaming Eagle 2, 3, and 4H wells. Alma testified about her investment, her interactions with Alfaro, and the documents she and her husband reviewed throughout the investment process. The Court finds Alma's testimony credible but ultimately hindered by her inability to remember specific facts, namely, the chronology of events subsequent to her first investment with Alfaro; whether or not the agreements she signed are represented in Defendants' Trial Exhibit AQ; and who was or was not present at her meetings with Alfaro.

### 3. Orlando Guerra

Orlando Guerra ("Guerra") is a personal investor with Primera. He invested approximately $90,000 in the Screaming Eagle 2H and 3H wells. Guerra testified regarding his investment, his interactions with Alfaro, and the documents he reviewed while investing with Primera. The Court finds Guerra was a credible witness.

### C. Defendants

### 4. Brian Alfaro

Brian Alfaro ("Brian" or "Alfaro") is the owner of Primera and the former owner of Alfaro Energy. He testified at both the Preliminary Injunction Hearing and at trial. Brian testified regarding his actions and decisions relating to his business entities, his relationship and interactions with investors, his relationship and interactions with Primera employees, and his financial history.

The Court finds Brian Alfaro's testimony to be inconsistent and evasive at times. Further, Brian Alfaro's answers were at times non-responsive to the questions asked. On multiple occasions, the Court had to direct Brian Alfaro to answer questions and to avoid rephrasing the question or arguing with counsel. The Court finds that it should give limited credibility to the testimony of Brian Alfaro.

### 5. Kristi Alfaro

Kristi Alfaro is Brian's wife. She testified the Preliminary Injunction Hearing on March 28, 2015. She was not called to testify at trial. She testified that she dealt primarily with the day-to-day finances of the household, which included paying loans or notes that the couple had on various assets that they owned. The Court finds Kristi Alfaro was a credible witness.

### D. Employees

### 1. Michael Covington

Michael Covington ("Covington") was a Certified Public Accountant ("CPA") employed by Primera from March 2010 until January 15, 2015. He was called to testify at the Preliminary Injunction Hearing on March 28, 2015 and was not called to testify at trial. He testified that in 2013, he invested $99,888 for one unit in the Screaming Eagle 2H well, and $66,166 for 2/3 of a unitin the Screaming Eagle 3H well. Covington testified regarding his duties at Primera, his interactions with Alfaro and other Primera employees, the documentation he reviewed for Primera, his personal investments with Primera, and the circumstances surrounding his leaving Primera. During the course of Covington's testimony, it was revealed that he was corresponding with Plaintiffs' counsel about matters ongoing at Primera Energy. It should also be noted that Covington is a Platintiff in this adversary.

2.      Cody Reyes

Cody Reyes ("Reyes") was a sales associate at Primera between March 2014 and mid-May 2014. Reyes testified about his pre-hire interview with Primera, his job duties with Primera, and the circumstances surrounding his termination. Although Reyes only worked at Primera for a month, the court finds Reyes's testimony credible.

3.      Megan Blair

Megan Blair ("Blair") was the accounting assistant at Primera. She testified about her duties at Primera, her interactions with Alfaro and other Primera employees and her knowledge as to Primera's accounting practices. The Court finds Blair's testimony to be inconsistent at times and limited. Moreover, the Court finds that Blair was evasive in her answers, particularly regarding Alfaro's compensation at Primera.

4.      Sonia Jimenez

Sonya Jimenez ("Jimenez") is the executive assistant to Alfaro. She testified that she worked at Primera and currently works at Silver Star. She testified about her duties as Alfaro's assistant, her recordkeeping process, and her interactions with Alfaro. Although Jimenez's testimony was at times vague and indecisive, the Court finds that Jimenez was a credible witness.

5.      Timothy Hundley

Timothy Hundley ("Hundley") is an employee that has worked at various entities owned and operated by Alfaro. Hundley testified that between 2007 and 2015, he worked for Primera, Alfaro O&G, Alfaro Energy, and Pinnacle Partners. He is not currently employed by Silver Star. Hundley testified about his duties at Primera, his interactions with Alfaro and other Primera employees, and documents he reviewed while working for Primera. The Court finds Hundley's testimony to be inconsistent at times and limited.

6.      Edgar Perez-Mendez

Edgar Perez-Mendez ("Perez-Mendez") was a full time CPA at Primera for approximately two months beginning on May 3, 2015. He replaced Michael Covington as the CPA for Primera. Perez-Mendez testified regarding his job duties, his interactions with Alfaro and other Primera employees, and documents he reviewed and prepared for Primera. The Court finds Perez's testimony credible.

7.      Justin Rodriguez

Justin Rodriguez ("Rodriguez") is a former employee of Primera, and a current employee of Silver Star. Rodriguez testified regarding his job duties at Primera, his interactions with Primera investors, and his compensation as an employee of Primera. The Court find's Rodriguez's testimony not credible.

E.      Vendors

1.      Alphonse Seger

Alphonse Seger ("Seger") leased his land in Gonzales County for the construction of the Screaming Eagle 4H well. Seger testified as to money he is owed for maintaining the well and checking its progress. Seger also claims to be owed money per his lease agreement and reimbursement for covering the costs of logistical expenses related to the well. He further testified regarding his lease with Primera, his interactions with Primera, and the invoices he prepared for delivery to Primera regarding money he believed he was owed. The Court finds Seger's testimony credible.

2.      Cliff Davis

Cliff Davis ("Davis") is a petroleum engineer with R.W. Dirks Engineering, Inc. Davis worked for Primera as a consulting engineer on several projects, including the wells in question in

this case. Davis testified about the casing and collar failures on the Screaming Eagle 3H well, the circumstances behind running electricity to the Screaming Eagle 4H well, his interactions with Alfaro, and unpaid and past-due invoices owed to vendors. The court finds Davis's testimony credible.

F.      Experts

1.      Michael Perkins

1.      Michael Perkins ("Perkins") is a CPA who was appointed as auditor in this case during the State Court Action by State District Judge Larry Noll. Perkins testified as to a report in he made detailing the financial records of two Screaming Eagle wells that indicate Alfaro was transferring investor money into his personal bank accounts in the form of owner draws, intercompany transfers, and W-2 compensation. Perkins's examination took place over the course of three visits to Alfaro's office. The scope of his review included a two-year period ending on December 31, 2014. The Court finds Perkins's testimony credible; however, Perkin's report in Exhibit C of Plaintiffs' Trial Exhibit 1 is limited as there is not enough information regarding what authorizations Primera had in place regarding the transferring of investor contributions between accounts and the handling of other sources of income.

2.      Michael Turner

Michael Turner ("Turner") is a forensic accountant that Alfaro referred to defense counsel. Turner testified that Alfaro's attorneys hired him to conduct forensic accounting into Alfaro O&G, Alfaro Energy, and Primera. Turner testified regarding his forensic accounting into Alfaro O&G, Alfaro Energy, and Primera. The Court finds Turner's testimony credible.

IV.    **Factual Findings**

    A.    Corporation and Trust Formation

The parties stipulated to the following dates contained in this paragraph related to formation and termination of the various corporations and trusts involved in this litigation. Alfaro Energy was formed on December 5, 2001. Thereafter, the Living Trust was created on July 28, 2004, and Primera was formed on May 25, 2005. Silver Star followed with formation on September 14, 2006, and King was formed on January 22, 2008. Alfaro O&G was formed on March 5, 2008. 430 Assets was formed on February 5, 2009, and Candy Island was the last to be formed on September 5, 2012. Thereafter, on April 29, 2013, Alfaro Energy terminated its existence, and the next day, on April 30, 2013, Alfaro O&G changed its name to "Alfaro Energy, LLC.".

The parties agree that Alfaro is the sole member of Primera, Alfaro O&G, Alfaro Energy, Silver Star, King, 430 Assets and Candy Island. Further, the parties agree that Alfaro does not own a not-for-profit entity.

    B.    Well Drilling and Distributions

        1.    Montague Legacy

The parties stipulate that the Montague Legacy 1H well was drilled in November 2010, with its first distributions to investors occurring in April 2011. The parties also stipulate that the Montague Legacy 2H well was drilled in June 2011, with its first distributions to investors occurring in April 2013. Further, the parties stipulate that, on March 2, 2016, the Chapter 11 Trustee in the underlying bankruptcy case sold the Montague Legacy 1H and 2H wells for $497,500, and no Plaintiff objected to the sale of those wells.

2.      Screaming Eagle

The parties stipulate to the following with respect to the Screaming Eagle wells: (1) the Screaming Eagle 1H well was drilled in September 2012, with its first distribution to investors occurring in April 2013; (2) the Screaming Eagle 2H well was drilled in May 2013, with its first distribution to investors occurring in August 2013; (3) the Screaming Eagle 3H well was drilled in November 2013, with its first distribution to investors occurring in May 2014; (4) the Screaming Eagle 4H well was drilled in January 2014; and (5) the Screaming Eagle 6H well was drilled in March 2015, but was never completed.

The parties also stipulate that, as of September 2015, the Screaming Eagle 3H and 4H wells were producing and selling their respective production to Trafigura Trading, LLC.

3.      Blackhawk Buda

The parties stipulate that the Blackhawk Buda well was not drilled.

C.      State Court Activities

The parties stipulate to the following regarding state court actions by and against the Defendants:

1.      Tejas Tubular Suit

In June 2014, Primera filed a lawsuit against Tejas Tubular Products, Inc. ("Tejas Tubular") for the collar and casing failure that arose at the Screaming Eagle 3H well. The lawsuit was originally filed in McMullen County, Texas but was subsequently re-filed on October 14, 2015, in Harris County District Court under Cause No. 2015-65104-7 and seeking recovery of not less than $2.3 million from the defendant, Tejas Tubular. As of the writing of this Memorandum Opinion, the Tejas Tubular lawsuit was scheduled for trial on October 16, 2017.

2.      Acute Safety Suit

In June 2014, Acute Safety, LLC ("Acute Safety") filed suit against Primera for theft of services and breach of contract.

3.      Key Energy Suit

In October 2014, Key Energy Services LLC ("Key Energy") filed suit against Primera for breach of contract and foreclosure of lien claims.

4.      Unit Texas Drilling Suit

In November 2014, Unit Texas Drilling filed suit against Primera for breach of promissory note, suit on sworn account and foreclosure on an oil and gas mechanic's lien.

5.      Energy Fishing Suit

In November 2014, Energy Fishing & Rental Services, Inc. ("Energy Fishing") filed suit against Primera for breach of a settlement agreement.

6.      Platinum Energy Suit

In January 2015, Platinum Energy Solutions ("Platinum Energy") filed suit against Primera for breach of contract and foreclosure of lien claims.

7.      Qwik Pipe Suit

In January 2015, Qwik Pipe, LLC filed suit against Primera for claims including fraud and breach of contract.

8.      American Oilfield and Tejas Transport Suit

On April 9, 2015, C.C. American Oilfield, LLC ("American Oilfield") and Tejas Transport Company ("Tejas Transport") filed suit against Primera for breach of contract and suit on a sworn account.

9.      Brennan Short Suit

On April 13, 2015, Primera filed a lawsuit in the 216th District Court for Kendall County, Texas, Cause No. 15-148, against Brennan Short, the engineer responsible for drilling and supervising the drilling of the Screaming Eagle 6H well. The lawsuit seeks recovery of damages in the amount of $750,000 plus damages under the DTPA and punitive damages. As of the writing of this Opinion, this case is currently pending in Kendall Country District Court.

D.      Plaintiffs

1.      Questions Asked to Plaintiffs

All testifying Plaintiffs were asked about some variation of the same questions regarding their investment with Primera. A summation of the questions that were asked each testifying Plaintiff is as follows:

1. How do you know Alfaro?

2. How did he contact you?

3. If Alfaro contacted you by phone, what did he tell you during the initial call?

4. Have you ever met Alfaro in person?

5. What happened after you were talked to Alfaro?

6. Did you rely on Alfaro's statements and/or representations about his experience in the oil and gas business, his statements about the success of the well, and his statements about how investor money would be used?

7. Do you agree that the PPM states that all oral representations should be disregarded?

8. Did you understand that investing in oil and gas was a high risk investment?

9. Did you review the marketing material, including the PPM, which was given to you?

10. Were you rushed into making a decision about investing?

11. What wells did you invest in?

12. How much have you invested in the wells?

13. What was a price for a unit in each of the wells for which you have invested?

14. What other expenses did you incur other than paying for the initial investment?

15. What was your understanding of how Primera was using your investment money?

16. What was your understanding from the PPM of whether or not Alfaro and his salesman would take commissions[2] off of investors' investments?

17. If you had known your investment money was going to pay for Alfaro's personal expenses would you have invested?

18. If you had known that Alfaro and his salesman were taking commissions, would it have affected your decision to invest?

19. What was your understanding of Alfaro's background and experience drilling oil and gas?

20. Do you consider yourself to be a sophisticated investor?

### 2. The Governing Writing

It is undisputed that there was a writing governing the agreement between the Plaintiff-investors and Primera, the private placement memorandum (hereinafter referred to as the "PPM") and corresponding subscription agreement. It is further undisputed that the subscription agreement incorporates the PPM. As such, the PPM and the subscription agreement will be referred to collectively as the "Contract."

### 3. James Peters

---

[2] The Contract refers to "transaction-based" compensation, while testifying witnesses sometimes use the phrase"commission-based" compensation or used the two terms interchangibly. As such, the Court will use the term commission-based compensation to describe a situation where an employee receives payment based on the amount of sales the employee makes.

Peters was solicited as a personal investor in Primera by phone by Alfaro but did not know how Alfaro obtained his telephone number. Peters has never met Alfaro in person. Peters' net value of assets does not exceed $25 million. Additionally, prior to investing with Primera, Peters had never made any oil and gas investments.

Peters testified that, in the initial phone call, Alfaro claimed he was entering into an agreement to drill in Eagle Ford Shale, describing it as a "really hot spot." Peters also testified that Alfaro further stated that Peters' investment of $100,000 would be contributed to drilling expenses. After the initial phone conversation with Alfaro, Peters received a promotional document via surface mail for the Screaming Eagle 3H well which Peters identified at Plaintiffs' Trial Exhibit 75. Plaintiffs' Trial Exhibit 75 is the Contract for the Screaming Eagle 3H well.[3] Peters testified that there were then follow up calls with Alfaro where Alfaro explained "what was going on, . . . how he was going to do it, and what was going to happen." Peters reviewed the documents and stated that he understood that investment funds would go for drilling and testing costs, completion, and equipment costs. Further, Peters understood that no commission would be paid out of his investment monies. Peters testified that Alfaro explained to Peters that the Screaming Eagle 3H well was located in "a sweet spot," and this statement "pretty much convinced [Peters] to do it."

Peters testified that he invested $122,000 in the Screaming Eagle 3H well and divided that investment into $99,000 for one unit plus an additional $23,000 "supposedly for a blowout, or that they needed more funds." Peters admits that he read and signed the subscription agreement for the Screaming Eagle 3H well that was sent with his investment to Primera. Peters also acknowledges

---

[3] The Court received evidence from many witnesses and considered a number of documents, but the operative document that the Court must analyze is the Contract and whether or not the Contract provides a basis for Plaintiffs' claim for relief. There was a Contract for each well and solicitation. Although there was a Contract for each well prospectus with relevant geological and engineering data, the operative language governing limitations on oral representations by sales staff and investor's acknowledgement of being accredited are the same.

that the subscription agreement which he signed warrants that no representations or warranties had been made to him by Primera or its agents as to any profits, losses or cash flow, which may be received or sustained as a result of his investment, other than those contained in the Contract. Further, Peters admits that his signature on the subscription agreement "bonded and promised" to Primera that Peters' decision to invest was based solely on the information found within the Contract and not on oral statements made by the company or its agents.

Peters also testified that, after investing in the Screaming Eagle 3H well, he received a letter from Alfaro promising a large check for the Screaming Eagle 3H well and offering Peters seven days to invest in the Screaming Eagle 4H well. Peters testified that he received a similar document as he had received for the Screaming Eagle 3H well and identified that document as Plaintiffs' Trial Exhibit 76. Plaintiffs' Trial Exhibit 76 is the Contract for the Screaming Eagle 4H well. Peters stated that, while he relied on this new Contract to some extent, he also relied on the belief that Alfaro was telling the truth to invest in the second well. Peters testified that he also invested approximately $105,000 in the Screaming Eagle 4H well and divided that investment into $99,000 for one unit and "one call of around $5,588 or something like that was an initial expense on the 4H." Peters could not recall what the additional expense on the Screaming Eagle 4H well was for.

Peters stated that he did not have much knowledge or background regarding Alfaro, acknowledging that he took Alfaro at his word and trusted the information he received regarding Primera's previous drilling programs in the Contract for the Screaming Eagle 3H well. Peters testified that the information he received from Alfaro was an important factor in his decision to invest. Peters testified that, had he known a commission would be taken out of his investment, it would have "naturally" affected his decision to invest. Peters stated that, had he known his

investments would be used to pay Alfaro's personal affairs or commissions—as opposed to direct costs such as paying vendors—he would "absolutely not" have invested in either the Screaming Eagle 3H or 4H wells. Peters testified that he relied on the Authority for Expenditure ("AFE") contained in the Contracts and the estimates for expenditures therein for making his decision to invest in the Screaming Eagle 3H and 4H wells.

Ultimately, Peters maintains that he relied on both the written and oral representations made by Alfaro as to the potential and likelihood of success for each well. Peters, however, also admits that the Screaming Eagle 3H and 4H wells were producing wells and conceded that Alfaro "fulfilled his promise to drill and complete the 3H and 4H." Peters asked the Court to make the investors whole again because they were "mislead from the very beginning."

4.      Richard David Collins

Collins was solicited as a business investor on behalf of DC Oil via cold call from a Primera representative, Mike Fanuzzi ("Fanuzzi"). After three to four conversations with Fanuzzi, Collins received documents related to the Screaming Eagle 4H well. After receiving and reviewing the documents, Collins stated that he made "a couple" phone calls to Alfaro regarding "the PPM and the AFE[4] and such." Collins testified that his calls with Alfaro included discussions of the projected estimated barrels and the management fee.

Collins testified that DC Oil invested $210,000 for two units in the Screaming Eagle 4H well and $220,000 for two units in the Screaming Eagle 6H well. The price for each unit in the Screaming Eagle 4H well was $100,000. The price for each unit in the Screaming Eagle 6H well was $108,000. Collins recalled that the excess funds paid beyond the base unit cost were additional

---

[4] "AFE" denotes Authorization for Expenditure. These were the costs associated with the drilling, operation, and production of the well. Primera could ask for capital contributions from investors if an expense was unanticipated and not in the AFE. Failure to pay an investor's pro-rata share of an expense would result in the working interest owner forfeiting his or her share in the well.

funds needed for the Screaming Eagle 4H well and payment for a pump needed on the Screaming Eagle 6H well.

Collins admits that he received, read, and thoroughly reviewed the Contracts for the Screaming Eagle 4H and 6H wells. Additionally, Collins admits that he asked many questions about the wells and investigated Gonzales County oil and gas production before investing. Further, Collins admits that he was told that these investments were considered high-risk investments.

Collins considers himself to be a sophisticated investor and testified that he is careful and serious when considering investment opportunities. Collins testified that—between the documents he received and the answers to his questions—it appeared that Primera was experienced and had conducted similar business ventures in previous wells. In fact, according to Collins, the references made to Primera's experience in previous ventures led him to believe that Primera was the drilling contractor for those wells. Collins testified that, had he known that Primera was not the drilling contractor, it would have affected his decision to invest in the wells. Collins said Alfaro assured him that his investment funds would be placed in a segregated account and would remain in said account until all drilling, testing, and completion were paid. Collins understood that it was only after these expenses were paid that funds could be transferred to the Primera general operating account.

Further, Collins testified that the completion of the wells was critical to his decision to invest and that, if the monies in the Screaming Eagle 4H and 6H wells were not distributed as stated in the Contract, Collins would not have invested. Collins testified that Alfaro's role as president of the company provided weight to the representations and assurances he made to Collins, and that Alfaro's position with the company is largely the reason Collins felt he could rely on Alfaro's verbal claims in deciding to invest. Further, Collins testified that his numerous phone

conversations with Alfaro instilled confidence in this investment and where his funds would be distributed, thereby, leading him to invest.

Ultimately, Collins admits that he received a working interest in the Screaming Eagle 4H and 6H wells on behalf of DC Oil. Additionally, he admits that DC Oil took a tax dedication as a result of the investment and expenses for the wells.

Collins also stated that he received pictures of the Screaming Eagle 6H well site and rig from Jimenez—a Primera representative—so that he believed all necessary funds had been raised and drilling had begun on the Screaming Eagle 6H well. Collins now understands that the Screaming Eagle 6H well was never completed. Upon inquiring into the status of his completion funds, Collins testified that Alfaro told him there was a problem but did not provide further detail. Collins testified that he later discovered that vendors on the Screaming Eagle 6H well were not being paid and, as a consequence, had pulled out and left the site—a revelation which Collins stated was inconsistent with what he was told in response to his inquiries over the previous months.

Collins states that he wants Alfaro's personal assets to be liquidated to reimburse DC Oil and the other investors for what he characterizes as "[taking] his money for ill-gotten gains."

5.    James "Buford" Salmon

Salmon was initially contacted regarding potential investments by Alfaro via telephone. Since this initial contact, Salmon has invested in sixteen wells with Alfaro totaling $6.3 million. From these sixteen investments, Salmon testified that he has received back approximately $400,000 total. Salmon had been receiving regular checks prior to the commencement of this adversary proceeding but cannot recall which of the checks related to a particular project. He stated that his assistant would record the checks and their origin as they were received but that the checks "never measured up to what [he'd] been promised." Salmon testified that he is "out about $5.9

million as of today," not considering any tax benefits submitted by his accountant. The Court finds this testimony limited, however, because not all of Salmon's investments are the subject of this suit, and Salmon did not provide an itemization of investments in each well.

Salmon received a Contract for each of his sixteen investments. He admits to not reading any of the documents completely; rather, Salmon relied on his knowledge from the prior investments to assume that the documents from Alfaro would contain the same information, terms and conditions. As such, Salmon admits that he just skimmed the documents. Salmon testified that the Contract material he received from Primera, which he referred to as a brochure, gave him the impression that Primera was experienced in oil and gas and drilling wells. Further, although Salmon had an understanding that several projects were underway at any given time, he testified that he thought all expenses were timely paid. Salmon further stated that he would not have invested with Alfaro had he known that contractors were not being paid in a timely manner. Salmon also admitted to signing the subscription agreements which stated that a signature was evidence that the signor had read and agreed to the terms within the document even though he admittedly did not read all the Contracts.

Salmon understood that Alfaro's income came from units which Alfaro retained and that Alfaro's income was derived from those units' earnings. Salmon testified that Alfaro told him that he would drill, frack and complete wells with Salmon's investment monies. Salmon does not know which of the projects in particular were completed. Salmon believed that Alfaro did not take any responsibility for the status of the operation.

Salmon testified that he is asking the Court to return the remaining $5.9 million invested in all wells with Alfaro. Salmon argued that the investments have not been profitable and Alfaro

misrepresented the projections as to what oil flow and income would be, making the investment sound appealing and worthwhile.

### 6.     William L. Crawford

Alfaro initially contacted Crawford regarding investment opportunities by telephone. Crawford is a building contractor and testified that his individual net worth is in excess of $25 million. Crawford testified he invested $95,862 in the Legacy 1 well, $94,888 in the Legacy 2 well, $199,776 in the Screaming Eagle 1H well, $299,664 in the Screaming Eagle 2H well, and $299,664 in the Screaming Eagle 3H well.

Crawford understood that Alfaro had an interest in the wells himself and that Alfaro O&G or Primera were being paid when oil was sold. Crawford also testified that, had he known Alfaro was paying commissions out of his investment, it may not have affected his decision to invest depending on the amount of the commissions being paid. Crawford testified that, when he considered making the investments, he did not expect to make the full amount that Alfaro represented to him. Crawford admits that he was receiving checks but is no longer receiving any money from the various wells.

Crawford testified that he seeking "some return on some of the money" because "it appears that he's [Alfaro is] getting away with a whole lot of money."

### 7.     David Davalos

Stephen Anzeldus ("Anzeldus"), a salesperson at Primera, initially contacted David regarding investment opportunities at Primera. In his phone conversations, Anzeldus represented that the Screaming Eagle 4H well was almost fully funded, that the hole was drilled and capped, and that all that was left to complete the well was the fracking. David testified that Anzeldus said it was a low-risk investment. Anzeldus also represented that the Screaming Eagle 4H well was a

promising investment because the well was located near another high-performing site. David testified that Anzeldus specifically told him that Primera representatives were not paid on commission. David classified himself as a new investor.

David testified that he received documents regarding the Screaming Eagle 4H well and that Anzeldus communicated a sense of urgency to review the information and return the Contract with funds. David recalled having less than a week to make his decision to invest because Anzeldus told him that only three units remained. David admitted that he read the Contract, including the language limiting reliance to only those representations in the documents and not oral representations. David testified that Anzeldus told him the documents were merely a legal formality, and that he signed the documents as a result of Anzeldus's reassurance.

David invested approximately $25,400 with Primera for a one-quarter unit interest in the Screaming Eagle 4H well. David testified that he has received a small return on his investment totaling approximately $300. Additionally, Davis testified that, after sending in his final check for his investment, Primera billed him for what he thinks was a pump or electrical equipment problem associated with the well.

David believed Primera to be experienced based on Anzeldus's representations that Primera had  success in drilling previous wells. David also recalled seeing a list of several wells and production results that indicated prior success by Primera in the oil and gas industry. David testified that he understood, based on his conversations with Stephen, that his monies were being used to fund completion of the Screaming Eagle 4H well. David also testified to seeing a spreadsheet, which outlined how the funds would be used, so David believed his investment would be utilized in the drilling, testing and completion of the well in addition to the management fee stated. David testified that, if he knew that 100% of his funds would not be used for direct expenses

but to pay Alfaro instead, he likely would not have invested in Primera. Further, David stated that he likely would not have invested in Primera had he known 10% of his investment would be deducted for a commission.

David believes he is entitled to return of his investment funds and reimbursement of his legal fees because he "[does not] believe that money was invested appropriately . . . [and] suspect[s] that . . . it was spent in other places."

8.     Daniel Davalos

David Davalos advised his son Daniel regarding the Primera investment opportunities. Daniel had no contact by telephone or in person with Alfaro or any representative of Primera. Daniel testified that he invested about $30,000 for a one-quarter percent interest in the Screaming Eagle 6H well. The $30,000 investment was paid amongst three checks.

Daniel testified that he received documents in the mail, which he signed and returned. Although he did not immediately recall whether Plaintiffs' Trial Exhibit 77 was the Contract he received for the Screaming Eagle 6H well, Daniel testified that he remembered signing and dating a document resembling the Contract. He described the documents as "a big roll of paper" containing details as to how deep and far out the drilling would extend. Daniel understood that 100% of the investment funds were to be attributed to the well's completion. He testified that, had he known that 100% of the proceeds were not going to complete the well, he probably would not have invested. When asked about commissions, however, Daniel admitted that he would probably still have invested if he had known that Alfaro or a salesperson was taking a commission because "since [he] didn't know how this business work[ed], somebody's got to be paid."

Daniel testified that he did not expect an immediate return of his investment and that, even if it took twenty years, he would understand. Daniel stated, however, that "when nothing

happens . . . it's a different story." Daniel stated that if Alfaro does not "stand up to his promise to get the well running," he should be entitled to return of his funds.

9. Rick Reiley

Rick is a retired electrical contractor with some experience in oil and gas operations because of his work as an electrical contractor on oil and gas wells and production. Rick testified that he invested in one other oil and gas venture shortly before Alfaro contacted him. Rick testified that, at the time he signed the subscription agreement, his net worth was somewhere over $1 million taking into account his personal and business holdings. Rick considers himself a careful investor who takes the investment process seriously. As such, he read all of the Primera documents and asked where his investment would be spent. Rick testified that, along with the warnings in the Contract, he knew this to be a high-risk business.

Alfaro first contacted Rick by telephone regarding the Primera investment opportunities. After receiving a phone call and brochure in the mail from Alfaro, Rick began discussions with Rodriguez and Alfaro regarding the costs and details of the investment opportunity. Rick testified that, in these initial discussions, he was told his investment would be used for drilling and bringing the oil wells up to production. Once he received the brochure, Rick testified that he spoke with Alfaro one time and Rodriguez two or three times over about a week and a half before deciding to invest.

Rick testified that several statements were made to him prior to his decision to invest, which he relied upon that he subsequently learned to be false. Rick testified that statements were made regarding what the returns would be, how great the properties were, how it was a "no-brainer," how he should hurry to invest, and that other investors were waiting to invest as well. Further, Rick testified that the brochures, maps, and statistics provided to him were intended to validate the

likely success of the wells. Rick also noted that Alfaro told him, "[T]he wells were doing so well that he had to choke them back."

Rick invested approximately $150,000 total in the Screaming Eagle 2H and 3H wells; $49,885 in the Screaming Eagle 2H well; and $99,800 in the Screaming Eagle 3H well. Rick testified that he believed the Screaming Eagle 2H well to be a good investment based on the information he received regarding returns, location of the wells, and the production of the other wells. Rick stated that his correspondence with Alfaro and Justin Rodriguez led him to believe that they were experienced and were controlling and managing the drilling in-house. After investing, Rick also spoke to his father, James Reiley, about the Primera opportunities.

Rick understood that all his investment proceeds would be attributed to making the Screaming Eagle 2H well a producing well—specifically going to the drilling and completion costs. Moreover, Rick stated that it was important for him to know where his investment monies were going to be applied, and had he known his funds would be used anywhere other than for drilling and completion costs, he would not have invested. Similarly, Rick stated that had he known his funds would be transferred to Alfaro's personal bank account, he would not have invested.

Rick testified that he understood that compensation to Primera employees and officers was paid through the management fee. Rick also pointed out language in the Contract detailing that the company's officers and employees would not receive commission-based compensation based on their sale of units and understood this language to mean that no commissions would be paid outside of the disclosed management fee. Rick testified that, had the 10% transaction based payment been disclosed to him up front, he still may have invested, but alleged that the personal payments to Alfaro far exceeded that 10% commission. Rick stated that his understanding was that profit was built into the management fee and argued that he relied upon that management fee being the only

profit. Rick also testified that he would not have invested if he knew that Primera had built profit into its estimates for drilling and completion. Based on his own general business understanding, Rick understood the management fee to be attributable to sponsorship and supervision to operate the well and the office operations.

Rick stated that, when he was unable to get Alfaro on the phone, he would visit his office where "he would have his –all of his people at the table already lined out on what they're supposed to say, and tell us how these wells were going to do so well, where the costs were[.]" Rick also testified that, while at Alfaro's office, he witnessed vendors calling and claiming that they were owed money, but Alfaro told his staff to put the vendor's requests to the side.

Rick is asking the Court to order return of his attorneys' fees and his investment. He testified that he believes he is entitled to that relief because Alfaro took advantage of elderly people who trusted Alfaro. Rick testified that the state court injunction and termination of incoming checks was sought to "stop the bleeding" to ensure there was money remaining to pay vendors and the investors.

At trial, Rick also testified regarding what he witnessed occurring between his father, James, and Alfaro. He testified that Alfaro told James that the Screaming Eagle 3H well was never producing and that the investors would never see a dime of it.

10.    James Reiley

Rick Reiley referred his father James to Primera for investment opportunities. After being referred to Primera, Rodriguez visited James at his home and brought materials with him. After this home visit, James testified that he read through the materials, including the Contract. He then met with Alfaro at the Primera office, where Rodriguez, a geologist and a lawyer or CPA were also present. James testified that, in this meeting, Alfaro informed him that it was "a very good

well . . . in a good location." James testified that he asked Alfaro questions regarding his reputation and the potential for success in the well. Alfaro responded that this would be a very good well, "the best well they'd hit in forever."

James testified that he read both Contracts for the Screaming Eagle 2H and 3H wells, and that he had a specific conversation with Alfaro regarding the mention of fraud in the Contract. James stated that Alfaro told him the fraud allegation had nothing to do with his business in these wells and that Alfaro had been cleared on a prior investigation of securities fraud. James testified that, because of this conversation, he believed and relied on Alfaro's verbal assurances and did not investigate into the disclosed fraud claim any further. James recalls Alfaro telling him that the investments were "almost like a guaranteed deal" and that Alfaro rushed him into making the investment. James admits that he knew that the investments were a high risk, as stated in the Contract; however, James also stated that he relied on Alfaro and Rodriguez's statements in making his decision to invest. James testified that he understood Alfaro to be the owner and president of Primera.

James invested approximately $100,000 in the Screaming Eagle 2H and 3H wells and contributed $11,000 for a pipe repair. James understood that all of his investment monies would be going to the well "to a turnkey operation." James stated that, after reading the Contract, he understood that all of his investment would go to drilling and completing the well for his investment. James understood that Alfaro would be compensated through a 3% management fee, which was explained in the materials and documents he received for each well. James testified that, if he had known Alfaro intended to take more than the 3% management fee, he "wouldn't have liked it . . . the 3% seemed like a lot."

James testified that he read in the Plan of Distribution[5] stating that Primera employees and officers who sell units will not receive commission-based compensation for their sales. James stated that he likely would not have invested had he known Alfaro or his salesmen were going to make a 10% commission off his investment. James also testified that, had he known Alfaro would not fully compensate vendors for their services, he would not have invested. Further, James stated that he believed that his investment proceeds be used to pay expenses of the well operation, and to pay the vendors. James did not know there were $3 million in liens recorded on the Screaming Eagle 3H well. Further, James stated that when he would inquire as to where his return on his investment was, he was told the well was broken down or inoperative.

James is suing Alfaro individually because he believes "he's [Alfaro] doing wrong by what he did . . . taking our money and not using it all on our well . . . he would keep calling, '[e]verything is looking beautiful, and it's a good day and the wells are doing good.'" James would like to get his attorney fees and investment back, or at least some of his money back.

11.    Betty Reiley

Rick Reiley told his mother, Betty, about investment opportunities in Primera. Betty testified that, prior to investing Rodriguez came to her home two or three times in the few prior to Betty making her investment. Betty stated that it was a "very short time" of "maybe three weeks" that she had to review the Contract materials before investing, because Rodriguez told her that the units were selling out and that she should act quickly. When Betty and her husband inquired into the mention of fraud surrounding Alfaro, Alfaro told them that the allegations were either false or that it was not him. Betty testified that, before signing Contracts, she went to the Primera office and met with Alfaro in the conference room where he told her he thought the Screaming Eagle

---

[5] Trial Pl. 75, p. 36.

wells were a good investment. Betty also stated that, before investing, Justin Rodriguez came to her home and provided projections of income and barrels of oil, telling her that it was going to "boom" and that she "should get some really good checks off of this. This should be a good investment."

Betty testified that she invested approximately $111,000 in the Screaming Eagle 2H and 3H wells, along with her husband James. Betty understood, based on her conversations with Rodriguez, that her money would be spent on drilling the well, putting the pump in, fracking and getting the well operational. Betty also stated that she understood the application of proceeds per unit chart included in the materials to mean that all the funds she invested would be attributed to drilling, testing, completion, equipment and the management fee. Further, she understood that the funds she paid into the segregated account would be used for the above-mentioned expenses prior to being released to the company's general operating account.

Betty stated that it was important for her to understand where her money was going before she decided to invest had she known her investment monies would be spent on other expenditures outside of the fees listed in the Contract, she likely would not have invested. Further, Betty stated that, had she known Alfaro was taking a 10% commission from her investment, she would not have invested. Finally, Betty affirmed that, had she known vendor invoices would be unpaid, she does not think she would have invested. Betty also testified that she believed the management fee covered Alfaro's salary.

Despite knowing that the investment was risky and that the possibility of a dry hole existed, Betty testified that she was made to feel as though her investment was a "safe thing to do." Betty stated that the documentation, magazines, and statistics provided of similar wells indicated that Primera was experienced in drilling for oil and gas in other wells that had generated profit.

Betty testified that she and James were receiving checks; but, in early 2013, Betty was unsatisfied with the amount being paid. Betty visited Alfaro to inform him that she was unhappy with her investment returns. She testified that they received approximately $5,000 return on the Screaming Eagle 2H well and $7,000 return on the Screaming Eagle 3H well. At the time they invested, Betty's testimony is that she and her husband were worth just under $1 million.

Betty testified that she would like to get some of her investment back because she believes she is entitled to this relief because Alfaro did not tell the truth.

### 12.    Dieter Jansen

Rick Reiley referred his good friend Jansen to Primera and Alfaro. Jansen testified that he invested to create a nest egg for his son. Jansen testified that prior to investing, he met with Rodriguez who told Jansen that the Screaming Eagle 3H well was projected to produce twice as much as the Screaming Eagle 2H well, which was, at that time, generating $2,500 monthly per unit. Further, Jansen testified that Rodriguez informed him that Primera was ready to begin drilling, so the sooner he invested, the better. Jansen stated that when he signed the paperwork to invest in Primera and sent the check, he "trusted the guy 100%."

Jansen signed the subscription agreement and sent in $25,000 for a quarter unit. Jansen testified that it was his intention to purchase one-quarter unit in the Screaming Eagle 3H well, but shortly after sending his check he received a letter saying that he owed an additional $25,000 for the Screaming Eagle 3H well. Jansen stated that he and his wife "didn't know any better" and he paid the additional $25,000. After he made this initial investment, Jansen testified that he received a phone call from Alfaro requesting $11,500 for a broken pipe, and that he sent a check for that as well. Altogether, Jansen has invested roughly $66,500 in the Screaming Eagle 3H well. Jansen

testified that, at the time he invested in the Screaming Eagle 3H well, his net worth was roughly $500,000.

As to Alfaro's compensation, Jansen testified that he understood that once the well was operational and producing, the profits would be shared between investors and Alfaro. Jansen stated that in 2015, the well was drilled and about five or six months later it began to produce. Because of that production, Jansen testified that he received sporadic checks for varying amounts, until all of the sudden the checks stopped. Jansen further testified that he does not know why he stopped receiving checks. Jansen testified that when he stopped receiving checks, he called Rodriguez, who told him that a check should be arriving by the end of the week. After two weeks elapsed, Jansen stated that he called again and Rodriguez told him that he would follow up on the issue. Jansen testified that he received a phone call from Alfaro later that day informing him "[y]ou ain't getting no check no more," and hung up on Jansen.

As to the application of proceeds, Jansen stated that he and his wife understood that the money would go into a "pocket," from which employees, office expenses, vendors and direct expenses of equipment would be paid and the well operations would be fully funded. From there, Jansen testified that if there were excess funds, then Alfaro could take a share of the remaining funds for himself. Jansen testified that if he had known Alfaro was able to take his money out of Primera for his personal use, he would not have invested.

Jansen stated that he is seeking return of all his expenses. Jansen testified that he believes all the investors should get their funds back and he would like to have his attorneys' fees, in the amount of approximately $18,000, repaid.

13.     Vincent J. Gillette

Vincent stated that he first met Alfaro after his brother Thomas J. Gillette referred him to Alfaro. Vincent met with Alfaro in the Primera office in March or April of 2013. At this initial meeting, Vincent testified that Alfaro spoke about the property he had leased, where Primera planned to drill, and the success of surrounding area wells. Specifically, Vincent testified that Alfaro told him about the return on investment for other wells and to "count on half of that." Vincent stated that Alfaro told him to expect about $7,500 a month return on one unit of investment. Vincent testified that, based on the Screaming Eagle 2H, 3H and 4H well Contracts, Vincent understood that his investment would be spent on drilling and well expense to bring the well into production. Vincent stated that he relied on those representations in the Contract in making his decision to invest in Primera. Further, Vincent stated that if it turned out the monies that he invested were not allocated as outlined in the Contracts, he would not have invested.

As to commission-based compensation, Vincent testified that he asked Alfaro about compensation on multiple occasions, and that, "Brian, in front of the engineer, the lawyer, and the accountant, in the conference, unequivocally said they would not take any commission on the transaction." Further, Vincent stated that Alfaro informed him that investor money came from the management fee and their working interest in the wells. Vincent testified that he does not believe he would have invested with Primera had he known Alfaro was going to take money from his investment before he even began to pay for the well expenses.

Vincent testified that he met with Alfaro sometime between February and April of 2013, and that he took notes during that meeting. Vincent stated that Alfaro told him about the property that he had leased and that he was going to pay $ 1 million for the mineral rights and begin drilling immediately. Vincent testified that Alfaro told him that the well he was to invest in had already

been drilled, and that they were going to begin fracking. Vincent testified that Alfaro told him that on the Screaming Eagle 2H well, the first six to twelve months would be the strongest pumping, and then it would be reduced by half for the next year, with a year life span for the well. Vincent also stated that Alfaro told him the Screaming Eagle 2H well would cost $9.9 million. Vincent testified that during this conversation, Alfaro told him that the 2H well will produce $500,000 barrels of oil over twenty years. As to the payoff distribution, Vincent stated his understanding was that the owner would receive 25%, Primera would receive 10%, and partners or investors would receive 65%. Vincent testified that based on that breakdown, he understood that Primera would have ten units in the well.

Vincent testified that he asked Alfaro why he was soliciting investors if the drilling was done and all that was left to do is frack and that Alfaro explained that Primera needed additional investors to complete the well, but that the work was done. Vincent also testified that Alfaro stated that there was no risk in the investment. Further, Vincent testified that he asked Alfaro how long the well would take to begin producing after it was fracked, and that Alfaro told him after fracking and cleanup, the flow-back would begin in two days, leading to production.

Vincent testified that he received a letter from Primera offering Screaming Eagle 2H investors the opportunity to invest in the Screaming Eagle 3H well, and that when he received the letter he had seven days to decide whether to invest. Vincent testified that as of January 21, 2014, he had invested in the Screaming Eagle 2H and 3H wells. Vincent stated that in February 2014, he received a notice that Primera had completed the flow-back testing on the Screaming Eagle 3H well and that the results were more impressive than expected. Vincent testified that the notice, however, did not disclose the collar and casing failure of the Screaming Eagle 3H well.

Vincent testified that on July 30, 2014, he received a notice saying that the distribution checks would be lower than previous months because the Screaming Eagle 3H well had to be shut down for seventeen days with no production. Vincent further testified that he received an invoice dated January 6, 2015 for an electrical expense related to the pump on the Screaming Eagle 4H well. Based on his recollection, the additional funds were requested because the Screaming Eagle 4H well was not producing and Primera needed to bring in electrical power to operate the pump. Vincent stated that he inquired into why the AFE the did not cover the pumping unit, and that Alfaro told him that he had to pay the invoice or he would be in jeopardy of losing his investment. Further, Vincent testified that the AFE contained a line item attributable to "artificial lift pumping unit compressor" with an estimate of $155,000. Vincent testified that he paid $155,820 for the Screaming Eagle 4H well overage pursuant to the letter he received.

Vincent testified that he received a notice, dated March 24, 2015, stating that the Screaming Eagle 2H and 3H wells contained a high concentration of hydrogen sulfide and that the notice informed investors that Primera would be reducing their returns as a result.

As to operating costs, Vincent testified that he understood that neither Primera nor Alfaro could use the distribution of production as an offset for costs for the drilling and testing and completion of the well. Vincent stated that he understood that only operating expenses could be deducted from the profits that he receives. In fact, Vincent stated that when he invested in the Screaming Eagle 2H, 3H and 4H wells, he understood and relied on the assertion that Primera would not take expenses for which it was not entitled.

Vincent then testified that he received a letter stating there was a collar and casing failure on the Screaming Eagle 3H well, that he had to pay an additional $25,000 to have the casing and collar repaired, and that those costs would eventually be reimbursed by insurance. Vincent testified

that Primera was going to file an insurance claim based on the failure and sue the pipe contractor that put the casing or collar in place.

Vincent testified that he relied on Alfaro to abide by the terms of the Contract. For example, if he discovered that Primera did not have insurance for the Screaming Eagle 3H well, as the Contract stated that it would, Vincent would not have invested in the Screaming Eagle 3H well. Vincent stated that he relied on what Alfaro told him in making his decision to sign the subscription agreements and invest. Vincent testified that he tries to be a careful investor, and that he has invested in other opportunities, including an automotive repair shop, a small software development company, and some small real estate ventures.

As to the AFE, Vincent testified that, before he sent his money in for the Screaming Eagle 2H, 3H or 4H wells, he understood that if total costs were higher than the estimate, the working interest owners would be responsible for their pro-rata share of the excess. Further, if the costs were lower than the estimate, Primera would be entitled to retain the difference. Vincent stated that he understood this to apply to the entire cost of the well, not by individual line item. Vincent stated that he believed the AFE was broken down by line item for purposes of disclosure, estimates, and budget. Vincent stated that Alfaro told him that Primera was to be compensated by retaining 5 to 10% of the units for themselves and profiting from the commercial production.

Vincent testified that when he stopped receiving checks, he called Alfaro multiple times and was unable to get a straight answer about why the wells were not producing. Further, Vincent stated that he left several messages and when he would have his call returned, he was told that Primera's accounting system was down and they were working on getting financials together. Vincent testified that he asked Alfaro for financial statements multiple times to monitor income versus expenses and remain apprised of their status. Vincent stated that he would like to recover

his investment of approximately $300,000 and the money he spent on the collar failure, which was roughly $23,000 to $25,000.

14.    Brian Huber

Huber testified that he began investing in Primera's wells in 2010 when Alfaro initially contacted him through a solicitation call. Huber testified that before he made his first investment, he and Alfaro spoke at least monthly for approximately one year. Further, Huber stated that each time Alfaro was soliciting investors for a new well he would contact Huber. Huber testified that his return on investment to date for the wells are as follows: Montague Legacy 1 is $7,188.66, Montague Legacy 2A is $1,824.66, Screaming Eagle 1H is $26.24, Screaming Eagle 2H is $3,465.29, Screaming Eagle 3H is $2,285.33, and Screaming Eagle 4H is $468.92.

Huber testified that within each investment, Huber understood that he was investing in a particular well and that his investment funds were used to drill the well and put it into production. Huber stated that he relied on the fact that his monies would be used to drill, complete, and test the wells and that if Huber knew his funds would be used for other expenses, he would not have invested in Primera. As to Primera's profit, Huber testified that he was only aware of the management fee that was disclosed in the Contract. Further, Huber stated that he assumed Primera and Alfaro Oil&Gas held some of the working interests in the well, and the management fee was compensation for "putting the package together."

Huber testified that each well had a corresponding PPM which contained a subscription agreement, and that he had to sign each PPM and send it to Primera with the down payment. Huber stated that he did not read every word of the Contract, but did read the "highlights" of these documents. Huber testified that he considers himself a careful investor, and that he treats investing seriously. Huber stated that before he formally invested, he studied and evaluated the opportunity

for at least a year. As to negotiation of the actual investment, Huber testified that he did not feel he had the ability to change the terms of the contract.

Huber stated that Alfaro's oral statements to him influenced his decision to invest. For example, Huber testified that when he asked Alfaro about the liability language in the Contract, he was told not to worry because the lawyers require that the language be put in the Contract. Further, Hubner testified that Alfaro told him there is insurance to cover investors. Huber stated that "it seemed like every [well] was going to be better than the last one."

Huber stated that the first well he invested in was Montague Legacy 1. Huber testified that before he invested, he received information from Alfaro as to the projected production of the well including an estimate of $3,000 per unit per month, which would result in a $750 return on Huber's quarter interest per month. Huber stated that these numbers affected his decision to invest because even with a conservative view, he believed it was a "pretty good return on [his] investment." Huber further testified that he relied on the figures for the production of wells in close proximity to the Montage Legacy 1 and that the accuracy of these figures was an important factor in investing.

Huber stated that on July 14, 2011, he made a payment along with the "Joint Venture Ballot," which stated that if he wished to participate in the special assessment for enhancing production, he should enclose a check for the increased cost of fracture stimulation.

Huber stated that he received an offer to participate in the Screaming Eagle 2H well with additional units on or around July 1, 2011. Huber stated that he sent in his first payment of Montague on the Screaming Eagle 2H well on July 11, 2011. Huber stated that within that document, representations to the effect of "high expectations" were made because the surrounding wells were successfully producing. Further, Huber stated that the document presented the well as

"relatively low risk" because the wells close by were performing well and had already been drilled and producing.

Huber stated that he invested in the Screaming Eagle 1H well and when invested, Primera owned the well. Huber testified that he understood the Screaming Eagle 1H well had a problem with saltwater after Primera drilled through a fault line, and that saltwater ruined the well. Huber stated that he was never informed that Alfaro sold the well. As to that sale, Huber testified that he believes the proceeds of the sale should be divided equally among the owners of the working interests in that well.

Huber further testified that on June 9, 2014, he paid an additional $5,755.62 in overages on the Screaming Eagle 3H well. Huber stated that he received an invoice and notice informing him that he needed to pay or he would lose his interest in the well. In cross-examination, Huber stated that this additional money was for the failed casing. Huber testified that Alfaro called him and tried "real hard pushing for [him] to invest" in the Screaming Eagle 6H well, and that he would not do it anymore. As to the investing in the Buda well, Huber testified that Hundley and Alfaro both called him quite a few times.

Huber testified that he feels he is entitled to around $100,000 because he "could have invested that money in other places and been . . . earning money on it." Huber stated that he has been told many stories about how well the wells would perform and feels he has been misled.

15.    Sharon Walls

Walls was an original plaintiff in the State Court Action. Walls stated that she met Alfaro when she and her brother, Vincent J. Gillette, went to his office for a meeting prior to investing in the Screaming Eagle 2H well. Walls testified that she met Alfaro, Primera's attorney, and Rodriquez. Walls stated that she believed Rodriquez was the vice president of sales at Primera.

Walls testified that at that time, Primera's wells had been drilled, but had not completed fracking, and Alfaro stated that they had run out of money and needed investors. Walls stated that she had two meetings with Alfaro in person and in these meetings, she and Vincent asked about the lawsuits that were listed in the Contract, and asked Alfaro to explain the status of the legal proceedings.

Walls testified that she understood that her investment would be deposited into a separate account and used to "get that well to complete production." Walls stated that if she had known that Alfaro did not intend to use the money as described in the Contract, she would not have invested in any of the wells.

As to Primera and Alfaro's compensation, Walls testified that she understood that there were a few components: a management fee which would cover their costs, a line item in the AFE for overhead and insurance, a line item in the AFE for contingency, and any funds leftover after completion of a well would be retained by Primera as profit. As to commission-based payments, Walls stated that she did not think that they were paid to Primera employees. Further, Walls testified that if she had known Alfaro or his salesmen were getting 10% of her investment, she would not have invested.

Walls testified that the total amount invested with Primera is approximately $350,000, which includes the additional costs for which Walls received invoices. In total returns, Walls testified that she has received approximately $23,000. Walls further stated that she has paid about $25,000 in additional overages.

As to the Screaming Eagle 3H well, Walls testified that after the 2H well produced oil, Alfaro contacted her and invited her to participate in the Screaming Eagle 3H well, which he explained would be drilled from the same location. Walls stated that she invested because she

believed the likelihood was high that oil would be produced from the Screaming Eagle 3H well. Walls testified that she paid an additional $25,000 in the Screaming Eagle 3H well was for casing and collar failure.

Similar to the investment to the Screaming Eagle 3H well, Walls testified that Alfaro contacted her with the opportunity to invest on the Screaming Eagle 4H well by phone and a letter in the mail. Walls testified that she would like to see return of all of her investment funds, in addition to $21,000 in legal fees that she has incurred. Walls stated that she believes she is entitled to that because she was "misled on how the money that [she] invested would be used."

16. Rick Griffey

Griffey stated that he has worked in the oil patch since he was seventeen years old. He further testified that he presently owns a company in which he builds oilfield equipment, and that he is familiar with drilling, production, testing, and other operations. Griffey testified that he did not have assets or net worth that exceeded $25 million at the time of investing.

Griffey testified that he received the Contracts prior to making his investment, and had the opportunity to read and study them. Further, Griffey confirmed that he signed the subscription agreements. Griffey testified that he wrote Alfaro a letter, stating that he sent his money in for the first section of the Screaming Eagle 6H well and requesting a title of assignment for the Screaming Eagle 4H and 6H wells. Griffey stated that there was a clause in the initial agreement stating that investors could request title assignment to their interest in the wells, and that he did request it at least fifteen times by emails, letters, and verbal communication. Griffey stated that he never received a title of assignment. Further, Griffey testified that he requested copies of the operating agreements, and he did receive it for one well, but not other. Griffey stated that the operating agreement he received was a typical operating template for the Screaming Eagle 4H well, but an

unsigned version. As to his communication with Alfaro, Griffey testified that Alfaro seldom put things in writing, and even when he asked a question in writing, Alfaro would reply verbally.

Griffey stated that he understood that his funds would be used for drilling and testing the the Screaming Eagle 4H and 6H wells for which he had invested. Further, Griffey stated that if the funds were not used in that way, he would not have invested.

Griffey stated that he made at least fifteen trips to the Screaming Eagle 4H well site, before and during drilling, during fracking, and completion. Griffey testified that after investing in the Screaming Eagle 4H well, he spoke with Alfaro frequently, anywhere from a few times a day to every few weeks. Griffey testified that he received a letter on or around March 16, 2015, stating that the Screaming Eagle 4H well had reached a peak production of 177 barrels a day.

Griffey testified that he sent Alfaro an email on August 26, 2014, requesting an update in writing as to the current status of the Screaming Eagle 4H well. Griffey stated that he received a reply two days later from Jimenez saying that the well was shut down and that Primera had over a thousand barrels of oil in tanks and were waiting on storage facilities. Griffey stated that he sent an email to Alfaro requesting various updates and information as to the Screaming Eagle 4H well, and that he never received the cost summary for the actual cost spent on the Screaming Eagle 4H well that he requested several times, both verbally and in writing.

Griffey testified that he received a letter on or around March 3, 2015, from Primera stating that the production on the  Screaming Eagle 4H well was pumping 132 barrels a day and 90 barrels of water. Griffey testified that in one email, he questioned the cost for the electrical wiring for the pump and generator because he thought that the AFE covered it. Griffey stated that Alfaro informed him that it was extra expense and not included in the original AFE. Further, Griffey stated that he understood that if he did not pay the invoice for this additional cost, he would lose

his interest in the well. Griffey testified that he received a letter on or around March 9, 2015 updating investors as to the Screaming Eagle 4H well and informing them that investors had the right to inspect Primera's books. Further, the letter stated, "[o]ur Screaming Eagle 6H oil well recently began drilling and has already made another discovery in the Eagle Ford Shale." Griffey stated that he does not understand how Primera could have made a discovery if they never completed the well.

Griffey testified that as to the Screaming Eagle 6H well, Alfaro represented to him that it was almost sold out, and that if he wanted to invest in the Screaming Eagle 6H well Griffey needed to do it quickly. Griffey testified that in an email sent on January 12, 2015, he asked the status of the drilling rig as to Screaming Eagle 6H well because he was concerned about the length of time that passed before drilling. Griffey stated that the Screaming Eagle 6H well was drilled but not fracked, and was just a cased hole.

Griffey testified that he would like to get his money back because he feels like he and the other investors were defrauded.

### 17.    Marjorie A. Gillette

Marjorie testified that she received the Contracts for each well, and that she thoroughly read the PPM and subscription agreement for the Screaming Eagle 2H well. Marjorie stated that she assumed the documents were substantially similar for the Screaming Eagle 3H and 4H wells, and so she did not read the Screaming Eagle 3H and 4H well Contracts with the same level of detail. Marjorie stated that she did sign each subscription agreement.

Marjorie testified that before she invested in each well, her understanding was that her investment funds would be used to drill the well. Majorie stated that if she had known her money would not be used to drill the wells as set forth in the Contract, she would not have invested.

Marjorie further testified that after reading the Contract, she did not realize that Alfaro or Primera salesmen were able to earn commission-based income on her investment. Marjorie stated that if she had known commission-based payments would be taken, she would not have invested because she wanted her funds to be invested directly into each well.

Marjorie testified that she was in frequent contact with Rodriquez who gave her updates on the wells and told her how, "everything was going so wonderfully." Marjorie stated that she only spoke with Alfaro when he called her to invite her to invest in the Screaming Eagle 4H wells. Marjorie said that she told Alfaro she did not want to invest, but he convinced her and offered her one of his units. Marjorie said she declined his offer, but that she ultimately acquired one unit in the 4H.

Marjorie testified that she did receive some return on her investment for the wells, but she does not recall the precise dollar amount. Marjorie stated that from this litigation, she would like her money back. Majorie understands that her investment funds were not used for each specific well as promised.

18. Thomas J. Gillette

Thomas stated that after speaking with his friend Rick Reiley about Primera, he went to the Primera office and Alfaro set up a meeting with him and Rodriquez in the conference room. Thomas said that Rodriquez explained Primera's business model and said, "This well should produce $8,500 a month at 12 to 1,500 barrels a day." Thomas testified that he asked Justin why they were soliciting investors if the wells were going to be so successful and Alfaro told Thomas that Primera needed the cash flow to maintain multiple wells simultaneously. Thomas stated that he was impressed and comforted by the nice and extravagant office in which Primera operated out of, and that to him, it looked like they knew how to make money.

Thomas confirmed that he read the Contracts and signed subscription agreements for the Screaming Eagle 2H, 3H, 4H, and 6H, and Buda Wells. Thomas testified that based on the Contracts, his understanding of how his funds would be applied was directly to the well he had made his investment, and not applied to past or future wells. Thomas stated that he relied on those terms of the Contract, and that if he knew that his funds would be spent for other expenses other than the applicable wells, he would not have invested. Thomas stated that he relied on the application of proceeds as outlined in the Contract, and if he discovered that his funds were not applied in that manner, he would not have invested.

Thomas testified that he specifically asked how Primera makes their money and he was told that Primera retains 10 to 15% of each well to generate profit for the company and its employees. Further, Thomas testified that he was told that the management fee was used to pay for the operation of the well.

Thomas testified that he believes his investment funds were not properly spent on the Screaming Eagle 2H well because of what he heard in the State Court Action and the fact that he did not receive monthly checks. Thomas stated that because he was charged for items that he believed he had already paid for, he does not think his funds were fully attributed to the applicable well. Further, Thomas testified that the State Court Action revealed that there is still money that is owed to subcontractors for work that they have completed. As to the Screaming Eagle 3H well, Thomas testified that he believes his investment funds were not properly spent because he was charged for items that he believes the contingency or insurance should have covered.

Thomas testified that Justin called multiple times and ultimately came to his ranch in China Grove to present him with the Buda well opportunity. Thomas stated that he signed the agreement and gave him a check for $50,000 for one unit.

Thomas testified that out of this litigation, he believes he is entitled to $850,000 based on his calculations using 1,600 barrels of oil production and the return he would have received on that production. Further, Thomas stated that he has incurred approximately $22,000 in attorneys' fees.

19. Edward A. Gillette

Edward stated that after hearing about Primera from his brother Thomas, Rodriguez contacted him and they visited the Screaming Eagle 2H well site. Edward testified that seeing the site with a pipe coming out of the ground with a valve head on it indicated that the hole was drilled and ready to be fracked. Edward testified that he attended a meeting with his brother Thomas and Alfaro, and that Alfaro said that he paid his contractors on time and that all proceeds would go to the well site.

As to commission-based payments for Primera employees, Edward testified that he understood that was not part of the Contract. Edward further stated that if he had known commissions would be taken from his funds, he would not have invested. Edward testified that he relied on the Contracts to the extent that he expected to have an interest in a working well.

As to whether profit was built into the AFE, Edward testified that he understood that after the entire project was completed and everything was paid for, any remaining funds could be used at the discretion of Alfaro. Edward testified that he relied on that fact and would not have invested were that not the case.

Edward testified that he hopes to get his money back because he feels he was misled as to the use of his investment.

20. Michael Covington

Michael Covington is a CPA employed by Primera from March 2010 to January 15, 2015. He was called to testify at the Preliminary Injunction Hearing on March 28, 2015, and was not

called to testify at trial. Covington testified that he did interact with the salespeople of Primera. He testified, however, that he was only vaguely aware of the salesperson's job duties at Primera. He stated that there was a bullpen area with offices on the perimeter of the bullpen with Alfaro's office in the corner. Covington explained that newly hired salespeople stayed in the bullpen area, while the more seasoned salespeople had their own office.

At the Preliminary Injunction Hearing, Covington testified that he was subpoenaed to appear before the Court and bring records that he took from Primera when he left the company. He further testified that the documents he took from Primera pertained to the Screaming Eagle 2H and Screaming Eagle 3H wells. He testified that he took the documents, and had a right to do so under his agreement with Primera as an investor. Covington testified that he did not take his employment file from Primera. Covington further testified that he could not explain why the chapter 11 trustee could not locate his employment file from Primera.

Covington testified that his day-to-day accounting duties at Primera included everything from reviewing bank statements to preparing financial statements. Covington stated that he performed the bookkeeping for all the Alfaro entities and wells. Covington did the bookkeeping for Primera and prepared the company's tax returns. He testified that he prepared all the Alfaro partnership tax returns, Alfaro's personal tax returns, and tax documents to send to investors who were working interest owners.

Covington testified that he had no veto power over Alfaro's decisions, and Alfaro made all the decisions for Primera. Covington stated that vendor invoices were paid solely at Alfaro's discretion. He testified that he would send Alfaro an email with a list of vendor's invoices that were due and then Alfaro would inform Covington on what he should pay and what he should not pay. Covington stated that even if he believed that an invoice should be paid he could not pay it if

Alfaro did not tell him to do so.

Covington only reported to Alfaro. Covington stated that he would report to Alfaro on a daily basis regarding cash balances in each one of the wells and corporate accounts and would provide Alfaro with a daily log with these amounts. Covington testified that he created a spreadsheet-type document that gave Alfaro outstanding accounts receivable and outstanding accounts payable.

Covington testified that he received all the information necessary to make deposits, write checks, and make payments into Primera's and Alfaro's accounts from Alfaro. He further testified that he did not give this information to anyone else.

Covington explained that he would have to go to the bank by 12:00 PM daily because Alfaro would receive a call from the bank stating there were checks that needed to be covered. Covington testified he would go by 12:00 PM to prevent checks from being returned. Covington believed that insufficient funds would occur because the balance at the time was not sufficient to clear all the checks that had been written.

Covington testified that Alfaro would call him and ask him to take $5,000–$10,000 out of the Primera operating account and put it into Alfaro's Broadway or Chase account or use it to pay Alfaro's personal Bank of America credit card. Covington explained that he would tell the Primera's accounts payable clerk to write the check, and then Covington would take it to the bank. He testified that he did not know why Alfaro would ask him to do that.

Covington testified that investors would receive a Contract as Primera drilled wells. He stated that these Contracts included an AFE that came from R.W. Dirks, the engineering firm that did the drilling and construction of the wells. Covington testified that the AFE gave an estimate of how much the well was going to cost to complete the well construction and bring it on line for

production. Covington explained that the AFE for the Screaming Eagle 3H well had an original projection of $9.6 million. Covington stated that after the Screaming Eagle 3H well's casing and collar experienced failures, plus additional expenses, that the Screaming Eagle 3H well ended up costing about $10.6 million. Covington stated that as an investor he understood the AFE to require that any expense over the AFE could be charged back to investors as a legitimate charge and investors would have to pay it.

Covington further testified that for the Screaming Eagle 3H well expenses over the AFE, the investors should have been billed approximately $1 million. Covington testified that the investors were billed $2.3 million as the amount over the AFE for the Screaming Eagle 3H well. Covington stated that Alfaro determined the amount that needed to be billed to the investors. Covington testified that he and the in-house counsel for Primera argued against charging the investors $2.3 million instead of the approximately $1 million over the AFE. Covington testified that Alfaro overruled them and instead had Cliff Davis and Jessica Conlin (the bookkeeper and accounts payable clerk), to create a list of invoices that was equal to the $2.3 million that Alfaro wanted to charge investors. Covington testified that he refused to pay his proportionate share of the alleged $2.3 million in expenses over the AFE as calculated by Cliff Davis and Jessica Conlin. Covington testified that he paid only $5,000, which he calculated as his proportionate share for the actual overage over the AFE. Covington stated that after he failed to pay his share of the $2.3 million expense that he was removed as an investor from the Screaming Eagle 3H well.

Covington testified that he was familiar with the terms of the Primera Contracts, and he stated that the Contract did allow for Primera to take a management fee. Covington stated that he believed the management fee to be 3% of an investment in a well. Covington admitted that he was not sure if the 3% fee was a limit, but rather an estimate of what Primera could receive. After

Covington reviewed Plaintiff's Trial Exhibit 10, the Contract for the Screaming Eagle 1H well, he testified that there was no mention of a 3% management fee in the Contract. He further testified that he got the 3% management fee figure from Defendants' Trial Exhibit A-Q (explain what is A-Q).

Covington testified that salespeople received a draw against their commission on a monthly basis. Covington explained that salespeople received either their draw or their commissions, which ever was higher. Covington explained that salesperson's draws were based on investor's checks that were sent in with the Contract. Covington stated that he and Alfaro would review an investor's check and determine who the salesperson was. Covington stated that if there was no salesperson who had contacted the investor then the client would be Alfaro's and he would not share the commission with any salesperson. Covington would take the check to the bank and put it into the investor's account for the designated well. Covington would then transfer money out of the well operating account and would deposit 25 to 30% of an investor's funds into the Primera operating account and approximately 10% would be paid to Alfaro.

Covington explained that these discretionary draws requested by Alfaro were made only when the daily account logs showed a cash balance that exceeded the amount of the draw. Covington stated that money was transferred from each of the Screaming Eagle wells to Alfaro's personal account. He testified, however, that he could only speculate on how the money was spent.

Covington testified that management fees were monies that would be transferred from a designated well account to the Primera operating account. Covington explained that he described them as management fees because he was trying to be consistent with the previous accountant's bookkeeping entries. Covington said that these management fees could not represent the profit from a particular well after the drilling. Covington testified that the amount for a management fee

started at 15% around July of 2011, and then gradually went up to 20%, then 25%, and finally in 2015 by the time Covington left Primera it was up to 30%. He further testified that Alfaro set this number.

Covington testified that he prepared the ledger for 2013. Plaintiff's Trial Exhibit 13, p. 89–90. Covington testified that for 2014 he only did general ledger entries, but did not do the closing entries. Covington did not have an explanation as to why the 2014 ledger did not take into account the reclassification of expenses to pass-through the expenses to working owner interests. Covington testified that Primera could pass through management fees to working interest owners as intangible drilling costs, which could be used as tax deductions for individual investors.

Covington testified that the owner's draws category had an invoice number that was created when there was an invoice transaction Plaintiff's Trial Exhibit 13, p.129. He testified that the only way a check could be written was if there was an invoice transaction in place.

Covington testified that he was also familiar with the Screaming Eagle 1H Well. He testified that it was not a producing well because it had been drilled into water tables and too much water was being produced instead of oil. He stated that the well was sold and the investors were never apprised of the sale. Covington stated that the proceeds from the sale of the Screaming Eagle 1H well were placed into the designated 1H Well account and that $60,000 of the proceeds were then transferred to the Primera operating account. On the same day, a check was written to Brian Alfaro for $60,000 from Primera operating account. Covington testified that Brian Alfaro told him he was going to use the $60,000 to build a garage in his new home to house all of his automobiles.

Covington testified that he had no personal knowledge of a letter to investors advising them that the Screaming Eagle 1H well was going to be sold because it was not producing. He further testified that he would have been involved in sending a letter of this nature out to investors given

his duties as an accountant for Primera.

21.     Megan Blair

Plaintiffs called Blair as adverse witness. Blair testified that she assisted Covington until he unexpectedly resigned in January of 2015. Blair testified that she assumed Covington's responsibilities between Covington's resignation and the hiring of Edgar Perez as Covington's replacement. She testified that Covington developed Primera's accounting system and that she just inputted information into the accounting system. Blair further testified that one of her responsibilities was to email a daily cash report for Primera to Alfaro.

Megan Blair testified that some of her duties at Primera were to input accounts payable into the Primera's accounting software and to monitor invoices and billing for the company. She testified that she is not a CPA. Blair also testified that it was partially her responsibility to handle investor paperwork and investments. Blair further testified that it was her responsibility to take phone calls from vendors and to tell vendors whether their invoices had been paid.

Blair testified that Plaintiffs' Trial Exhibit 1 is a report generated from Primera's accounting software and that the report listed invoices by vendor for the time period of March 2, 2015, to June 2, 2015. Blair testified that she inputted some of the transactions listed on this report. Blair testified that the transactions were entered into the accounting software at or near the time that Blair got the information.

Blair testified that vendors would often call because they were not being paid and that this occurred through May of 2015. Blair testified that according to the Primera accounting software, the claims of the complaining vendors were valid. Blair, however, testified that if Alfaro disputed a vendor bill, Primera would not pay it unless it could get a reduction for the amount of the invoice. Further, Blair agreed that Alfaro was paid $204,194 during from March 2, 2015 to June 1, 2015.

Trial Pl. 1. Blair, however, attempted to recant what Plaintiffs' Trial Exhibit 1 showed by stating that she was not in charge of payments made by Primera or compensation received by Primera employees. Further, Blair further testified that she did not know if Alfaro was ever paid $204,000 because she was not sure about the veracity of Plaintiffs' Trial Exhibit 1. The Court finds this explanation not credible.

Blair explained that it was one of her regular job duties to create emails stating the cash balance for Primera each day. *See, e.g,* Trial Pl. 29. Blair stated that the email included the amount of money that was available that day in each of the segregated accounts and the bills that were due on each of those segregated accounts. Blair then indicated that as of February 2015, the amount of accounts payable for the Screaming Eagle 1H well was $194,695.60. Further, Blair testified that the funds available in the 1H account at that time was $111. Blair then testified that the bills due section of the email was broken down into two sections: (1) lease operating expenses for production of oil and gas; and (2) bills due for drilling and completing the well. Further, testified that Alfaro owed $2.8 million in drilling and completion costs in the Screaming Eagle 3H well and $3.074 million on the Screaming Eagle 4H well. Trial Pl. 29.

Blair testified that she was familiar with the marketing materials for Primera and identified them as a "Book" or brochure. Trial Pl. 76. Blair testified that according to the Book, the management fee is supposed to be 2.7%. Nonetheless, Blair testified that she wrote the phrase "less 30% fees" in the section dealing with accounts receivable. Trial Pl. 29. Blair could not remember if Alfaro had corrected her and indicated that Primera does not take a 30% management fee. Blair further indicated that every day that she provided a cash balance report to Alfaro, it contained a deduction for management fees of 30%. Blair, however, indicated that she did not know what "less 30% fees" meant and did not understand management fee in the context of the

book.

Blair testified that part of her duties was to enter ledger entries for paying Cliff Davis, the engineering consultant, for his services and vendors on each well. Trial Pl. 27. Davis emailed Blair telling her and Alfaro that the Screaming Eagle 3H well was shut-in because of compressor problems. She then stated that Davis asked her and Alfaro to "[p]lease get these people [the vendors] current." Blair then verified that Alfaro was not current with regard to the compressor vendor and because Primera was not current on payment, the compressor was not repaired.

Blair testified that she was not aware that a TRO was issued against Alfaro and that Alfaro was restricted from compensating himself while the TRO was in effect. Blair reviewed Plaintiffs' Trial Exhibit 6 and confirmed that a TRO was in place against Alfaro on April 28, 2015, until May 12, 2015. Blair acknowledged that she sent an email to Alfaro on May 13, 2015, and confirmed that the second page of the email was a spreadsheet entitled "Brian Alfaro Bonus Schedule." Trial Pl. 37. Further, Blair noted that in the email she told Alfaro the following: "You are owed $44,087.47, and today you were paid $25,000, which leaves you with $19,087.47 still due to you." Trial Pl. 37. Blair was then asked about an owner draw to Alfaro for $25,000.00 while the TRO was in effect. Trial Pl. 1. Blair reasoned that this did not necessarily mean that Alfaro was paid an owner draw because Plaintiffs' Trial Exhibit 1 did not show a check number.

E.    Defendants

1.    Brian Alfaro—Preliminary Injunction Hearing Testimony

Alfaro testified at length during the Preliminary Injunction Hearing. At times Alfaro was either non-responsive or evasive in his responses. Other times he was argumentative. The Court had to instruct Alfaro on multiple occasions of his duty to answer questions directly. Alfaro testified that he took a $1.2 million dollar salary from Primera prior to 2013 but could not recall if

he also took $1.2 million in 2013, as he believed that he took less. Alfaro testified that in 2014 he received bi-monthly compensation of $30,000. In addition to the bi-monthly compensation, Alfaro testified that he takes non-commission based owner draws. To that end, Alfaro testified that in January 2013, there were only four days in which he did not take a draw. Alfaro testified that the draws were not used to fund personal obligations.

When asked if he only took owners draws when the company was profitable, Alfaro indicated that he would review the available cash on hand, amounts of invoices outstanding, and meet with Covington to see if he could take a draw based upon available funds. When pressed about owner draws equaling 10% of investor contributions, Alfaro denied that an owner draw of $5,000 on January 10, 2014, the same day that Salmon contributed $50,000, was a commission. Alfaro further denied that he took an owner draw of $20,200 on January 20, 2014, on the same day that Alfaro received investor checks from Quackenbush and Appel totaling $202,332. Additionally, Alfaro denied that a draw of $18,291, taken the same day as Alfaro received an investment of $182,910 from Thesken, was commission based. Alfaro denied he took an owner draw of $19,722 on December 27, 2013, the same day that Alfaro received an investment check of $197,220 from Mr. Appel was not commission based. Alfaro again testified repeatedly that it was a coincidence that the draw was taken on the same day that an investment was received in an amount of 10% of the investment. Alfaro reiterated multiple times throughout the Preliminary Injunction Hearing and the trial on the merits that neither him, his employees, nor his salesman ever took commissions. Alfaro maintained that employees and salesmen were paid a salary and could earn a bonus above and beyond the salary.

a.      Testimony Regarding Primera's Investment Process

Alfaro indicated that there were three phases of an investment or subscription agreement

with Primera: the first phase was payment for the subscription; the second phase was for drilling

and testing of the well; and the third phase was for completion of the well.

Alfaro stated that the first phase of the process is that the well is marketed, Primera then

decides on the number of units, the purchase price based upon an AFE, and what it would cost to

drill the well. Outside investors would then invest and buy a working interest percentage in a well.

Alfaro testified that investor monies were allocated for a particular well and were used to

pay expenses for that well. After the investment was received, it was treated as revenue, and then

placed into the segregated well account for Primera to pay obligations of the well. Alfaro, however,

disagreed that the monies that were in the account, through investor contributions, were supposed

to stay in the segregated account to pay vendors. Instead, Alfaro testified that investor's money

often is placed into the segregated well account, and then moves to the Primera operating account,

and then it may move back into the segregated well account to pay bills. Further, Alfaro maintained

that this process is disclosed in the Contract.

Alfaro testified that he did not know how the CPA coded the movement of money between

accounts and therefore could not affirmatively answer that money transferred from the segregated

account to the Primera operating account was coded as management fees. Alfaro then testified that

the CPA often coded a particular transaction incorrectly—an assertion made throughout Alfaro's

testimony. Alfaro testified that the movement of money between accounts did not dilute the funds

available to pay Primera's vendors. Alfaro testified that funds available to vendors depended on

other variables such as the amount of accounts receivable, how much is owed a vendor, and how

much product there is to sell.

Regarding Primera's working interest in each of its wells, Alfaro explained that a 10%

working interest was retained by Primera Energy in the Screaming Eagle 2H well; 6 to 8% was

retained in the Screaming Eagle 3H well; and 1.8% was retained in the Screaming Eagle 4H well. Alfaro, however, did not know the revenue from distribution of those wells.

           b.        Testimony Specific to the Screaming Eagle 4H Well

Alfaro testified that he raised either $9.4 or $9.6 million from investors for the Screaming Eagle 4H well. Alfaro agreed that Primera owned the excess working interest in the well which was roughly a 1.898% interest. Thus, Alfaro testified that 97% of the working interest was sold to investors in the Screaming Eagle 4H well.

Alfaro testified that for years 2013 and 2014, Primera received $9,698,238 from investors for the Screaming Eagle 4H well and that this represents the selling of most of Screaming Eagle 4H well's working interests. Alfaro further testified that money received by Primera in December 2014 for the Screaming Eagle 4H well was not used for the next prospect. Alfaro stated that there were investor deposits of $1.46 million and transfers to Primera of $1.101 million in January of 2014. As such, $69,000 remained in the Screaming Eagle 4H well account after January 31, 2014. Alfaro, however, would not agree that the transfers to Primera operating account were in excess of the drilling amounts collected under the Screaming Eagle 4H well investments, as money was often transferred back and forth between Primera operating and well accounts, making the accounting confusing. Alfaro would also not agree that there were no transfers back and forth between Primera operating account and the Screaming Eagle 4H well account in January 2014. *See* Trial Pl. 13, p. 677 (showing that Alfaro stated that use of the word "transfers" did not reflect the actual act of moving money back and forth between accounts).

Further, Alfaro testified that he did not agree that the only transfers that were coming into the Screaming Eagle 4H well account in December 2014, were from the Primera operating account to pay Screaming Eagle 4H well vendors. Alfaro, however, did testify that in November and

December of 2014 there were no investor deposits placed into the Screaming Eagle 4H well account. Alfaro further testified that he did not know how many units were still available at this time or the status of accounts receivable. Based on the financials of Primera from 2014, Alfaro testified that he did not agree that money received by Primera in December 2014, would have to come from investors for the next well prospect. Alfaro testified that in December 2014, the overall Primera operating account lists fifteen entries that show transfers being made from the Screaming Eagle 6H well account into the Primera operating account. Alfaro testified that the money transferred out of the Screaming Eagle 6H well was not transferred into the Screaming Eagle 4H well. Alfaro also testified that he disagreed with the assertion that from January to October 2014, Primera would take money out of the Screaming Eagle 4H well account to the point that there was not enough to pay vendors that drilled the Screaming Eagle 4H well.

Alfaro stated that Covington wrote and signed the checks for Primera to pay vendors, but that he approved vendor payments. Alfaro testified that he did not have an incentive to disregard vendor invoices despite the fact that money that does not go to vendors would be profit for Primera. Alfaro stated that he was not sure if Primera still owed $3 million in invoices on the Screaming Eagle 4H well. According to Primera's bankruptcy schedules, the outstanding invoices for the Screaming Eagle 3H and 4H wells totaled over $7 million. The Court notes that it appears that the Primera bankruptcy schedules are inaccurate because there are outstanding claims by vendors not included in the schedules. Nonetheless, Alfaro signed the schedules indicating that the number of outstanding claims was accurate.

Regarding overages on the Screaming Eagle 4H well, Alfaro testified that Primera hardly ever asked investors, who had already paid an initial investment, to pay more money as overages. He testified that overages were charged on the Screaming Eagle 4H well because Primera did not

realize electricity for the well would be needed. Alfaro testified that electricity was one of the line items on the AFE for the Screaming Eagle 4H well, but this initial estimate in the AFE was not enough. Alfaro testified that he relied on Cliff Davis to assess this extra expense for the Screaming Eagle 4H well. Alfaro testified that the subscription agreement states that if investors do not pay an assessment, even if it is wrong and/or fraudulent, an investor interest could be terminated. Alfaro stated that when an interest is terminated, it reverts back to Primera.

c.     Testimony Regarding the FINRA Investigation and Contract Statements

Alfaro testified that he had been the subject of a FINRA investigation in 2010 involving a business that Alfaro owned called Pinnacle. Alfaro then testified that on April 25, 2012, a FINRA order was issued stating that Alfaro has misused customer funds. Alfaro denies that he misused customer funds.

The FINRA investigation and findings was disclosed in the Contract. The Contract stated:

October 9, 2012, California Corporations Commissioner issued a desist-and-refrain order against Alfaro Oil and Gas. Mr. Alfaro and Tim Hundley, who's currently serving as executive vice president of client relations to the company. The letter alleges that Alfaro Oil and Gas and Alfaro and Hundley sell joint ventures in California, in violation of the state securities law, and orders Alfaro Oil and Gas, Hundley, and— to refrain from the sale of securities in the state of California, in violation of state law.

d.     Testimony Regarding the Investment Process

Alfaro testified that he called most of the investors before they invested in their wells, except for the Gillette group. He further testified that many of them brought in referrals. Alfaro testified as to which investor was a walk-in and who received a phone call prior to investing. Alfaro testified that Curtner, Campisi, Crawford, Keese, Ed McPherson, Wesley Crow, Bill Quackenbush, Rick Reily, Greg Shilts, DC Oil Company, Buford and Lillian Salmon, Joe Hart,

Brian Huber, David Davalos, Daniel Davalos, R+E+G, K&Z, Dennis McMillian, Chip Johnston, and Milan Knezovich all received telephone calls prior to investing Alfaro testified that all other eighteen investors were walk-ins.

Alfaro explained the investment process that was used with Primera' investors, was that he would send a brochure to the investor and see if the investor had a tolerance for high risk. Alfaro would then check to see if the investor is accredited—that is, if the investor can withstand financially losing his or her investment. Alfaro explained that the term "accredited" means that the investor has a net worth of at least $1 million and/or the investor's income is $200,000–300,000 if the investor is single; if the investor is married, they must have over $300,000 in liquid assets not including house and home furnishings. Alfaro testified that he based these numbers using Securities and Exchange Commission ("SEC") statistics. Alfaro stated he would ask a potential investor if they are accredited. If an investor was accredited, Alfaro would find out if they are interested in investing in Primera, give them the Contract and walk the investor through the document, and then get the investor to sign a contract stating that they are accredited.

Alfaro explained the company was marketed by sending potential investors a postcard with a picture of a well. Alfaro stated that this is a common practice the oil and gas industry. Further, Alfaro stated that part of the reason he sends postcards out is to entice investors and the other part is inform potential investors. Alfaro testified that he sent the postcard to people that were potential oil and gas investors and current investors in Primera. Alfaro then testified that he did not recall receiving any calls based on the postcard campaign. If an individual wanted to invest in a well, Alfaro testified that the investor is required to sign a subscription agreement before Primera accepts an investment in a well. Further, the investor must also send a check with the subscription agreement for the purchase of a unit(s). Alfaro testified that this practice is the same for all wells:

Screaming Eagle 1H, 2H, 3H, 4H, 6H wells, and the Black Hawk Buda.

Alfaro explained how the investment process worked for particular investors. For example, Alfaro testified that Curtner would have received a Contract after Primera had built a relationship with him and established him as suitable investor. Alfaro said that Curtner received a brochure that explained Primera's philosophies and served as an educational tool to see if the Curtner qualified. Alfaro explained the subscription agreement between Primera and Curtner and that there were a number of disclosures and a suitability questionnaire in which the investor must attest that s/he is accredited. The investor then signs the questionnaire, dates it, and attests that s/he meet the qualifications.

Similar to his dealings with Curtner, Alfaro stated the he made no representations to Patek or other investors prior to executing the subscription agreements. Additionally, Alfaro testified that he made no representations to Mrs. Patek before she executed the subscription agreement. Alfaro then indicated that he made no representations to any of the Plaintiffs before they executed their subscription agreements. Alfaro cited language in the Contract advising investors about not relying on salespeople oral representations. Alfaro explained that the disclosures in the Contract indicate that one should not rely on oral representations because investors should only rely on the disclosures within the Contract.

Additionally, Alfaro did not dispute that he or his sales staff may have made oral representations to investors over the phone. Alfaro stated that he only made representations that are contained in the Contract. Moreover, Alfaro stated it was his impression that he can say anything he wants over the phone because he can rely on the Contract's limitation against relying on oral representations in the Contract. Moreover, Alfaro maintained that he did not tell investors over the phone that the investment was guaranteed.

Alfaro then stated that that the subscription agreements for the wells are virtually the same. Further, Alfaro testified that there is no difference in the representatives and warranties in the subscription agreement for all of the wells.

Alfaro acknowledged that the Contract contains a number of representations and warranties of the subscriber (Primera). The Contract states that: "Oral statements which differ from the written data provided prospective investors have not been authorized and should not be relied upon under any circumstances." Alfaro testified he did not make any such representations of fact prior to any of the Plaintiffs executing their subscription agreement. Further Alfaro stated that he made no representations to any of the Plaintiffs such that they would rely on those statements prior to executing their subscription agreements. In addition, Alfaro testified that he coordinates the preparation of the Contract. Alfaro stated that the geologist and engineer prepare geological and engineering data and then it is approved by the legal team. Alfaro further stated that a Contract was provided for each unit sold in all wells (Screaming Eagle 1H, 2H, 3H, 4H, 6H wells, and Buda Black Hawk).

Alfaro explained that every investor received the Contract before investing. Alfaro noted that in the back of the Contract, the investor had to provide information regarding their suitability for the investment. The investor then certified that the investor is accredited for making the investment. Alfaro stated that once Primera receives the subscription agreement, suitability questionnaire, and investment, then the investor is considered an investor in a particular well.

Alfaro testified that in the Contract that the investor is notified that the investor could forfeit his or her interest. Specifically, the Contract states that there could be forfeiture of interest:

> A portion of the purchase price for the units represented the unit's share of estimate drilling and testing costs and completion and equipment costs associated with the well. In the event that the unit share of actual drilling and testing costs or actual completion and equipment costs exceed the amount estimated, participants will be

required to tender additional funds to the company and payment for their working pro rate portion of such excess costs, overages. And if they should fail to do so, then their working interesting ownership in the well will be forfeited to the company.

### e. Testimony Regarding the Gillette Group

Alfaro testified that he had several meetings with the Gillettes. At the first meeting, the following individuals were present: Eddie Gillette, Thomas J. Gillette, Vince Gillette, possibly Margie, Tish Gillette, Vince Gillette, Orlando Guerra and possibly his brother, and Ms. Guerra-Gillette. Alfaro testified that the Gillettes came with Rick Reily, and possibly, Rick Reily's mother and father (Betty and James Reily). Alfaro stated that he had the geologist, the engineer, Covington, and a legal team present to answer the Gillettes' questions. Alfaro and his team answered legal, tax, and geological questions regarding the prospective investment. Alfaro stated that he did not tell the Gillettes that Primera already found oil and that the company just needed the Gillette's investment money. Alfaro testified that the Gillette group was excited about investing in Primera, but Alfaro told them to calm down and take home the material, read it, and they could all reconvene later. Alfaro testified that the Gillette group wanted to invest immediately but he wanted them to wait so that they understood the risks.

Alfaro explained that the next meeting with the Gillettes was either the next day or the day after. Alfaro testified that the Gillettes asked a number of questions, particularly regarding Alfaro's past. Alfaro stated that he answered all their questions and characterized the group as being skeptical during this meeting. Alfaro stated that he went through the FINRA and California Regulatory action issues with the group, as well as the disclosures. Alfaro noted that the California action was disclosed in every Contract and that he never denied that he was the person involved in the California action. Alfaro then testified that after he answered the group's questions, the Gillette group signed the subscription agreement and the documents were executed.

Additionally, Alfaro testified that at one of the meetings with the Gillette group, Tish expressed interest in selling for Alfaro as she knew a number of doctors. Alfaro stated that she was excited about the product and he told her that he could hire here as an executive at Primera but she wanted to sell on an outsourced basis. Further, Alfaro testified that his attorney, Patton Zarate, was present for this discussion and the way they could make Tish a salesperson would be to have her sign a BD form.

        f.      Testimony Regarding Commissions, Management Fee, and Vendor Payments

Alfaro testified that he understood commission-based compensation to mean that when you make a sale you get a specific percentage of the sale's price. Alfaro then stated that he never received commission-based payment as the president of Primera. Alfaro stated that Primera never earned more than 10% in the Screaming Eagle 1H, 2H, 3H, 4H, or 6H wells. Alfaro testified that no other Primera employee was paid a commission. Alfaro maintained that he did not pay any commissions because Primera is not a brokerage firm. Alfaro also stated that he has never taken a commission on any of the investor monies that had been deposited into Primera's accounts.

Alfaro stated that Primera has employees fill out monthly sheets that show job duties and if the employee is doing a good job, an employee may receive a bonus. Alfaro then testified that an employee could earn a bonus based on overall job performance such as sales, but that a bonus is not based solely on sales. Alfaro stated that paying of bonuses was discretionary with him to determine how much the person has accomplished and if the employee deserved a bonus. Alfaro stated that he would look at documentation such as an employee's monthly job duty report, then sit down with the employee, and discuss their value to Primera. Alfaro agreed that during 2013, hundreds of thousands of dollars were given in bonuses to sales persons. Alfaro testified he would

look at the financial health of the company before paying a bonus. Alfaro then stated that when assessing the health of the company, he would look at where Primera was sitting financially—incoming revenue versus the obligations of the company. Alfaro then stated that Covington would provide information regarding the health of the company.

Alfaro testified that he would sit down with Covington to discuss Primera's financial situation when he wanted to take an owner draw. Alfaro further testified that the two would discuss the financial health of the company, outstanding invoices, accounts payable, accounts receivable, and Primera's overall finances. After discussing this, Covington and Alfaro would determine how big of a bonus Alfaro could take. Alfaro said that he relied on Covington's financial expertise when taking a bonus. Nonetheless, Alfaro testified that he did not believe that the books and records of Primera are accurate.

Alfaro stated that Primera was able to charge a management fee but he did not believe that it was ever done. Alfaro acknowledged that millions of dollars had gone into his personal bank account since January 1, 2013 as compensation to him.

Alfaro testified that when bills came to Primera, the bills were routed to the accounting department. Alfaro stated that Covington was in charge of accounting. Alfaro stated that it was the accounting department's responsibility to input an invoice into an accounts payable ledger. Alfaro further stated that he received the payable ledger every day and this would be something he looked at when deciding whether to take an owner draw. Alfaro stated that he recalled Covington's testimony that no bill would be paid unless it had Alfaro's approval. Alfaro, however, testified that this statement was not true as Covington paid many basic bills without approval. Covington would verify that he wanted to pay certain bills and Alfaro would tell him to get them paid. Alfaro explained that Primera did not refuse to pay invoices, but noted that prior to bankruptcy, the

company had to prioritize and pay the important bills first. Alfaro maintained that it was not true that he chose to pay himself and take owner draws as opposed to paying invoices.

2.    Brian Alfaro—Trial Testimony

a.    Testimony Regarding the Subscription Agreement and PPM

The Plaintiffs called Alfaro at the trial as an adverse witness. Some of the examination was repetitive of what Alfaro testified at the TRO hearing, and will not be repeated here. The Court will only provide a summary of newly elicited testimony of Alfaro. Plaintiffs' counsel again examined Alfaro about his understanding of the Contract. Alfaro agreed that as the president of Primera, he was careful to include only truthful and accurate information in the Contract. Alfaro testified that it was perfectly reasonable for the investors to rely on the information in the Contract. Alfaro further testified that he communicated to potential investors that neither he nor Primera's employees would receive commission-based compensation for the sale of the units. Alfaro agreed that every time he sent a Contract to a potential investor he was making that promise.

Alfaro then testified that one of the promises that Primera made in the Contract was how Primera would apply the investor proceeds to the particular well for which the investor had invested. Alfaro was asked if he agreed that every time he sent out a Contract he was representing that he was going to apply the funds as stated in the Contract. Alfaro further testified that every time he signed a subscription agreement he was making a promise that he would not pay commission-based compensation. Alfaro testified that it was reasonable for investors to rely on the promise that he would not pay commission-based compensation to himself or his employees.

b.    Testimony Regarding Bankruptcy Filing and TRO

Alfaro stated that Perez and Blair put together the schedules and statement of financial affairs for the bankruptcy case. Alfaro confirmed that Perez and Blair provided him the information

for the bankruptcy schedules and he signed it. Alfaro confirmed that when he signed the schedules he was stating that as owner of the Primera and that, he read the summary and schedules and they were true and correct to the best of his knowledge. Alfaro stated that he made the decision to put Primera into bankruptcy. Alfaro confirmed that, according to the schedules, Primera owed $7,202,013.11 to creditors. He further testified that the amount of compensation he paid himself during 2013 and 2014 was over $5 million. Alfaro stated that he did not think his taking out $5 million in owner draws and in W-2 compensation in 2014 contributed to Primera's bankruptcy.

Alfaro discussed whether the TRO prohibited him from making payments to vendors or draws for himself. Trial P 6. Alfaro testified that the TRO said nothing about Primera being prohibited from paying vendors. Alfaro confirmed that the TRO said was that Primera could not pay Alfaro any money besides a $5,000 payment on or about April 30, 2015. Alfaro then confirmed that the order was entered on May 28, 2015. Alfaro further testified that the order was in place for fourteen days and it would have expired on June 12, 2015.

Alfaro then testified that he took owner draws from Primera from May 1, 2015 to June 1, 2015. He confirmed that he took ten owner draws during the time the TRO lapsed. Alfaro admitted that he took a $5,000 owner draw on June 1, 2015, even though the TRO stated that he could only take one draw. Alfaro understood that the investors intended use of their funds was for drilling and completing a specific well. Alfaro agreed that the investors intended that their money be used to pay vendors for their wells.

c.      Issues with Investments and Wells

Alfaro explained that in 2015, 100% of Primera's profit came from investor contributions. Further, Alfaro agreed that in 2014, the only money that Primera made from production from its working interests was $137,000. Alfaro then testified that, with the exception of $137,000, all of

Primera's revenues came from investor contributions.

Alfaro stated that the Screaming Eagle 4H well Contract, like the other Contracts, provides that proceeds received from the offer and sale of all units will be deposited into a segregated bank account in the name of the program. Alfaro explained that if moneys were transferred from a well account to the Primera operating account it was done at the direction of his lawyers or pursuant to Primera policy. Alfaro would not accept responsibility for whether an investor's investment should have not gone to the Primera operating account. Moreover, Alfaro believed that an investor's money could go into a segregated well account, then to the Primera operating account, and then to Alfaro's personal account.

Alfaro acknowledged that Primera compensated him two ways—through owner draws and through W-2 compensation. Alfaro stated that he believed his W-2 salary in 2013 was $880,000 and that his W-2 salary in 2014 was $1.2 million. Alfaro admitted that over a two and half-year period he took 483 owner draws. Trial P 132. Further, of the 483 draws taken from 2013 to 2015, 113 constituted exactly 10% of investor contributions, or nearly 10% of the contribution. Nonetheless, as of June 26, 2015, Primera had not paid over $7 million that it owed to vendors. Alfaro argued that many of the vendor claims were illegitimate, and therefore, were not paid,

Alfaro acknowledged that one of Primera's vendors, Platinum, sued Primera for unpaid invoices. Nonetheless, Alfaro agreed that he took out $146,000 in draws just before Platinum filed suit, and, had he not taken the draws, Primera could have paid Platinum under a settlement agreement.

d.      Testimony Regarding Alfaro's Personal Financials

Alfaro stated that he lived in Shavano Park, Texas and that Bexar County Appraisal District value in 2015 was $2.9 million. The monthly payment for the home was $23,000. Alfaro indicated

that when Primera filed for bankruptcy, he also owned a lot in Boerne, but was in the process of selling it. Alfaro agreed that the lot was worth $1.2 million. Alfaro also owned a house at Cinnamon Shores on Mustang Island, Texas and was worth about $926,000.

Alfaro then testified that at the time of the bankruptcy, he owned a Bentley, Ford Mustang, Porsche, G-Class Mercedes, Lamborghini, and was leasing a Cadillac Escalade. Alfaro testified that the monthly payment for the G-Class Mercedes was $2,300. Alfaro stated he purchased a new G-Class Mercedes about the time of the Primera bankruptcy for about $150,000. Alfaro stated that the lease on the Escalade was $1,600 a month and he made $2,854 monthly payment for the Porsche. Alfaro could not recall the monthly payment was for the Bentley. Alfaro testified that he does not pay cash for the vehicles, but puts nominal cash down and takes a note. Alfaro testified that at the time when he purchased the cars, properties, and San Antonio Spurs tickets, the only job he had was as president of Primera, Alfaro O&G, and Alfaro Energy and that during this time, his sole income came from the three entities.

e.     Testimony Regarding Silver Star Resources

Alfaro explained that he had another business venture—Silver Star Resources which facially appeared to do the same thing as Primera. Nonetheless, Alfaro testified that Silver Star's business model is not the same as Primera's business model. Further, Alfaro stated that in March of 2016, Silver Star Resources paid $732,200 into the Kristi and Brian Alfaro Trust.

3.     Kristi Alfaro

Kristi Alfaro testified on March 28, 2015, at the Preliminary Injunction Hearing. She did not testify at trial. Kristi Alfaro has been married to Brian Alfaro for twenty-four years and they have four children.

Kristi Alfaro testified that she dealt primarily with the day-to-day finances of the

household, which included paying any loans or notes that the couple had on various assets that they owned. The assets Kristi Alfaro testified to owning along with Brian Alfaro included:

- G-class Mercedes, purchased around 2013 at purchase price of $130,000 and monthly payment of $2,300.

- Orange Lamborghini, purchased around fall of 2014 at purchase price of $400,000, and monthly payment of about $6,000. As well, she stated that she did not know of any other Lamborghinis that her husband may have owned or been driving.

- Porsche, purchased for $130,000.

- Cadillac Escalade, purchased March of 2015 and monthly payment of $1,600.

- Bentley, purchased within the last two years for $189,000. Kristi Alfaro also stated that her husband did own another Bentley prior to the purchase of the one he owned currently.

- Ford GT, purchased around June 2006 for $160,000.

- 1999 Viper, purchased around fall of 2005.

- Two Ducati Motorcycles, purchased between 2005 and 2007.

- Home at Huntington Place in Bexar County, purchased in December of 2013 and a monthly payment of about $23,000. She did not dispute the Bexar County Appraisal District's record of $2.5 million of value for Huntington Place.

- Home in Anaqua Springs, purchased in September of 2005 monthly payment on the home of roughly $6,300 and was for sale for $1.2 million.

- Two lots in Anaqua Springs valued at $100,000 and $500,000 respectively, purchased around 2007 and 2008. There was a monthly payment on the property valued at $500,000, but Kristi Alfaro could not testify to the amount of the payment.

- Condo downtown at Fedora, purchased about two or three years prior. Kristi Alfaro was not aware of the purchase price or monthly payment. She additionally stated that the condo at Fedora was for sale, but did not know the exact purchase price.

- Lot in Lago Vista, near the Austin area, purchased outright with no monthly payment many years ago.

Mrs. Alfaro stated that she and her husband created a trust for the benefit of their children on July 28, 2004. Assets held by the trust included a beach home at Cinnamon Shores on Mustang Island and life insurance policies. When asked when the beach home was transferred to the trust, Mrs. Alfaro stated she was not sure, but that she thought it had been a couple of years. Further, she testified that the Alfaro's life insurance policies either initially funded the trust or were transferred into the trust at the same time as the home. The trust was created to protect assets from frivolous suits, and to provide for their children. Mrs. Alfaro did not know that by transferring the home to the trust it would become more difficult for people, who sued her and her husband, to obtain it in a judgment. She did state, however, that they wanted to protect the assets for their children and their children's children.

Kristi Alfaro stated that she and her husband owned numerous investment and bank accounts including: a Scottrade account to make investments, a Chase Bank account that contained assets from a closed Broadway account, a 529 Account with Edward Jones created for the benefit of her children's education, a Karnes City national Bank for the purpose of paying the Huntington Place home payment, and a Wells Fargo account used to make the monthly payments on the Anaqua Springs.

F.      Primera Employees and Michael Turner

1.      Justin Rodriguez

Rodriguez is a former employee of Primera, and a current employee of Silver Star Resources. Rodriguez testified that he worked at Primera from late 2011 until June 2015, and that a portion of his job function included sales. Specifically, Rodriguez was responsible for trying to generate potential investors in the wells. Rodriguez testified that he was responsible for recruiting the Gillettes as potential investors.

As to finding new investors, Rodriguez testified that Primera purchased lists of leads and the sales representatives would call the individuals on those lists. Further, Rodriguez stated that he understood the lists were comprised of high-wealth individuals who were accredited to purchase a working interest in a well.

Rodriguez testified that he receives a salary. Rodriguez disputes that it is a draw, as characterized by Cody Reyes in his testimony. When asked, Rodriguez expressly denied that as a salesperson for Primera he was paid a commission for investor contributions that he brought into the company. Similarly, Rodriguez expressly denied receiving commission-based income for any sales that he brought into the company.

2.      Michael Perkins

Perkins stated investor contributions to the Screaming Eagle 3H well totaled $10,560,454.77 and that $3,183,740, or 30.1% of the contributions, had been paid to Primera as management fees. The well's balance sheet indicated an outstanding accounts payable attributable to vendor claims for $2,895,238. Perkins testified that investor contributions for the Screaming Eagle 4H well totaled $9,698,238. Roughly 65% of these contributions ($6,304,608), was paid to Primera as management fees. The Screaming Eagle 4H well balance sheet showed an outstanding

accounts payable attributable to vendor claims for $3,060,106. Perkins testified he examined financial records to complete his report; including balance sheets, income statements, general ledger, bank statements, and support for journal entries.

Perkins testified he believed money flowed to Alfaro in three ways: owner draws, intercompany transfers, and W-2 compensation. Perkins testified that Exhibit C of Plaintiffs' Trial Exhibit 1 showed 10 instances during the first quarter of 2014, the period between January 1 and March 31, 2014, wherein the amount of draws paid to Alfaro represented either exactly 10% or close to 10% of investor contributions collected that same day. Perkins testified that owner draws totaled $3,257,158 during that period.

Perkins testified that he requested Alfaro's personal bank statements to determine whether or not Brian Alfaro actually received the funds in his accounts. Those statements were not provided to Perkins. Rather, Perkins stated he knew the money was paid to Alfaro because it was notated in Primera's general ledger.

Perkins testified that his report in Exhibit C was not exhaustive. Perkins stated he did not have time to examine every draw in the ledger listing and focused his report only on draws that correlated to an investor contribution, all of which were approximately 10% of the contribution suggesting the presence of commission-based compensation. Perkins admitted it would not be surprising if the Screaming Eagle 4H well had more than 100 investor contributions between 2013 and 2014.

Perkins testified it was not possible to say that the same dollar deposited into the Screaming Eagle 3H or 4H wells segregated account that came from an investor contribution was the same dollar that went directly into Primera's operating account and was subsequently transferred to Alfaro. Perkins testified it was likely Primera had other sources of income other than investor

contributions that were likely accounted for in the ledger.

Perkins testified that he did not read Primera's PPM or any of its subscription agreements, and admitted to having no knowledge as to what Primera could do with investor contributions deposited into a segregated well account or whether Brian Alfaro was entitled to commission and owner draws. Perkins also admitted to not knowing whether Primera could pay itself regardless of whether a well was profitable or losing money.

3.     Edgar Perez-Mendez

Perez worked as the CPA for Primera full time from May 3, 2015 until July 9, 2015. Perez stated that he understood Covington was there for "five years, with a small gap" prior to him. Perez stated that he understood Covington would transfer certain funds from individual well operating accounts into Primera's operating account, and that some of those funds would be transferred back into well accounts. Further, he understood that vendors were paid from those well accounts, and the general account was for expenses such as salaries, overhead and rent. Perez testified that Blair was his assistant while he was a full time employee in the CPA role.

Perez stated that when Primera filed for bankruptcy just a few days before he started full time, he appeared on Primera's behalf at the section 341 meeting of creditors. Further, Perez testified that he was involved in the preparation of documents for that meeting along with Blair and Primera's bankruptcy counsel. Perez noted that the data he used to prepare for the meeting was compiled from the records in the Primera accounting computer system. Perez testified that according to the summary of schedules (ECF No. 57 in the bankruptcy case), creditors hold unsecured nonpriority claims in the amount of $6,266,930.80. Perez stated that he represented to the bankruptcy court, on behalf of Primera that it owed trade creditors the amount in the summary of schedules.

Perez testified that of those claims, he indicated, on behalf of Primera, that the claims lacking an invoice were marked as "disputed." Perez also stated that he was not the appropriate person to determine whether charges are valid, and that he was just gathering and compiling information.

As to Alfaro's compensation, Perez stated that he limited familiarity with it. Perez testified that Alfaro received W-2 employee compensation, as well as frequent draws. As an aside, Perez testified that the frequency of the draws taken by Alfaro appears unusual to him in his experience. Specifically as to Alfaro's compensation, Perez testified that in 2013, Alfaro received salary of roughly $880,000 and in 2014, salary of $1.2 million. In addition to the salary, Perez testified that from January 1, 2013, to December 31, 2014, Alfaro took draws of $3,357,158.00. Perez testified that in total, including draws and salary, Alfaro was paid $5,337,658 in 2013-2014.

Perez testified that in 2013 and 2014, the Screaming Eagle 3H and 4H wells collected a total of $18.6 million in investor contributions. From that, Perez testified that he divided the $3.2 million that Alfaro received in owner draws to determine that Alfaro took 18% of the investment funds collected in draws. Perez stated that on the money raised in the Screaming Eagle 3H and 4H, 29% went to Alfaro in compensation or draws.

As to draws, Perez testified that it would be consistent with Perkins's report that from January 1, 2013, to June 1, 2015, there were 113 instances of Alfaro taking 10% or nearly 10% of investor contributions. As to splits with sales persons, Perez testified that there were another 166 instances of Alfaro and another sales representative together taking 10% or nearly 10% of investment contributions.

As to how Primera generated income, Perez stated that he understood that Primera sells working well interests to investors, and that Primera possibly could have retained working interests

in the well itself. Perez testified that of the money brought into Primera in 2013-2014, 90-95% of it came from investor contributions. Perez agreed that because 90-95% of Primera's revenue came from investor contributions, any draws that Alfaro took then also came from investor contributions. Similarly, in 2015, Perez testified that probably all of the revenue Primera received was investor contributions. Perez stated that during the time that he was at Primera as its CPA, he noticed Primera customarily paid Alfaro and other sales representatives 10% of the monies they brought in from investors. Further, Perez testified that when he began work full time as Primera's CPA, there were many vendors who had not been paid, or even had their invoices entered into the accounting system yet.

Perez stated that he understood the actual cost of the wells to be approximately 60% of the amount reflected in the AFE, leaving a 40% profit margin. Perez testified that he did not know whether that 40% margin was in the AFE, but that that was what Primera netted regardless. Further, Perez stated that when Primera filed bankruptcy, it had over $6 million in total liabilities, despite netting 40% of investor contributions.

As to the 40% profit margin, Perez testified that it would include operating costs, administrative costs, overhead, and a factor for risk. Moreover, Perez also stated that it is not unusual for oil and gas promotion companies to retain a substantial amount of the contributors' investments for expenses.

Perez was told that in March to May 2015 preceding the bankruptcy filing, Alfaro took $204,000 in owner draws. To this, Perez testified that he would not have done that because it would not be good for the company and that he "couldn't sleep at night."

4.      Tim Hundley

Hundley stated that Alfaro has spoken with him about commissions throughout the entirety of their relationship, but that he does not recall specific instances. When asked whether his job was to sell working interests to prospective investors, Hundley stated that that was not necessarily accurate, and rather, "one of [his] job duties was to participate in the sales process of working interest in the projects that the company had available." When asked how much investment monies he sold in total in working interests, Hundley testified that he would not be surprised if the amount exceeded $5 million.

Hundley stated that he has spoken with Brian Huber, and that he knows him as a former client of one of Alfaro's entities. Hundley testified that he has spoken with Huber, but when asked whether he received a commission of the sale of Huber's investment, Hundley stated that he "did not believe so."

As to his compensation, Hundley testified that he was a salaried employee. When asked if he took a draw as part of that salary, Hundley stated "perhaps." As to draws, Hundley testified that he believe he did have to pay them back. Hundley stated that he received a base salary in addition to discretionary bonuses awarded by the company and not attributable to specific sales.

5.      Sonia Jimenez

Jimenez testified that she manages Alfaro's phone calls, including forwarding incoming calls, taking messages, relaying those messages, and deciding when to put callers through to him. Jimenez testified that she is the record keeper for Alfaro. Jimenez stated that records are kept in a company database, including the information of all of the investors. As to the mail management, Jimenez testified that she prepares and sends out mail on behalf of all employees of the company, including sending correspondence out to investors such as reports on the wells or invoices.

6.     Cody Reyes

Reyes testified that at a pre-hire interview, Alfaro described how salespersons of Primera were to be compensated: $3,000 per month and a bi-weekly pay check, on top of commissions, which Reyes stated were referred to as bonuses, of 10% per every share sold. Reyes stated Alfaro would then take back the $3,000 draw from the $10,000 sale bonus corresponding to every share sold.

Reyes testified that he was selling shares for the Screaming Eagle 4H well, cold calling potential investors; Reyes added that he was never really sure what he was selling and had trouble conducting phone calls. Reyes stated he was required to pick investors from a database showing the investors' states and assets and was required to make 200 phone calls per day. Reyes testified that he never discussed securities licensing during the pre-hire interview and reiterated that it was not required. Reyes testified that he had no other job duties other than cold-calling investors and trying to sell shares.

7.     Michael Turner

Turner testified that in conducting his forensic accounting investigation, he did not have access to the accounting program used by the Alfaro entities, Wolfpack. Rather, Turner stated that he worked off printed copies of ledgers. Turner testified that by not having access to the accounting software that and it slowed his analysis down immensely.

On June 2, 2015, Lamont A. Jefferson was appointed by the Honorable Judge Antonia Arteaga to serve as the receiver for Primera, Alfaro O&G, and Alfaro Energy. The appointment does not encompass Alfaro's personal assets. Mr. Jefferson prepares and submits quartly reports discussing the receivership estate and the property in its possession. Mr. Jefferson monitors the receivership account at Frost Bank and traces the deposits and disbursements made from that

account. Mr. Jefferson also monitors the status of the East Moss Lake/LNG wells the North Cankton well.

Turner testified that he created his report from his investigation as to the monies that the receiver for Alfaro Energy and Alfaro O&G recovered from Jordan Oil. Turner stated that there was $900,000 deposited into the registry of the Court, and that it had come from various Primera accounts.

Turner confirmed that pursuant to his investigation into the Alfaro entities, he discovered that the monies recovered by the receiver were not entirely due to Alfaro Energy or Alfaro O&G. Rather, Turner stated that of the $900,000 recovered, approximately $577,000 were transferred by an Alfaro entity to the investors of the East Moss Lake well. Turner stated that he could trace the $577,000 that was paid to the East Moss Lake investors from accounts belonging to Alfaro entities. Specifically, Turner stated that the source of the funds were attributable to the Primera operating account, and specific segregated accounts including the Montage Legacy 1H well account, the Montage Legacy 2H well account, the Alfaro Screaming Eagle 1H account, and the Primera Screaming Eagle 1H account. Further, Turner testified that the monies used to pay the distributions to the East Moss Lake were "earmarked" in the accounting entries as being specifically for that purpose. Finally, Turner stated that he understands these funds to be characterized as either a loan or monies to replace the distributions that were not being paid by Jordan. For example, in January 11, 2012, $95,000 was transferred from the Montage into the Alfaro operating account. Subsequently, $100,000 was transferred from the Screaming Eagle account and that same day, $195,000 was transferred to the East Moss Lake LNG.

Turner testified that during 2012 and 2013, over $5 million was transferred from various well accounts into the Alfaro operating account. Turner stated that from that $5 million,

$577,655.91 was used to pay the East Moss Lake investors. Turner testified that he found numerous intercompany transfers between Alfaro Energy, Alfaro Oil and Gas, Primera Energy and the individual segregated well accounts. Turner testified that his opinion of the state of the accounting records at Primera is "a real mess."

Turner confirmed that the Contracts state that investors' initial funds (their contributions) are in a segregated account. He testified that a segregated account is usually labeled at the banking institution with the name of the joint venture. Turner testified that Primera did have segregated bank accounts for each individual well.

## V.  **Miscellaneous Evidence Presented**

- The parties stipulate that, on April 4, 2016, the Chapter 11 Trustee sold the remainder of the leases belonging to Primera in McMullen and Gonzales County, Texas for $700,000, and no Plaintiff objected to that sale.

- The parties stipulate that, on May 2, 2016, Plaintiffs filed their Objection to the First Amended Plan and the proposed treatment of the Plaintiffs as being subordinated to the claims of the unsecured creditors, claiming that the Plaintiffs were not shareholders of Primera, but that they had purchased working interests in specific wells and should be treated as general unsecured creditors.

- The parties stipulate that, as part of confirmation of the Chapter 11 Trustee's plan in the underlying bankruptcy, Plaintiffs agreed to subordinate their claims to the claims of unsecured creditors in exchange for which the Chapter 11 Trustee released any and all claims of Primera against Plaintiffs, including but not limited to Plaintiffs' joint and several liability with Primera as joint venturers of Primera Energy.

ANALYSIS OF PLAINTIFFS' CLAIMS

As an initial matter, Defendants note that only seventeen of the twenty-eight Plaintiffs remaining at the time of trial testified (some of the Plaintiffs elected to non-suit the Defendants). Defendants argue that the failure of each Plaintiff to testify at trial should be a *per se* bar to those Plaintiffs' ability to recover on their plead claims. While the burden of proof remains on each Plaintiff to prove the elements of each cause of action, the Court declines to find that failure to appear to testify at trial alone provides a bar to recovery on all claims. Although the lack of testimony provided by those Plaintiffs may ultimately prove fatal to their claims, the Court shall take the evidence presented by each Plaintiff on each claim in turn and weigh the evidence and burden of proof accordingly.

## I.     Common Law Fraud and Fraud in the Inducement

### A.      Breach of Contract or Fraudulent Inducement?

As an initial matter, the parties differ as to an important perspective of the fraud allegations. Briefly stated, Plaintiffs base their allegations of fraud on both: (1) misrepresentations contained in the Contracts; and (2) oral representations by Defendants and their agents outside of the Contracts. Defendants argue that: (1) the Statute of Frauds and the Contracts themselves bar reliance by Plaintiffs on oral representations made before signing the Contract; and (2) all representations made in the Contracts were factual or mere projections of the future and not false.

The conundrum created by Plaintiffs claims is the underlying allegations of fraudulent inducement to enter into the Contracts in the first place. Defendants, on the other hand, argue that any claim stemming from representations in the Contract and actions purportedly taken in contradiction of the Contract must be brought as a breach of contract claim *only*—a cause of action not alleged by Plaintiffs.

The Court must, therefore, answer the following questions before proceeding to analyze Plaintiffs' fraud and fraudulent inducement claims: (1) May the Plaintiffs recover under a theory of fraudulent inducement under the Contract, or is Plaintiffs' only recourse in breach of contract?; and (2) Does the Statute of Frauds preclude Plaintiffs' claims that are based solely on false oral representations?

### 1. May Plaintiffs' Recover Under Fraudulent Inducement?

Defendants argue that even if certain obligations existed within the Contract that Primera or Alfaro did not fulfill, under Texas law, such conduct is only actionable in a breach of contract claim and not in fraud. (ECF No. 365, p. 33). Defendants assert that Plaintiffs are merely disguising a breach of contract claim as a common law fraud claim, and that because the only harm suffered by Plaintiffs was economic loss, they are legally confined to a breach of contract action. (*Id*).

In contrast, Plaintiffs argue that they are not limited to a breach of contract action because the Defendants committed fraud by entering the contract with the intent not to comply with its terms. (ECF No. 366, p. 3). Plaintiffs maintain that, because they have demonstrated through Alfaro's conduct that he intended to immediately depart from the terms of the Contract, they are entitled to seek relief under fraud and fraudulent inducement claims against Alfaro. (*Id.*).

Generally, the existence of a contract is a prerequisite to a fraudulent inducement claim. *See Haase v. Glazer*, 62 S.W.3d 795, 798 (Tex. 2001). "As a general rule, the failure to perform the terms of a contract is a breach of contract, not a tort. However, when one party enters into a contract with no intention of performing, that misrepresentation may give rise to an action in fraud." *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc*., 960 S.W.2d 41, 46 (Tex. 1998) (quoting *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 597 (Tex. 1992)).

The Texas Supreme Court has insisted that, "Texas law has long imposed a duty to abstain from inducing another to enter into a contract through the use of fraudulent misrepresentations." *Formosa*, 960 S.W.2d at 46. Notably, that duty is independent of a contracting party's duty to perform under the terms of the contract. *Id*. Here, Plaintiffs argue that Alfaro made material representations for the purpose of inducing potential investors to enter into a contract with Primera. (ECF No. 366, p. 3). By way of background, the contract that was governing the investment transactions was the Contract for each respective well.

To begin with one brief example, the Contract signed by each investor expressly states that a portion of investor funds will be allocated to a management fee of varying percentages throughout the different wells. This management fee is disclosed in the "Application of Proceeds" chart within the Contract. Despite the lack of authorization, according to the evidence presented by Plaintiffs, there were multiple instances of management fees being withdrawn from the investment funds far in excess of the amount outlined in the Contract. Specifically, "[o]n the 3H well, 30.1% of the investor contributions were management fees; and 65% of the investor contributions went to management fees on the 4H well. (ECF No. 366, p. 7) (citing Trial Audio, 81:4–11, August 28, 2015).

In that same vein, the Contract expressly stated that no commission-based payments would be deducted from investor funds. Based on the terms surrounding the allocation of investment monies in the Contract, the Plaintiffs collectively understood that Primera was to operate and profit off of the aforementioned management fee, as well as profits generated once each well began producing. At trial, Plaintiffs put forth ample evidence demonstrating a blatant disregard for and contradiction to these terms. Moreover, countless Plaintiffs testified as witnesses that, had they known that ten percent of their funds would be immediately paid out as commissions, in a manner

inconsistent with the Applications of Proceeds chart, they would not have invested. The evidence presented at trial demonstrates, without question, that Alfaro and Primera's sales representatives received commission-based payments. For example, Plaintiff's Trial Exhibit 41 contains a spreadsheet calculating Primera salesman Justin Rodriguez's compensation based on ten percent of the sales he generated for Primera. Plaintiff's Trial Exhibit 132 provides a summary of hundreds of examples where Alfaro received ten percent or nearly ten percent of investor contributions that he generated for Primera.

While Defendants characterize this conduct as a breach of contract, Plaintiffs insist that Alfaro had no intention of abiding by the Contract, and rather it existed to entice potential investors to take part in these ventures. As the intent to defraud is not susceptible to direct proof, it invariably must be proven by circumstantial evidence. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986) (citing *Maulding v. Niemeyer*, 241 S.W.2d 733, 737 (Tex. Civ. App.—El Paso 1951, orig. proceeding, [mand. denied])). "Slight circumstantial evidence" of fraud, when considered with the breach of promise to perform, is sufficient to support a finding of fraudulent intent. *Spoljaric*, 708 S.W.2d at 435 (quoting *Maulding*, 241 S.W.2d at 738.) While a party's intent is determined at the time the party made the representation, it may be inferred from the party's subsequent acts after the representation is made. *Spoljaric*, 708 S.W.2d at 435 (citing *Chicago, T. & M.C. Ry. Co. v. Titterington*, 19 S.W. 472, 474 (Tex. 1892)). Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony. *Spoljaric*, 708 S.W.2d at 435.

To continue with the same example, the misuse of funds was consistent throughout the interaction with each individual investor, and across multiple wells. The Court finds that this is evidence of intent to deliberately stray from the terms of the Contract, and to continue that course

of dealing in all investment transactions. To elaborate, initially, when the first investor's funds were misappropriated, Primera should have taken steps to amend the Contract before proceeding with other investors. Instead, Primera continued offering investors an opportunity under terms that they had already departed from in the same venture. Similarly, when funds were misused much the same way for the next investor, a pattern of conduct emerged by Primera and Alfaro. That pattern reflects that Primera and Alfaro continuously presented investors with terms that they had no intention of complying with. Therefore, it is evident that when the representations were made to, say the fifth investor in any given well, Defendants presented the Contract with the intent to induce reliance and continue their same course of business. By representing that no commission-based payments would be made—when in fact Primera was fully aware it had been compensating employees for these commission type payments—Defendants apparently intended to continue to utilize investor funds in a manner inconsistent with the contract.

As to Defendants economic loss and independent injury rule arguments, the Texas Supreme Court in *Formosa* addressed both issues clearly and decisively. In regards to the economic loss rule, Defendants argue that the only harm Plaintiffs suffered was monetary, thus limiting them to a breach of contract action. Further, Defendants assert the independent injury rule, claiming that because the only harm alleged is the benefit of the bargain; Plaintiffs are limited to breach of contract.

First, the Texas Supreme Court unambiguously stated that tort damages are not precluded simply because a fraudulent representation causes only economic loss. *Formosa*, 960 S.W.2d at 46. Also in the *Formosa* opinion, the Texas Supreme Court expressly departed from a prior line of cases that barred tort damages in a fraudulent inducement claim unless plaintiff suffered an injury that is "distinct, separate, and independent from the economic losses recoverable under a

breach of contract claim. *Id*. Specifically, the Court articulated,

> [a]llowing the recovery of fraud damages sounding in tort only when a plaintiff suffers an injury that is distinct from the economic losses recoverable under a breach of contract claim is inconsistent with this well-established law, and also ignores the fact that an independent legal duty, separate from the existence of the contract itself, precludes the use of fraud to induce a binding agreement.

*Id*. at 47. The Court went on to explicitly list appellate cases in which it disapproves of holding that tort damages cannot be recovered for a fraudulent inducement claim absent an injury that is distinct from contractual damages. *Id*.

With that in mind, the Court finds that Plaintiffs are not precluded from recovering under tort for fraudulent inducement under these facts. The Court can infer that Primera continued to use the Contract—which had proved successful in convincing investors their funds would be safely attributed to only the direct costs of the well in which they acquired an interest—to induce reliance of future investors. This repeated pattern of misappropriation of funds illustrates that Alfaro was aware that investors were entering these transactions with an understanding of how their money would be allocated, based on the Contract they signed and the information they were presented. Further, Alfaro and representatives of Primera actively encouraged new investors to bind themselves to terms that they themselves had no intention of abiding by. Several Plaintiffs testified that it was important to them to have knowledge of how their investment funds would be spent, and that if they knew that their investment would be transferred into Alfaro's personal account, or applied to anything other than the direct expenses of drilling and completing the well, they would not have invested with Primera. The deliberate pattern of providing governing contract terms to the other party for purposes of encouraging their investment is consistent with Plaintiffs' claims of fraudulent inducement.

The Court finds that the facts of this case do not constitute a run-of-the-mill inadvertent breach of contract. Rather, this recurring conduct is evidence of Alfaro's intent to misuse

investment monies for personal gain, supporting Plaintiffs' action under common law fraud.

        2.      Does the Statute of Fraud Preclude Plaintiffs' Claims Based on Oral Representations?

Plaintiffs assert various claims on the basis of fraud. Defendants raise the defense that they are barred by the doctrines of parol evidence and the statute of frauds. (ECF No. 365, p. 21–22). Defendants assert that the statute of frauds requires all material terms of the contract to be in writing in order to be enforced, and that Plaintiffs claim that they relied on verbal representations not included in the written contract. (*Id.* at 22).

"The Statute of Frauds, which has been with us since the 17th century, reflects concerns about the reliability of oral evidence." ***General Dynamics Corp. v. United States.***, 563 U.S. 479, 488 (2011). The statute of frauds largely renders a contract that falls within its purview unenforceable. ***Dynegy, Inc. v. Yates***, 422 S.W.3d 638, 641 (Tex. 2013) (citing Tex. Bus. & Com. Code § 26.01(a)). Generally, the Statute of Frauds mandates that certain promises and agreements are unenforceable unless reduced to a writing and signed by the party to be charged with the promise or agreement. Tex. Bus. & Com. Code § 26.01(a). Specifically, in Texas, the promises and agreements subject to this mandate include: a promise by an executor or administrator to answer out of his own estate for any debt or damage due from his testator or intestate; a promise by one person to answer for the debt of another, a contract for the sale of real property; a lease of real estate for a term exceeding one year; an agreement which is unable to be performed and completed from one year of making the agreement; an agreement to pay a commission for the sale or purchase of an oil, gas, or mineral lease or royalty; and an agreement of cure relating to medical care. Tex. Bus. & Com. Code § 26.01(b)(1)–(8).

Invoking the statute of frauds is an affirmative defense which must be specifically pled

pursuant to the applicable rules of civil procedure. Fed. R. Civ. P. 8(c); Tex. R. Civ. P. 94. The party pleading the statute of frauds bears the initial burden of establishing its applicability. *Dynegy*, 422 S.W.3d at 641 (citing Tex. R. Civ. P. 94; *Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 517 (Tex. 1988)). Once that party meets its initial burden, the burden shifts to the opposing party to establish an exception that would take the verbal contract out of the statute of frauds. *Dynegy*, 422 S.W.3d at 641.

Here, as Plaintiffs and Defendants both point out, "[u]nder Texas law, a conveyance of a working interest in oil and gas is a real property interest that subjects the agreement conveying the interest to the statute of frauds." *Exxon Corp. v. Breezevale, Ltd.*, 82 S.W.3d 429, 436 (Tex. App.—Dallas 2002, pet. denied).

The Defendants argue that all Plaintiffs who were asked conceded that the statements contained in the Contract were factually true, and therefore any statements Plaintiffs allege are false must have been communicated verbally and independent of the contract. (ECF No. 365, p. 22). In contrast, Plaintiffs argue that the verbal representations that they relied on fraudulently induced them to enter into the contract. (ECF No. 366, p. 3).

One of the elements of a fraud claim is that the plaintiff actually and justifiably relied on the misrepresentation to suffer injury. *DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A.*, 112 S.W.3d 854, 858 (Tex. App.—Houston 2003, pet. denied) (citing *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001)). For reliance to be justifiable, a party must have exercised ordinary care and reasonable due diligence for his own interests. *Id.* (citing *Thigpen v. Locke*, 363 S.W.2d 247, 251 (Tex. 1962)). Therefore, reliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law. *DRC Parts & Accessories, L.L.C.*,

112 S.W.3d at 858.

That being said, a contract is subject to avoidance on the grounds of fraudulent inducement. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 331–32 (Tex. 2011) (citing *Williams v. Glash*, 789 S.W.2d 261, 264 (Tex. 1990); Restatement (Second) of Contracts § 214 cmt. c (1981) (stating "What appears to be a complete and binding integrated agreement . . . may be voidable for fraud . . . ")). "For more than fifty years, it has been 'the rule that a written contract [even] containing a merger clause can [nevertheless] be avoided for antecedent fraud or fraud in its inducement and that the parol evidence rule does not stand in the way of proof of such fraud.'" *Italian Cowboy Partners, Ltd.*, 341 S.W.3d at 331–32 (quoting *Dallas Farm Mach. Co. v. Reaves*, 307 S.W.2d 233, 239 (Tex. 1957)).

Here, various Plaintiffs assert that they relied on the terms of the contract to dictate how their investment monies would be allocated. Specifically, as to what stage of the project their funds would be applied to, what account their funds would be held in, and that commission-based compensation would not be deducted. Evidence at trial revealed that these promises set forth in the contract were not complied with. As to verbal representations, Plaintiffs contend that they relied on projections and assurances of oil production, likelihood of success, level of risk and return on investment when deciding to invest. Some of these verbal representations are in direct conflict with the Contract. For example, the level of risk is expressly characterized as "high" multiple times throughout the contract, whereas some Plaintiffs claim that the risk was represented to them as low. Further, the Contract specifically warrants that the signor did not rely on any information outside of the Contract, that no oral representations or warranties have been made by the company; and that the signors decision to invest is based solely upon the terms of the Contract. *See* Trial Pl. 74, p. 61.

107

This particular issue of the consideration of parol evidence in a fraudulent inducement claim was addressed by the Fifth Circuit in **Dunbar Med. Sys. Inc. v. Gammex Inc**, 216 F.3d 441, 451 (5th Cir. 2000). In this case, the Court noted that the Plaintiffs contended that they were fraudulently induced to enter into the contract by the other party's misrepresentations. The Court found that the allegations of fraudulent inducement were not an attempt to by-pass the statute of frauds or enforce an unenforceable oral agreement, but rather the claim was asserted under the alleged violation of an independent duty not to procure a contract through fraud. *See **Dunbar Med. Sys. Inc.***, 216 F.3d at 451. Further, the Court clarified that, under Texas law, parties challenging contracts as fraudulently induced *may rely on evidence of oral promises or agreements* to support their claims. *Id.* at 452 (emphasis added).

For the above stated reasons, the Court finds that the statute of frauds does not preclude Plaintiffs' claims based on oral representations.

B.          Plaintiffs' Fraud Claims

As it has been demonstrated that there is no violation of the Statute of Frauds and that Plaintiffs are not restricted to a claim under breach of contract, the Court now addresses Plaintiffs' fraud claims. As previously stated, Plaintiffs base their allegations of fraud on both: (1) misrepresentations contained in the Contracts; and (2) oral representations by Defendants and their agents outside of the Contract. Because not all Plaintiffs testified at trial, any non-testifying Plaintiffs will only be able to recover under a fraud theory if the evidence sufficiently demonstrates that Primera's Contract contained misrepresentations amounting to fraud. Stated differently, non-testifying Plaintiffs may only recover if there is sufficient evidence to demonstrate that the statements within the Contract amount to fraud as no evidence of oral communications between non-testifying Plaintiffs is before this Court.

As a preliminary matter, Alfaro can be held individually liable for the fraudulent acts of Primera. Parties agree that Primera is a limited liability company and that Alfaro is the sole member of Primera. Section 21.223 of the Texas Business Organizations Code pertaining to corporations applies to limited liability companies. Section 21.223(b) states that a member can be held personally liable for using the company to perpetrate fraud. Thus, case law pertaining to holding corporate officers liable for fraudulent acts under section 21.223(b) is equally applicable to the case at bar.

A corporate officer who knowingly participates in fraudulent acts may be held individually liable to third person even though his acts were performed as an agent of the company. *Walker v. Anderson*, 232 S.W.3d 899, 918 (Tex. App.—Dallas 2007, no pet.). "The issue of a defendant's liability in his individual capacity is distinct from that of his liability under an alter ego theory. A corporation's agent is personally liable for his own fraudulent or tortious acts, even when acting within the course and scope of his employment." *Sanchez v. Mulvaney*, 274 S.W.3d 708, 712 (Tex. App.—San Antonio 2008, no pet.) (citations omitted). Further, an officer of a corporation can be held individually liable for fraud if he "knowingly participated" in the company's fraudulent activity. *Nwokedi v. Unlimited Restoration Specialists, Inc.*, 428 S.W.3d 191, 201 (Tex. App.—Houston [1st Dist.] 2014). In *Nwokedi*, the court found that the principal officer "knowingly participated" in the fraudulent activity because he actively participated in contract negotiations, directed employees on which contractual terms to modify, and gave personal assurances to Plaintiffs about receiving their money under the contract. *Id.* at 201–02. Because the subsequent paragraphs will demonstrate Alfaro's active and knowing participation in Primera's fraud, Alfaro can be held individually liable for that fraud.

To state a claim for common law fraud in Texas, Plaintiffs must prove that: (1) Defendants made a material representation that was false; (2) Defendants knew that the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) Defendants intended to induce Plaintiffs to act upon the representation; and (4) Plaintiffs actually and justifiably relied upon the representation and thereby suffered injury. *In re ACM-Texas, Inc.*, 430 B.R. 371, 410 (Bankr. W.D. Tex. 2010) (citing *Ernst*, 51 S.W.3d at 577); *see also Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015) ("A common-law fraud claim requires 'a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury.") (citations omitted).

### 1. Material False Representations

Plaintiffs allege that Defendants made the following false representations to Plaintiffs to induce Plaintiffs to invest: (1) that Defendants would use investor funds for well drilling and completion as allocated in the Contracts, *i.e.* that investor funds would compensate vendors for the tasks delineated in such allocations; (2) that Defendants would keep no more that 4% of investor funds as a management fee; and (3) that Defendants would not pay commissions to salesmen who procured investor funds. Defendants argue that any oral representations were not material, mere projections and estimates of future events or "sales puffing," and were not made in bad faith. Further, Defendants argue that all written representations in the Contracts were factual and not false representations.

"A fact is material if it would likely affect the conduct of a reasonable person concerning the transaction." *Coldwell Banker Whiteside Assocs. v. Ryan Equity Partners, Ltd.*, 181 S.W.3d 879, 888 (Tex. App.—Dallas 2006, no pet.) (citing *Custom Leasing, Inc. v. Tex. Bank & Trust*

*Co.*, 516 S.W.2d 138, 142 (Tex. 1974); *Miller v. Kennedy & Minshew, P.C.*, 142 S.W.3d 325, 345 (Tex. App.—Fort Worth 2003, pet. denied)).

As stated previously, Plaintiffs' allege three different types of false statements that were transmitted orally and/or through the Contract. The Court will now examine each statement to determine if it is a material statement, i.e., whether the statement would likely affect the conduct of a reasonable person concerning the transaction.

> a. Use of investor funds for well drilling and completion as allocated in the Contracts

The Court must determine if the use of investor funds as allocated in the Contract was a material representation that would likely affect the conduct of a reasonable person. During trial, Plaintiffs were asked if they would have invested had they known that Alfaro would not using investor funds as allocated in the Contract. Almost every Plaintiff answered that they would not have invested had they known that their funds would not be used as stated in the Contract. Given this testimony from individuals of varying age, background, and sophistication, the Court finds that a representation of how a person's funds would be spent would likely affect the conduct of a reasonable person's decision to invest in a transaction. As such, this would be a material misrepresentation as it relates to all Plaintiffs, not just those that testified that allocation of investor funds in accordance with the Contract was an important factor in deciding to invest.

> b. Management Fees

The Court must also determine if representation that no more than 4% of investor funds would be applied to a management fee was a material representation that would likely affect the conduct of a reasonable person. Similar to the above analysis, almost all Plaintiffs were asked some form of a question about Defendants only keeping 4% of investor funds as a management

fee and/or if they would have invested had their money not been used as it was allocated in the Contract. When answering this question, nearly every Plaintiff agreed that failure to comply with the Contract's allocation of funds, including the taking of more taking of more than 4% of their investment money, would have affected their decision to invest. Given this testimony from individuals of varying age, background, and sophistication, the Court finds that a reasonable person would consider the amount of investment funds allocated to management fee would likely affect the conduct of a reasonable person's decision to invest in a transaction. As such, this is a material misrepresentation both for testifying and non-testifying Plaintiffs.

**c.**      Commission-based Payments

The Court must also determine if the representation that Primera agents would not receive a commission-based payment was a material representation that would likely affect the conduct of a reasonable person. Almost all Plaintiffs were asked about the importance of commission-based payments in their decision to invest with Primera. The general response by Plaintiffs was that they were either told by agents of Primera that there would be no commission-based payments and/or they read and believed the statements in the Contract that stated that there would be no commission-based payments. Plaintiffs further testified that commission based payment would have been a reason for them not to invest. Given this testimony from individuals of varying age, background, and sophistication, the Court finds that the representation that Primera agents would not receive a commission-based payment would likely affect the conduct of a reasonable person's decision to invest in a transaction. As such, this is a material misrepresentation both for testifying and non-testifying Plaintiffs.

Based on the above analysis, the Court finds that the alleged misrepresentations made by Defendants are material statements.

2.      Knowledge of Falsity or Reckless Assertion

For a statement to be reckless it must be made by a person (1) without any knowledge of the truth; (2) who knows that he does not have sufficient information to support the statement; or (3) who realizes he does not know whether the statement is true. ***Texas Architectural Aggregate, Inc.,*** 430 B.R. at 410 (citing ***Johnson & Higgins of Tex., Inc. v. Kenneco Energy***, 962 S.W.2d 507, 527 (Tex. 1998)). Plaintiffs allege, through testimony and evidence presented at trial, that Defendants knew that oral and written representations made to Plaintiffs were false. In fact, Plaintiffs allege, and sought to prove during the course of the trial, that Alfaro reviewed the books and status of accounts daily with the Alfaro entities' accountant so that he would have up to date knowledge of whether representations regarding the health of the business and the disposition of incoming investments. Indeed, Alfaro was specifically questioned about his frequent review of the accounting and banking records to determine the health of the company, and often, to determine if he could take an owner draw based on the financial status of the company. Additionally, Plaintiffs have sufficiently alleged that made statements which were, in the least, reckless as a positive assertion without any knowledge of its truth or even patently false, as such representations are alleged to have been directed by Alfaro.

a.      Use of Investor Funds for Well Drilling and Completion

Contract states that, "[p]roceeds received from the offer and sale of all Units will be deposited into a segregated bank account in the name of the Program. All payments for Drilling and Testing Costs and Completion and Equipping Costs shall be paid from the segregated account." Trial Pl. 78 P. 26. Moreover, each Contract contains a section delineating how proceeds will be applied. *Id.* Alfaro testified that this section represented to investors how their investor money would be used once it was received by Primera (Trial Audio, 12:11–16, April 17, 2017).

At trial, Plaintiffs' testified that they believed their payment would be used in accordance with the Contract which included on time payment of vendors for whatever well(s) Plaintiffs had investments.[6] Further, Alfaro himself testified that he communicated with Plaintiffs that the investor funds would be used to fund the well and pay the vendors of the well (Preliminary Injunction Hearing Audio, 250:13–251:2, September 1, 2015).

It is clear, however, that Defendants, at a minimum, recklessly represented to Plaintiffs that their invested funds would be spent in accordance with these terms. First, Defendants frequently paid Alfaro large owner draws while vendor invoices went unpaid or underpaid. Plaintiffs, in their Post-Trial Brief in Support of Judgment (ECF No. 366), direct the Court to a prime example of Alfaro's often exorbitant owner draws. Defendants submitted evidence that Crawford invested in the Screaming Eagle 3H well by paying his investor funds on September 4, 2013. Trial Def., p. 6. Per the Contract for the Screaming Eagle 3H well, Defendants promised to use Crawford's funds as set forth in Contract, which included payment of vendors. *See* Trial Pl. 75, p. 6 (describing the application of proceeds for units). It is clear, however, that Defendants had no intention of using Crawford's funds as delineated in the Contract as Defendants, at this time had millions of dollars in unpaid debt from the Screaming Eagle 1H and 2H wells. *See* Trial Def. 115. Emails from Covington to Alfaro (citing numerous instances of unpaid vendor invoices). Further, using Crawford's investment as an example, Defendants confirmed their knowingly fraudulent intent when Defendants failed to pay substantial vendor debt due and owing on the 3H well after

---

[6] *See* Trial Audio, 51:17–21, April 10, 2017 (stating that Alfaro assured Peters); 89:12–23, April 10, 2017 (stating that Alfaro assured Collins); 169:1–4, April 10, 2017 (stating Salmon's understanding); 182:23–183:3, April 10, 2017 (stating Crawford's understanding); 192:5–7, April 10, 2017 (stating Daniel Davalos' understanding); 199:10–12, 201:22–202:1, April 10, 2017 (stating David Davalos' understanding); 223:17–24, April 10, 2017 (stating James Reiley's understanding); 14:8–11, April 11, 2017 (stating that Rodriguez and Alfaro assured Rick Reiley); 96:14–17, April 11, 2017 (stating Betty Reiley's understanding); 102:3–10, April 12, 2017 (stating Huber's understanding); 174:11–18, April 12, 2017 (stating Walls' understanding); 236:20–25, April 12, 2017 (stating Griffey's understanding); 263:21–25, April 12, 2017 (stating Marjorie A. Gillette's understanding); and 11:17–12:3, April 13, 2017 (stating that Alfaro assured Edward A. Gillette).

Crawford's subscription. All the while, Alfaro continued to take almost daily draws for thousands of dollars. *See* Trial Pl. 131 (demonstrating numerous instances of Alfaro's large and sometime daily owner draws).

This example serves to prove that Alfaro knew when he took Crawford's money that he would have no intention of using the funds as delineated in the Contract because, at the time, he had a amount of unpaid vendor invoices on other wells and yet continued to take out thousands of dollars in owner draws. This behavior is inconsistent with the terms of the Contract which delineate how proceeds will be applied. As such, Defendants knew that funds were not being used as delineated in the Contract when Crawford made his investment. Therefore, Defendants statements in the Contract were at least reckless as there was common knowledge among Plaintiffs that a substantial sum was due and owing to vendors on various wells held by the company which is in direct contradiction with the application of proceeds for units section of the Contract. *See* Trial Pl. 75, p. 6 (describing the application of proceeds for units).

Another example of the false use of investor funds comes from testimony elicited from Alfaro himself. Although he disagreed with the characterization of the transaction as an owner draw, Alfaro testified and did not deny that $5,000 was moved from Primera accounts to Alfaro's personal accounts on January 10, 2014, which was the same day that Mr. Salmon contributed $50,000. Prelim. Pl. 1, Exhibit C. This fact indicates that Defendants had no intention of being held to the Contract when it came to the use of investor funds.

The testimony elicited and the exhibits admitted at trial and at the Preliminary Injunction Hearing offer ample evidence that Defendants knew that their statements, either orally or within the Contract, were false or, at the very least, reckless given the information about Primera's financial dealings.

b.    Management Fees

Plaintiffs further allege that Defendants knew any statements made orally or within the Contract regarding management fee allocation were at a minimum recklessly made. The Contracts allocated between 2.7 and 4% of investor funds to management fees. *See* Trial Def. 107 p. 23 (stating that the management fee for the Screaming Eagle 4H well would be 2.7%). It is, however, clear based on the testimony and exhibits presented that Defendants had no intention of upholding this promise regarding the management fee. Again, Defendants offer a crucial example to this end in their Post-Trial Brief in Support of Judgment (ECF No. 366). On March 28, 2014, the daily cash balance email received by Alfaro shows accounts receivable on the Screaming Eagle 3H and 4H wells "Less: 25% Fees." Trial Def. 115. Thus, when Plaintiff David Dalavalos made his investment in the 4H well on April 15, 2014, Primera already knew that it would deduct 25% in management fees instead of the 2.7% allocated in the 4H well Contract. Trial Def. 16, p. 7.

c.    Commission-Based Payment

Finally, Plaintiffs' have produced evidence that Defendants at a minimum recklessly made statements regarding commission-based payment. The Contract expressly states that "[t]he Company will sell all Units through its officers and its employees, who will not receive commission-based compensation for sales of Units." Trial Pl. 78, p. 22. In his testimony, Alfaro stated that Primera made certain promises in their Contracts (Trial Audio, 11:1–3, April 17, 2017). Further, Alfaro testified that it was reasonable for investors to rely on information contained in the Contract (*Id.* at10:22–25). To that end, Alfaro agreed that every time a Contract was sent to an investor, Primera was making a promise that Alfaro and other Primera employees would not receive commission-based payment for the sale of oil and gas units (*Id.* at 11:13–12:1).

Additionally, many Plaintiffs' testified that Alfaro, and/or other Primera employees were repeatedly told that Primera employees, including Alfaro, would not receive commission based compensation (*Id.*). In reviewing the trial audio, the Court notes that almost every Plaintiff answered that they believed Primera employees would not receive commission-based payment. Plaintiffs' provide examples of this testimony in their Post-Trial Brief in Support of Judgment (ECF No. 366). Plaintiff Vincent J. Gillette testified that Alfaro expressly told him that no one at Primera would take commissions on his investment (Trial Audio, 29:14–30:18, April 12, 2017). Further, Plaintiff Sharon Walls testified that her understanding was that Primera employees did not receive commission based payment from the sale of oil and gas units (*Id.* at 175:12–16).

Contrary to the Contract and the representations made by Alfaro and/or Primera employees, the evidence is that Alfaro paid himself and other Primera employees commission-based payments on the sale of oil and gas units to investors. A statement made by Alfaro to one of his employees proves that he knew that the statement in the Contract regarding commission based payments was false. Cody Reyes testified that Alfaro stated that Reyes would be compensated via commission but that the company "didn't call them commissions, they called [it] a bonus. And that consisted of a 10%." (Preliminary Injunction Audio 181:17–182:3, September 1, 2015). This statement is corroborated by evidence produced at trial. On May 13, 2015, Megan Blair, as part of her accounting duties, emailed Alfaro regarding amounts paid and owed to Alfaro. Trial Pl. 37-1. The email included a spreadsheet that showed 10% "bonuses" based on investor contributions. *Id.* During her testimony regarding Plaintiffs' Trial Exhibit 37-1, Blair testified that Alfaro paid Primera salesman commissions based on what they sold (Trial Audio, 61:25–62:16, April 13, 2017). She specifically used the word "commissions" when describing the type of compensation that Primera employees received. Furthermore, Alfaro's own expert witness, Michael Turner,

stated that there was evidence of commission-based compensation (Preliminary Injunction Audio, 152:1–22; 174:10–177:8, September 15, 2015).

Under the Contract roughly 97% of investor funds should have gone to funding and operating the well. Instead, a substantial amount of money went to Alfaro directly. For 2013 and 2014, Alfaro received $3,257,158 in owner draws (Preliminary Injunction Audio, 88: 6–12, August 28, 2015). During this two year period, between 90 and 100% of the revenue for Primera came from investor contributions (Trial Audio, 39:8–25, April 17, 2017). Further, Plaintiffs' provided evidence that between 2013 and 2015, Alfaro took thousands of dollars in owner draws almost daily in contradiction to the Contract and oral representations regarding both the non-payment of commission-based compensation and the allocation of investment funds in accordance with the Contracts. Trial Pl. 131, p. 1–11. Defendants' Exhibits confirm that, other than Plaintiffs Salmon, Crawford, and Huber, testifying[7] Plaintiffs in the case at bar made their investments in various wells in the years 2013, 2014, and 2015.[8] Indeed, Plaintiffs Salmon, Crawford, and Huber did in fact make investments between the years of 2013 and 2015, but had also made earlier investments in the years 2011 and 2012. *See* Trial Pl. 7, 48–49, and 91–96 (citing examples of investments before 2013). As such, Defendants knew when they took Plaintiffs' investment funds that they would not comport with the written and/or oral representations made to Plaintiffs about the non-payment of commission-based compensation and the written and oral representations to Plaintiff regarding use of investment funds to produce and maintain, through vendor payments, the wells for which Plaintiffs invested. Plaintiffs knew this because in conjunction with taking investor

---

[7] The fact that they are testifying Plaintiffs is relevant because, through the Court's analysis of element four of fraud (actual and justifiable reliance), only testifying Plaintiffs will be able to recover under a common law fraud as only testifying Plaintiffs can provide testimony regarding their actual and justifiable reliance. As such, the Court only reviewed the execution documents of those Plaintiffs that testified and would ultimately prevail under element four of fraud.
[8] Plaintiffs Trial Exhibit 4–19, 23–41, 48–55, 77–78, 85–100.

money with promises of no commission-based payment and application of funds as delineated in the Contract, Defendants, through Alfaro, also knew that Alfaro was taking out, almost daily, thousands of dollars in owner draws by moving various investor amounts into his personal accounts. *See* Trial Pl. 131, p. 1–11 (showing almost daily owner draws of thousands of dollars by Alfaro from January 2, 2013, to June 1, 2015). Thus, money that should have been used for maintaining and providing for the well were personally used by Alfaro for his personal use. Defendants had no intention of complying with commission-based payment provision in the Contract or the Contract's allocation of investment funds when Defendants entered into investment agreements with Plaintiffs. Plaintiffs' Trial Exhibit 132 provide 100 of examples where Alfaro received 10% and above from Primera. Exhibit 32 indicates that Alfaro was drawing at least 10% commission based on Plaintiffs' investments and therefore knew that when he entered into the Contract with Plaintiffs that there were misrepresentations about how investments would be allocated and the use of commission-based compensation.

To summarize, Primera and Alfaro made representations in the Contract and, and in some instances, in person that Alfaro and other employees would not receive commission based compensation. Defendants, however, knew that Alfaro would take commission-based payments and not apply investment funds in accordance with the Contract as it had been his practice to not do this throughout the time Plaintiffs were making investments with Defendants.

3.      Intent to Induce Reliance

As the Court has already adequately addressed this element through an earlier discussion of fraudulent inducement, the Court adopts its earlier analysis of fraudulent inducement as it relates to the Defendants.

4.      Actual and Justifiable Reliance Causing Injury

A plaintiff's reliance must be both actual and justified (i.e. reasonable) before it can be said to suffer a compensable injury. ***Miller Global Props, LLC v. Marriot Int'l, Inc.***, 418 S.W.3d 342, 347–48 (Tex. App.—Dallas 2013, pet. denied). *See also **Grant Thornton LLP v. Prospect High Income Fund***, 314 S.W.3d 913, 923 (Tex. 2010) (stating that reliance must be both actual and justifiable). Courts will analyze actual reliance "given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud." ***Haralson v. E.F. Hutton Grp., Inc.***, 919 F.2d 1014, 1026 (5th Cir. 1990). "[A] person may not justifiably rely on a representation if there are red flags indicating such reliance is unwarranted." ***Lewis v. Bank of Am. NA***, 343 F.3d 540, 546 (5th Cir. 2003) (internal quotation marks removed) (quoting ***In re Mercer***, 246 F.3d 391, 418 (5th Cir. 2001)). Here, Defendants raise a defense based on the bespeaks caution doctrine. The bespeaks caution doctrine addresses situations in which optimistic projections are coupled with cautionary language, which in turn affects the reasonableness of the reliance on and the materiality of those projections. ***Rubinstein v. Collins***, 20 F.3d 160, 167 (5th Cir. 1994); *see **In re Donald J. Trump Sec. Litig.***, 7 F.3d 357, 373 (3d Cir. 2000) (concluding a prediction could not "materially influence a reasonable investor" when the disclosures are coupled with cautionary language); *see also **In re Fleming Cos. Secs. & Derivative Litig.***, 2004 U.S. Dist. LEXIS 26488 (E.D. Tex. June 10, 2004) (describing the judicially-created equivalent to the Private Securities Litigation and Reform Act "safe harbor" provision, the bespeaks caution doctrine). Cautionary statements and warnings may render allegedly misleading statements immaterial, but only when they exhaust the misleading statement's capacity to influence the reasonable investor. *See **Va. Bankshares v. Sandberg***, 501 U.S. 1083, 1097–98 (1991). Additionally, the cautionary language must be "substantive and tailored" to the specific future projections which the plaintiffs challenge. ***In re Donald Trump***, 7 F.3d at 372; *see also **Karacand***

*v. Edwards*, 53 F. Supp. 2d 1236, 1245 (D. Utah 1999) (holding that, because the bespeaks caution doctrine does not require the cautionary language to be in the same document as the alleged misstatement or omission, the Private Securities Litigation and Reform Act similarly does not impose such a requirement).

The doctrine is case specific and its application depends on the specific text of the offering document or communication at issue. *See Flynn v. Bass Bros. Enters.*, 744 F.2d 978, 988 (3d Cir. 1984) (holding courts must determine the materiality of soft information on a case-by-case basis); *see also Rubinstein*, 20 F.3d at 167 (stating the bespeaks caution doctrine reflects the proposition that statements must be analyzed in context). When an offering document's forecasts, opinions or projections are accompanied by meaningful cautionary statements, they will not form the basis of a securities fraud claim if they did not affect the "total mix" of information provided to investors. *In re Donald Trump,* 7 F.3d at 371. In other words, the question is whether, under all the circumstances, the omitted fact or prediction without a reasonable basis "is one that a reasonable investor would consider significant in [making] the decision to invest, such that it alters the 'total mix' of information available about the proposed investment." *Rubinstein*, 20 F.3d at 168 (citing *Krim v. BancTexas Grp.*, 989 F.2d 1435, 1445 (5th Cir. 1993)).

In *Rubinstein*, defendants were alleged to have made misrepresentations in statements concerning the value of newly discovered natural gas reserves. 20 F.3d at 162. The issues arose in August of 1991 when the Plains Corporation ("Plains") announced publicly that it had made a significant natural gas discovery. *Id.* at 162–63. In October, following this announcement, Plains announced the results of the initial test of the discovery well. *Id.* at 163. The test results suggested, according to analysts, that the well and the field in which it was located were extremely valuable. *Id.* Thereafter, Plains' investor relations manager was quoted saying that the level of condensate

production was unusually high, and that the energy content of the gas was exceptionally rich. *Id.* Additionally, the Chief Financial Officer of Plains was reported to have stated that the well could yield 500 billions cubic feet (hereinafter "bcf") of gas and that the asset value of Plains was between $66 and $100 per share. *Id.* He further stated that, based on the initial test of the discovery well a cash-flow estimate of $26-32 million for fiscal year 1992 was feasible. *Id.* According to plaintiffs, these predictive statements were materially misleading because the initial test of the discovery well did not provide a reasonable basis for the statements made. *Id.* Additionally, plaintiffs contended that certain materially adverse facts the defendants had not disclosed— including that there had been a drop in flow-tube pressure and a decline in shut-in pressure— suggested that the reserves were much smaller than originally projected. *Id.*

On November 8, 1991, Plains filed a registration statement for a proposed secondary public offering of 1.5 million shares of its common stock. *Id.* The registration statement reiterated the initial test results, and then stated:

> Although there is insufficient production history and other data available to definitively quantify the proved reserves attributable to this discovery, the Company believes, based upon well logs, sidewall core analyses and initial production test results, that the Miami Fee #1 well is a significant discovery that, when fully evaluated, could add substantially to the Company's oil and natural gas reserves. There can be no assurance, however, that subsequent production, drilling and other data will not cause the Company to reevaluate its assessment of the significance of this discovery.

*Id.* at 163–64. Plaintiffs alleged that the registration statement was misleading for the same reasons that the statements made by defendants in October were misleading. *Id.* at 164. Plaintiffs alleged that defendants knew that the discovery well testing completed was not sufficient to provide a reasonable basis for these statements and that defendants failed to disclose the declines in flow-tube and shut-in pressure. *Id.*

The discovery well began operating in November 1991. *Id.* Sales of gas and condensate

began on November 12th and continued until the well was shut-in on November 27th, which was not disclosed until December 16, 1991. *Id*. On November 15th and 20th, several of the individual defendants exercised their stock options and then immediately sold most of their newly acquired stock. *Id*. The aggregate proceeds from these sales were $760,599. *Id*. On December 4, 1991, defendants disclosed, for the first time, some of the adverse information regarding the discovery well. *Id*. Specifically, a press release revealed that the flow-tube pressure had suddenly dropped and the shut-in pressure had declined. *Id*. Immediately after the adverse disclosures were made, the price of Plains stock fell from $22 per share on December 3rd to $14.75 per share by close of trading on December 5th. *Id*. Five days later, Plains' CEO announced that the discovery well had been reperforated, was up and running and was producing gas and condensate at levels seen before the drop in flow-tube pressure. *Id*. On December 16, 1991, Plains sent a report by two analysts from Petrie Parkman & Co. to its shareholders which recommended the purchase of Plains stock based primarily on facts disclosed by Plains concerning the discovery well. *Id*. The public offering took place on January 24, 1992, and 1.2 million shares of stock were sold to the public at a price of $16 a share. *Id*. at 164–65. In the prospectus that accompanied the offering, Plains did not disclose that the discovery well had experienced a decrease in flow-tube pressure in November and December of 1991. *Id. at* 165. The prospectus included this statement:

> Notwithstanding the ultimate productive capacity of this well, the Company believes, based upon well logs, sidewall core analyses, the results from paleontological and depositional studies, initial production test results and actual production to date, that the Miami field discovery is significant and, when fully evaluated through additional drilling activity, could add substantially to the Company's oil and natural gas reserves.

*Id*. In March of 1992, Plains filed its 10-K report in which it reiterated the October test results for the discovery well and stated that, as of March 22, 1992, the production rate and flow-tube pressure had dropped. *Id*. Plains, however, stated that the field which the well was located in

"could add substantial incremental oil and natural gas volumes[.]" *Id*. On April 1, Plains announced that the discovery well was again inoperable and was undergoing repairs. *Id*. The announcement also disclosed that the well operations had ceased on March 28th—one day after the 10-K report had been signed. *Id*. Plaintiffs alleged that the defendant's scheme to inflate the market price of Plains stock came to an end on April 13, 1992, when an analyst reported that he acquired information regarding the discovery well, and then publicly reported that the well had reserves of only 3 bcf which equated to a value of less than $2 million. *Id*.

In the proceeding at the district court, the court found that defendant's statements were not material misrepresentations as a matter of law. *Id*. at 166–67. According to the Court of Appeals, the district court took the "*per se* position" that economic forecasts and predictions may never form the basis for a securities fraud action when such statements are coupled with cautionary language. *Id*. at 167. The Court of Appeals, however, stated that, under Fifth Circuit precedent, cautionary language is not sufficient alone to render predictive statements immaterial as a matter of law. *Id*. The court stated that "materiality is not judged in the abstract, but in light of the surrounding circumstances." *Id*. at 168 (citing *Krim*, 989 F.2d at 1448 (5th Cir. 1993)). The appropriate inquiry, according to the Fifth Circuit, is whether the "omitted fact or prediction without a reasonable basis, 'is one a reasonable investor would consider significant in making the decision to invest, such that it alters the total mix of information available about the proposed investment.'" *Id*. (citing *Krim*, 989 F.2d at 1448).

Plaintiffs claims were plead under two different theories—unsubstantiated disclosure and incomplete disclosure. *Id*. The first is premised on the notion that the predictions made do not have a reasonable basis. *Id*. In support of this contention, the plaintiffs alleged that, due to the initial and subsequent testing of and production of the testing well, the information available to

Defendants was not sufficient to form a reasonable basis for their predictions and forecasts. *Id*. Under this analysis, the court noted that "predictive statements are deemed to contain false statements of 'fact' under Rule 10b-5 when the predictions in those statements do not have a reasonable basis." *Id*.

A party that makes a claim made under Rule 10b-5 alleges that an individual, directly or indirectly, attempted to engage in a course of business which would fraud or deceit any person, used any device, scheme or artifice to defraud, or made an untrue statement of material fact or omitted a material fact. Employment of Manipulative and Deceptive Devices, 17 CFR § 240.10b-5 (2017). In making a claim under Rule 10b-5, plaintiffs however, must not only allege that the statements did not have a reasonable basis, but must also eventually prove that the defendants made the challenged statements with scienter. *Rubinstein*, 20 F.3d at 168. Scienter is a mental state in which an individual has the requisite knowledge and intent to deceive, manipulate or defraud. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976) (defining scienter as "a mental state embracing intent to deceive, manipulate, or defraud"). In a Rule 10b-5 claim, the party alleging a Rule 10b-5 violation has occurred must plead that the responsible party made the representation with the requisite scienter in order to prevail. The court found in *Rubinstein* that, plaintiffs satisfied the pleading requirements for scienter, and had presumptive evidentiary support because defendants allegedly committed insider trading in mid-November. *Id*. at 170.

The second theory, incomplete or "deceptively selective disclosure," was supported by the fact that defendants made various optimistic projections, while knowingly concealing adverse, and material information, such as the fact that the discovery well had experienced problems at the time of the releases. *Id*. at 170. Under this second theory, the court found that the Plaintiff's sufficiently plead a claim, because "a duty to speak the full truth arises when a defendant undertakes a duty to

say anything." *Id.* (citing *First Va. Bankshares v Benson*, 559 F.2d 1307, 1317 (5th Cir. 1977)). Furthermore, the court asserted that the inclusion of general cautionary language regarding a prediction would not excuse the alleged failure to disclose known material, adverse facts. *Rubinstein*, 20 F.3d at 171.

Based on the above reasoning, the Fifth Circuit reversed and remanded the case back to the district court. *Id.* at 173. The court found that plaintiffs had sufficiently plead their Rule 10b-5 and Texas common-law causes of action upon which relief could be granted. *Id*

Simply stated, the Court does not agree that the bespeaks caution doctrine serves as a defense for Defendants. Again, this doctrine addresses a specific situation wherein optimistic projections are coupled with cautionary language, which in turn affects the reasonableness of the reliance on and the materiality of those projections. In the case at bar, Defendants rely on written warranties to serve as cautionary language that would seem to nullify any representations made by Alfaro and/or other Primera employees regarding the success of an investment with Primera. Indeed, the Contract contains the following warning:

> THE COMPANY, FROM TIME TO TIME, MAY DISCUSS FORWARD-LOOKING INFORMATION IN THIS MEMORANDUM. THESE FORWARD-LOOKING STATEMENTS ARE BASED ON MANY ASSUMPTIONS AND FACTS, AND ARE SUBJECT TO MANY CONDITIONS, INCLUDING THE RECEIPT OR ENFORCEABILITY OF CONTRACTS, THE AVAILABILITY OF PRODUCTS AND SERVICES, THE LOCAL POLITICAL, ECONOMIC AND EMPLOYMENT ENVIRONMENT, THE MARKET FOR OIL AND GAS, AND THE OIL AND GAS WHICH COULD BE PRODUCED BY THE WELL.

Trial Pl. 78, p. 3. Indeed, the warranty may have protected Defendants if the misrepresentations at issue in this case had anything to do with false promises regarding the success of the joint venture. Instead, the basis of Plaintiffs' fraud claim is that Defendants made three different types of misrepresentations: (1) investment money being used in a way that is inconsistent with the Contract; (2) management fees that are inconsistent with the Contract; and (3) commission-based

compensation for Primera employees. None of these misrepresentations have anything to do with the success of the venture. They have to do with the wrongful use of investor money in violation of the Contract. The bespeaks caution doctrine, as it was used in ***Rubinstein***, refers to predictive written or oral statements that are made to predict future success, but are then scaled back to a level that is not fraudulent through the use of cautionary language. Here, there are statements within the Contract, and sometime oral statements, about the use of investor money by the Primera that are not protected by cautionary language. The cautionary language that is used protects against any statements that are made in writing or orally about the success of the venture or the likelihood of a return on investment. Even if there was a statement in the Contract cautioning the investor that, for example, the management fee stated in the Contract may actual differ in practice, the Court is not convinced that this would still allow for a bespeaks caution doctrine defense. The doctrine protects forecasts, opinions or projections, not the stated financial practice of a company.

Further, Defendants suggest that cautionary language regarding oral representations nullify any oral statements regarding management fee, commission-based compensation, and applying funds in accordance with the Contract. The Contract uses the following language:

> ANY ORAL REPRESENTATIONS OR PREDICTION AS TO THE AMOUNT OR CERTAINTY OF ANY PRESENT OR FUTURE CASH BENEFIT OR TAX CONSEQUENCE WHICH MAY FLOW FROM AN INVESTMENT IN THIS PROGRAM IS NOT PERMITTED TO THE EXTENT SUCH ORAL REPRESENTATION DEVIATES FROM THE SPECIFIC WRITTEN DISCLOSURES SET FORTH IN THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM.

Trial Pl. 78, p. 2. As stated previously, this is not the purpose of the doctrine. The bespeaks caution doctrine protects forecasts, opinions or projections when used in tandem with cautionary language. The oral misrepresentations made by Defendants were not projections or opinions. They were the stated financial practices of the company that were sometimes reinforced with oral statements

made by Primera employees.

For the reasons stated, the Court does not believe the Defendants are protected from liability through the bespeaks caution doctrine regarding statements in the Contract or oral statements dealing with management fees, commission-based compensation, or application of investment money as indicated in the Contract. The Court, however, agrees with Defendants that statements regarding the success of any individual investments is protected by the bespeaks caution doctrine as it is a statement, forecast, or opinion regarding the success of an investment that was coupled with cautionary language within Primera's Contract. These types of statements are exactly what is intended to be protected under the bespeaks caution doctrine. As such, any testimony regarding reliance on statements about projections of the success of the oil and gas investment will not be considered when determining actual and justifiable reliance to indicate a fraud cause of action. Instead, the Court will only consider reliance on statements regarding application of investment funds contrary to the Contract, management fees, and commission-based compensation.

Because Defendants are not protected by an affirmative defense, and the Court has determined that Plaintiffs meet the other elements of the fraud, the Court must determine if Plaintiffs meet the fourth element of fraud. The Court finds that certain Plaintiffs can recover under a theory of fraud. For the reasons state below, only Plaintiffs that testified at trial regarding their reliance on the misrepresentations of Defendants that also testified that they wither read and understood the Contract or had certain oral representations made to them about the financial practices of Primera will be able to succeed under a fraud theory. The reason for this is twofold. First, this Court is restricted to the evidence that it received through oral testimony and documentary exhibits. As such, the Court cannot infer actual reliance on the Contract or oral

arguments if the Court did not receive any evidence about reliance on the part of non-testifying plaintiffs. Stated differently, because the Court was not presented with evidence of actual reliance by non-testifying Plaintiffs, it cannot assume there was reliance. Second, regarding an actual reading of the Contract, the Court cannot turn a blind eye to testimony by certain Plaintiffs that they either did not read the Contract or simply skimmed the document. There cannot be actual and justifiable reliance on a document that was not actually read. If, however, a Plaintiff testified that he or she did not read or skimmed the Contract, but was also given oral misrepresentations that Plaintiff will be able to recover as there is an outside source to justify reliance which are the statements made by Alfaro and/or Primera employees. The Court makes the following findings regarding the Plaintiffs recovery under fraud:

- Rick Reiley: He testified that he carefully read the Contract before investing (Trial Audio, 47: 3–4, April 11, 2017). Rick further testified that he relied on the information about where his money was going when making his investment with Primera and would not have invested had he known that the Contract would not be followed (*Id.* at 17:6–13). The Court finds that Rick Reiley may recover under fraud.

- Betty Reiley: She testified that she only skimmed the Contract and did not read the document in its entirety. Betty, however, further testified that Primera employees made a false statement to her regarding Alfaro receiving no more than 3% of the management fee (Trial Audio, 133: 3–12, April 11, 2017). Betty further stated that she relied on this statement as she testified that had she know Alfaro would receive more than 3% of the management fee, she probably would not have invested (*Id.*). The Court finds that Betty Reiley may recover under fraud.

- Dieter Jansen: He testified that he only skimmed the Contract and did not read it in its

entirety (Trial Audio, 150: 15–18, April 11, 2017). Further, the Court reviewed the record in its entirety and was unable to find any instances where Jansen testified that Alfaro or another Primera employee made oral misrepresentations to him. As such, the Court finds that Jansen cannot recover under a theory of fraud.

- Vincent J. Gillette: He testified that he always read documents about major investments, including the investment documents from Primera (Trial Audio, 58:22–59:5, April 12, 2017). Further, Vincent stated that he relied on the Contract's statements about how money would be allocated and distributed and relied on this information when deciding to invest and would not have invested had he known the money would be allocated and distributed differently (Trial Audio, 178:12–18, April 11, 2017). The Court finds that Vincent J. Gillette may recover under fraud.

- Brian Huber: He testified that he studied and evaluated the Contract for at least one year prior to investing (Trial Audio, 140:21–24, April 12, 2017). The Court, however, is unable to find any instance where testimony was elicited regarding Huber's reliance on the Contract when deciding to invest in Primera. Furthermore, any testimony elicited regarding Huber's reliance on oral representations focused solely on projections of well performance and investment success and are therefore covered under the bespeaks caution doctrine. *See id.* at 129:16–130:2 (stating that the misrepresentation Alfaro made to him were "[a]bout how good [the well] was going to be. . . . he would talk to me about surrounding area, wells in the area, how they were doing, how well they were doing"). As such, the Court finds that Brian Huber cannot recover under a fraud theory.

- Sharon Walls: She testified that she read the entire Contract and based her reading on her decision to invest in Primera (Trial Audio, 185:6–12, April 12, 2017). Further, Walls

testified that she made her investment based on what she read in the Contract (*Id.*) Walls also testified that had she known that Primera salesman would receive 10% off of her investment, she would not have invested (*Id.* at 175:25–176:4). The Court finds that Sharon Walls may recover under fraud.

- Rick Griffey: He testified that he read the Contract for each investment with Primera (Trial Audio, 256:10–12, April 12, 2017). Further, Griffey testified that he did rely on the statements in the Contract regarding commission-based compensation and would more than likely not have invested had he known that commission-based payment would be received (*Id.* at 238:15–19). The Court finds that Rick Griffey may recover under fraud.

- Marjorie A. Gillette: She testified that she read the Screaming Eagle 2H well Contract thoroughly (Trial Audio, 263:13–16, April 12, 2017). Further, she testified that had she known that Alfaro would take commission-based payments in opposition to the Contract, she would not have invested with Primera (*Id.* At 264:5–14). There was, however, no testimony elicited from Marjorie regarding her reliance on the Contract she read and reviewed when ultimately making the decision to invest. While the result may seem harsh, it is in keeping with the strict standard imposed by statutory fraud. The standard for fraud is actual and justifiable reliance. While the Court could certainly infer that there was reliance based on Marjorie's testimony as a whole, but that is not the evidentiary standard for which this Court must uphold. The Court must have testimony elicited from Plaintiff that demonstrates actual and justifiable reliance. As the Court has received no testimony regarding reliance, Marjorie may not recover under a theory of fraud. As such, the Court finds that Marjorie A. Gillette may not recover under a fraud theory.

- Thomas J. Gillette: He testified that he read the Contract (Trial Audio, 234:7–9, April 12,

2017). Further, Thomas testified that he relied on the statements in the Contract regarding application of proceeds and would not have invested had he known it would be different in actual practice (*Id.* at 238:10–13). The Court finds that Thomas J. Gillette may recover under fraud.

- James Peters: The Court, having reviewed the Peters' testimony in its entirety, can find no testimony elicited from Peters that he, in fact, read the Contract. His testimony was only that he "had an opportunity to read the PPM" (Trial Audio, 74:6–7, April 10, 2017). Although he did testify that he read the Subscription Agreement, this is not enough as the misrepresentations themselves arise from the PPM. As no testimony regarding an actual reading of the Contract was elicited, nor was there any testimony about oral representations made from a Primera employee to Peters, there can be no recovery under fraud.

- DC Oil Company, Inc. (Richard David Collins): Collins, on behalf of DC Oil, testified that he read the investment materials, which included the Contract, before sending in money to invest with Primera (Trial Audio, 105:22–25, April 10, 2017). Further, Collins testified that Alfaro specifically told him that his investment would go toward drilling and producing the Screaming Eagle 4H and 6H wells (*Id.* at 89:19–23). Collins also testified that this conversation with Alfaro led him to invest with Primera (*Id.* at 89:12–16). Put differently, Collins relied on his conversations with Alfaro about how money would be applied when investing with Primera. Finally, Collins testified that had he known that the application for the proceeds of units as they appeared in the Contract, it would have affected his decision to invest and he ultimately would have chosen not to invest in Primera (*Id.* at 95:14–21). The Court finds that DC Oil may recover under fraud.

- James Buford Salmon: Salmon testified that he did not read any of the Contracts he

received in its entirety, opting to skim the documents (Trial Audio, 143:15–23, April 10, 2017). Salmon did, however, testify as to oral statements made to him by Alfaro regarding what Alfaro would do with Salmon's investment money which was to drill, frack, and complete wells and pay the vendors of the wells for which Salmon had invested (*Id.* at 168:22–169:4). Further, Salmon testified that he relied on Alfaro's statements about how investment money would be applied when deciding to invest in Primera (*Id.* at 156:4–11). Salmon also testified that he would not have invested in Primera if he had none that vendors were not being paid in a timely manner. (*Id.* at 140:23–141:1). The Court finds that James Buford Salmon may recover under fraud.

- William Crawford: The Court, having reviewed the Peters' testimony in its entirety, can find no testimony elicited from Peters that he, in fact, read the Contract or was given any type of oral misrepresentation from an employee of Primera. The Court must have testimony elicited from Plaintiff that demonstrates actual and justifiable reliance. As the Court has received no testimony regarding reliance, William Crawford may not recover under a theory of fraud.

- Daniel Davalos: The Court, having reviewed the Peters' testimony in its entirety, can find no testimony elicited from Peters that he, in fact, read the Contract or was given any type of oral misrepresentation from an employee of Primera. The Court must have testimony elicited from Plaintiff that demonstrates actual and justifiable reliance. As the Court has received no testimony regarding reliance, Daniel Davalos may not recover under a theory of fraud.

- David Davalos: He testified that he read over the materials given to him by Primera and was told by a Primera employee that they did not get paid on commissions (Trial Audio,

202:2–8, April 10, 2017). Further, David testified that he relied on the oral statements made to him by the Primera employee (*Id.* at 209:22–210:1). Further, David testified that he would not have invested had he known that Alfaro and other Primera employees were taking a 10% commission (*Id.* at 203:22–25). The Court finds that David Davalos may recover under fraud.

- James Reiley: He testified that he did read the Contract (Trial Audio, 221:21–23, April 10, 2017). There was, however, no testimony elicited from Reiley regarding his reliance on the Contract he read and reviewed when ultimately making the decision to invest. It appears that counsel did attempt to ask about reliance on the Contract but never received an answer. (*Id.* at 225:5–9). The Court must have testimony elicited from Plaintiff that demonstrates actual and justifiable reliance. As the Court has received no testimony regarding reliance, James Reiley may not recover under a theory of fraud.

- Edward A. Gillette: The Court, having reviewed the Edward's testimony in its entirety, can find no testimony elicited from Edward that he, in fact, read the Contract or was given any type of oral misrepresentation from an employee of Primera. The Court must have testimony elicited from Plaintiff that demonstrates actual and justifiable reliance. As the Court has received no testimony regarding reliance, Edward A. Gillette may not recover under a theory of fraud.

- Michael Covington: The Court, having reviewed the Covington's testimony in its entirety, can find no testimony elicited from Covington that he, in fact, read the Contract or was given any type of oral misrepresentation from an employee of Primera. The Court must have testimony elicited from Plaintiff that demonstrates actual and justifiable reliance. As the Court has received no testimony regarding reliance, Covington may not recover under

a theory of fraud. Further, as a former employee of Primera that was actively involved in the handling of investment money, the Court is not convinced that there is no complacency in the fraudulent behavior of Primera on the part of Covington.

Thus, the Court finds that certain Plaintiffs may recover from fraud because they meet all elements of fraud, including actual and justifiable reliance on misrepresentations made by Defendants. As such, Plaintiffs successfully prove the elements of fraud in that they were induced into giving away money to Defendants.

      a.      Did the Contracts Contain "Red Flags" That Should Have Put Plaintiffs on Notice to Make Further Inquiries?

Although neither party briefed or discussed it in their respective pleadings, the Court finds it must determine if there were any "red flags" that would have put Plaintiffs on notice to make further inquiry into whether their investment was prudent. *See Lewis*, 343 F.3d at 546 (citing *In re Mercer*, 246 F.3d at 418 (5th Cir. 2001)) (noting that a person may not justifiably rely on a representation if there were red flags indicating such reliance is unwarranted). The Fifth Circuit noted in *Lewis* that a fraud plaintiff cannot recover if he blindly relies on a misrepresentation that would be patently false to him if he had made a cursory examination or investigation into the facts. *Id*. (citations omitted). As such, common law fraud requires a plaintiff to show that a misrepresentation was made and that the plaintiff justifiably relied on the representation. *Id*.

Texas courts measure justifiability by examining a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud, to determine if it is extremely unlikely that there is actual reliance on the plaintiff's part. *In re Arnette*, 454 B.R. 663, 687 (Bankr. N.D. Tex. 2011). That said, the justifiable reliance element of common law fraud does not require a plaintiff to show reasonableness. *Id*. (citing *Lewis*,

343 F.3d at 546). Rather, under the circumstances, the facts should be apparent to the plaintiff's knowledge and intelligence from a cursory glance that he has discovered something that should serve as a warning that he is being deceived, and that he should make an investigation of his own. *Id*. (citations omitted).[9]

This Court has noted that some courts "have focused their inquiry on whether the concealed information was material, that is, whether it *would have* affected decision-making had it been disclosed[.]"*In re Whittington*, 530 B.R. 360, 385 n. 13 (Bankr. W.D. Tex. 2014) (citing *Titan Grp. v. Faggen*, 513 F.2d 234, 239 (2d Cir. 1975)) (finding in the securities cases involving the nondisclosure of facts, that materiality rather than reliance is the decisive element of causation). Moreover, in the context of nondischargeability actions under § 523(a)(2)(A), the nondisclosure of a material fact in the face of a duty to disclose establishes reliance. *Id*. (citations omitted).

The evidence in this case establishes that none of the testifying Plaintiffs would have invested had they known that their investment was being used to pay management fees in excess of what was stated in the Contract; that Primera sales persons and Alfaro were receiving commission based fees; that Alfaro was taking company draws while vendors were not being paid; and that their investments were not solely allocated to the well of their investment. As such, had the testifying Plaintiffs known of these misrepresentations, the evidence is that they would have not invested.

As to the Contracts, there are "red flags" that detail under the "Legal Proceedings" section that Alfaro and some of his prior businesses were subject to FINRA and securities investigations. Trial Pl. 78, p. 29–30. Clearly, these investigations and lawsuits were "red flags" about Alfaro's

---

[9] *See Rattan v. Bosley*, 446 S.W.2d 345, 347 (Tex. Civ. App.—Waco 1969, no writ)(finding that when one has been induced to enter into a contract by fraudulent representations, the person committing the fraud cannot defeat a claim for fraud by asserting that the defrauded party might have discovered the fraud by exercise of proper care).

past conduct. In fact, some of the Plaintiffs, notably the Gillettes, asked Brian Alfaro about these investigations and lawsuits. Plaintiffs' testimony was that they were either satisfied with his explanation or were unable to uncover any further information. Further, the Contracts contain representations that "the Company and its officers, directors, and shareholders are not currently parties to any legal proceedings", "nor are any legal proceedings threatened" and that none of the other legal proceedings are "expected to have a material adverse effect on the Prospect or Operations." As noted, the majority of the Plaintiffs are elderly with limited fixed income. Plaintiffs invested in Primera to increase their retirement income and savings. Plaintiffs testified that their primary concern was how their investment would be utilized. The Court carefully listened and evaluated Plaintiffs' understanding of the Contracts and Primera salesman's representations. The Court recognizes that other potential investors may have been more wary, but the Court cannot find that these Plaintiffs, under these circumstances, failed to recognize the "red flags" regarding prior investigations and law suits and should have investigated further Primera and Alfaro.

C.      Fraud-in-the-inducement

For a fraud-in-the-inducement claim, a plaintiff must prove each of these same elements, plus the requirement of the existence of a binding agreement or contract based on the defendant's false representation. *Haase*, 62 S.W.3d at 798 (Tex. 2001). "Without a binding agreement, there is no detrimental reliance, and thus no fraudulent inducement claim. That is, when a party has not incurred a contractual obligation, it has not been induced to do anything." *Id*. As such fraud-in-the-inducement has the same analysis, plus the requirement of the existence of a binding agreement or contract, as common law fraud. Thus, the Court adopts its previous findings and legal conclusions in the common law fraud section of this opinion and further finds that the contract or binding agreement to satisfy the additional element of fraud-in-the-inducement is the subscription

agreement which incorporates the PPM. The PPM represents a final agreement between the parties as evidenced by Defendants on admission. *See* Defendants' Closing Statement and Brief in Support (ECF No. 365), p. 22 (citing argument for Statute of Frauds based on "written contracts" between Plaintiffs and Defendants). Some Plaintiffs, however, were not able to successfully prove fraud as some could not demonstrate justifiable reliance. As these Plaintiffs cannot recover under common law fraud, they are also precluded from recovery as to fraud-in-the-inducement. Therefore, the Court adopts its previous finds regarding which Plaintiffs can recover under common law fraud and further finds that Plaintiffs successful on a common law theory of fraud will also recover under a fraud-in-the-inducement as all Plaintiffs have a binding agreement or contract with Defendants.

## II.     Fraud in a Real Estate Transaction

Plaintiffs allege a cause of action for fraud in the real estate transaction pursuant to Tex. Bus. & Com. Code § 27.01(a). The elements of a cause of action for fraud in the real estate transaction are identical to that of fraud with the addition that the plaintiff show that the transaction involved real estate. Texas Business and Commerce Code § 27.01(a) provides the elements for statutory fraud in a real estate transaction and stock transaction. It states:

> (a) Fraud in a transaction involving real estate or stock in a corporation or joint stock company consists of a
>
> > (1) false representation of a past or existing material fact, when the false representation is
> >
> > > (A) made to a person for the purpose of inducing that person to enter into a contract; and
> > >
> > > (B) relied on by that person in entering into that contract; or
> >
> > (2) false promise to do an act, when the false promise is
> >
> > > (A) material;

(B) made with the intention of not fulfilling it;

(C) made to a person for the purpose of inducing that person to enter into a contract; and

(D) relied on by that person in entering into that contract.

Thus, to prevail under a cause of action for statutory fraud in a real estate transaction, Plaintiffs must prove that (1) the transaction involved real estate; (2) during the transaction, Defendants made a false representation of fact, a false promise, or benefited by not disclosing that a third party's representation or promise was false; (3) the false representation or promise was made for the purpose of inducing Plaintiff to enter into a contract; (4) Plaintiff relied on the false representation or promise by entering into the contract; and (5) the reliance caused Plaintiffs' injury. *Fidelity Nat. Title Ins. Co. v. Doubletree Partners, L.P.*, 866 F. Supp. 2d 604, 632 (E.D. Tex. 2011) (citing Tex. Bus. & Com. Code § 27.01(a)).

As stated herein, the Court has found that Plaintiffs have proven the four elements under fraud. As such, Plaintiffs only need to prove element number one—the transaction involved real estate—to have a claim for relief under fraud in the real estate transaction. "'For fraud in a transaction to be actionable under § 27.01, the contract must actually effect the conveyance of real estate between the parties and cannot merely be tangentially related or a means of facilitating a conveyance of real estate.'" *Id.* (quoting *Windsor Village, Ltd. v. Stewart Title Ins. Co.*, 2011 WL 61848, at *5 (Tex. App.—Houston [14th Dist.] March 17, 2011, no pet.)). "Under Texas law, a conveyance of a working interest in oil and gas is a real property interest that subject the agreement conveying the interest to the statute of frauds." *Exxon Corp.*, 82 S.W.3d at 436 (citations omitted). In *Exxon Corp.*, the Texas Court of Appeals considered whether the transfer of severable mineral interests in oil and gas leases are regarded as a sale of real estate under the Texas statute of frauds.

*Id.* One of defendant's arguments in that case was that the subject agreement did not convey a working interest but only a contractual right to the share of production. *Id.* In addressing this argument, the court stated that, even assuming the only interest conveyed was in the contractual right to production, the question "is not whether title to the minerals passes, but whether the interest is derived from rights to oil and gas in the ground . . . ." *Id.* "As the Texas Supreme Court has stated, 'a right to land essentially implies a right to profits accruing from it, since, without the latter, the former can be of no value . . . [t]hus a devise of the profits of land or even a grant of them, will pass a right to land itself.'" *Id.* at 436–37 (quotation omitted). As such, the ***Exxon Corp.*** court concluded that "a conveyance of an interest in the minerals that are produced from land, such as a working interest or a royalty interest, passes a right to the land itself." *Id.* at 437 (citing ***Pecos Dev. Corp. v. Hydrocarbon Horizons, Inc.***, 803 S.W.2d 266, 267 (Tex. 1991)).

Here, Plaintiffs purchased a working interest with their investment. *See e.g.,* Trial Pl. 77 ("Primera Energy LLC) is offering up to 100 units of 1% Working Interest (the 'Units') in the Screaming Eagle 6H Prospect, located in Gonzales County, Texas."). Because Defendant's conveyed working interests to Plaintiffs, and working interests are real property interest, the transaction involves real estate thereby satisfying the first element.

Some Plaintiffs, however, were not able to successfully prove fraud as some could not demonstrate justifiable reliance under common law fraud. As these Plaintiffs cannot recover under common law fraud, they are also precluded from recovery as to fraud in the real estate transaction. Therefore, the Court adopts its previous finds regarding which Plaintiffs can recover under common law fraud and further finds that Plaintiffs successful on a common law theory of fraud will also recover under a fraud in the real estate transaction.

## III. Negligent Misrepresentation

Plaintiffs allege a cause of action for negligent representation. The elements of a cause of action for negligent misrepresentation are identical to that of fraud with the addition that the plaintiff show that the defendant did not exercise reasonable care or competence in obtaining or communicating information that was false and supplied for the guidance of others, rather than meeting a heightened requirement of knowledge or recklessness regarding the falsity. *Federal Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991).

As stated herein, the Court has found that Plaintiffs have proven the four elements under fraud. As such, Plaintiffs only need to prove the third element— defendant did not exercise reasonable care or competence in obtaining or communicating the information—to have a claim for relief under negligent representation.

Defendants argue that the "independent injury" rule applies in negligent misrepresentation claims. *See Plano Surgery Ctr. v. New You Weight Mgmt. Ctr.*, 265 S.W.3d 496, 503 (Tex. App.—Dallas 2008, no pet.) (finding that when a party's claim sounds in tort and contract, there must be an injury independent of damages for breach of contract). That rule provides that, if the plaintiff's losses are calculated from the terms of a contract breach, then they are not "independent" and may not be recovered in tort. *Id*. Defendants maintain that the law is clear in this case: if the only injury to the plaintiff is the economic loss arising from the subject matter of the contract (the Contract), then the action sounds only in contract, not in tort. *SW Bell Tele. Co. v. DeLanney*, 809 S.W.2d 493, 495 (Tex. 1991). This is known as the "economic loss rule." *Formosa*, 960 S.W.2d at 47 (Tex. 1998). "[M]ere nonfeasance under a contract creates liability only for breach of contract." *Crawford v. Ace Sign, Inc.*, 917 S.W.2d 12, 13 (Tex.1996) (citation omitted).

Defendants maintain that even if Plaintiffs showed commission-based compensation to Alfaro and Primera sales persons that Plaintiffs would only have a breach of contract claim.

Further, Defendants assert that management fees that purportedly exceed what is stated in the Contract or Alfaro's owner draws would also give rise to a breach of contract claim. As such, Defendants argue that the only loss Plaintiffs assert was to the economic value of the subject contract, and thus the economic loss and independent injury rules limits Plaintiffs' cause of action to one for breach of contract. *Conocophillips Co. v. Koopman*, 2016 WL 2967689 at *15–16 (Tex.App.—Corpus Christi 2016, no pet.).

Further, some courts describe the law of contorts (a claim sounding both in tort and breach of contract) as "a muddy area, devoid of bright line rules" *Total E & P USA, Inc. v. Mo-Vac Service Co., Inc.*, 2012 WL 3612505, *5–6 (Tex.App.—Corpus Christi 2012, pet. denied) (citation omitted). Defendants assert that because Plaintiffs have not alleged damages or harm over and above the value of the contracts they signed, that Plaintiffs do not qualify to bring a negligent misrepresentation claim. If the only harm alleged is benefit of the bargain, as it is here, then Defendants posit that Plaintiffs are limited to a breach of contract claim. *D.S.A, Inc. v. Hillsboro ISD*, 973 S.W.2d 662, 663–64 (Tex. 1998) (per curiam). As such, Defendants state that because Plaintiffs cannot prove all threshold elements of common-law fraud, their negligent misrepresentation claim is also without merit and must be dismissed.

Plaintiffs argue that under *Formosa*, there is an independent cause of action because their claims sound in tort. Further, Plaintiffs point to the following instances that support a finding that Defendants committed negligent misrepresentation, and, that Plaintiffs are entitled to relief. Specifically, Plaintiffs cite to the following misrepresentations in which Defendants did not exercise reasonable care or competence in obtaining or communicating information to Plaintiffs:

(1) Intangible drilling costs stated to Investors were actual intangible drilling costs for that well, rather than moneys used to pay commissions and management "fees".

(2) Investors investments were placed in a designated well account for that investment and would be used to pay all of the costs necessary to drill and complete the well the Investor was investing in first.

(3) Brian Alfaro and the Primera sales persons stated there was little to no drilling risk; and that investors would receive their money back within nine months and make multiple times their investment; that Primera had already found oil it was just a matter of how much; Primera would have a significant ownership interest in the well and tell investors "when we get paid, you'll get paid."

(4) The wells Primera was selling were next to high producing wells pumping out 1600 barrels of oil a day, and used this as a basis to entice Investors on the expected returns they would receive upon investing.

(5) Mr. Alfaro and the Primera sales persons stated to Investors who had invested in a previous Alfaro Entity well that the well came in under the AFE on the previous wells; notwithstanding the segregated account for the wells had been diluted prior to paying the vendors who drilled and completed the well; that previous vendors still had not been paid; that lawsuits had been filed by those vendors; that wells had to be shut-in due to nonpayment; that mineral liens had been placed on the previous wells; and that vendors' equipment to service the wells were taken from the well due to non-payment and causing the well to be shut-in.

(6) Mr. Alfaro and Primera would not transfer monies out of the designated account to pay for expenses on other wells.

(7) Mr. Alfaro and Primera would not exceed the management fee as stated in each Contract.

(8) Primera would bear the costs of expenses relating to the offer and sale of units, including printing costs, accounting costs, and legal costs.

(9) Mr. Alfaro and Primera's sales persons would not receive transaction based compensation for the sale to an Investor.

(10)   Primera intended to sell 100% of the working interest in a given well, and if a percentage of working interest was retained, Primera would pay their respective share to completely fund the project under that well's AFE;

(11)   An AFE for each well was an accurate estimation of the actual costs it would take to drill and complete a given well, without any additional profit intentionally built in by Mr. Alfaro for an Alfaro Entity.

In the fraud discussion in this Memorandum Opinion, the Court found under *Formosa* that Plaintiffs met their burden in establishing that they had independent claims related to the Contract in tort. As such, under *Formosa*, the independent injury rule does not apply to Plaintiffs' negligent misrepresentation cause of action. Further, the Court finds that the Defendants did not exercise reasonable care or competence in obtaining or communicating information that was false and supplied for the guidance of Plaintiffs. As such, on an independent basis, Plaintiffs have proven their cause of action for negligent misrepresentation.

## IV.    Deceptive Trade Practices Act

To recover under the DTPA, a plaintiff must show that: (1) he is a consumer; (2) the defendant engaged in a false, misleading, or deceptive act; and (3) the act constituted a producing cause of plaintiff's damage. *Sparks v. Booth*, 232 S.W.3d 853, 864 (Tex. App.—Dallas 2007, no pet.).

To demonstrate consumer status under the DTPA, Plaintiffs must satisfy two requirements: (1) Plaintiffs must have sought or acquired goods or services by purchase or lease; and (2) the goods

or services purchased or leased must form the basis of the complaint. ***Brittan Commc'ns v. Southwestern Bell Tel. Co.***, 313 F.3d 899, 907 (5th Cir. 2002) (citing ***Cameron v. Terrell & Garrett, Inc.,*** 618 S.W.2d 535, 539 (Tex. 1981)). "If either requirement is lacking, the person aggrieved by a deceptive act or practice must look to the common law or some other statutory provision for redress. ***Cameron,*** 618 S.W.2d at 539. Plaintiffs maintain they are consumers under the statute because they purchased oil and gas interests, which constitutes real property and is therefore a "good" as defined by the DTPA. Plaintiffs also argue that their investments included the purchase of services furnished by Alfaro and the Alfaro entities as operators of the wells. Defendants contend that Plaintiffs are not consumers because, even if the Plaintiffs purchased goods or services, the goods or services do not form the basis for their claim. The Court will address each of Plaintiffs' arguments in turn.

A.     The Working Interest

Plaintiffs contend they are consumers because they purchased an undivided working interest, which under Texas law constitutes real property and is therefore a "good" as defined by the DTPA. Without deciding whether the undivided working interest is a good under the DTPA, the Court finds that Plaintiffs failed to satisfy the second requirement of establishing consumer status—that the working interest forms the basis of the complaint.

In the Fifth Circuit, for purposes of the DTPA, a good or service forms the basis of a complaint when the claimant's complaint is based on a defect or fault in the good or service purchased. *See* ***Americom Distrib. v. ACS Commc'ns***, 990 F.2d 223, 227 (5th Cir. 1993) (finding appellants are not consumers under the DTPA because, while they purchased goods, "their complaint [was] based on the suspension of a distributorship and not with any fault in the goods"); *see also* ***Brittan Commc'ns*** 313 F.3d at 907 (declaring DTPA claimant is not a consumer for purposes of DTPA

because its DTPA claim is based on wrongful suspension of services and not problems encountered with the quality of the services themselves); *Footloose v. Stride Right Children's Grp.*, 923 F. Supp. 114, 115 (N.D. Tex. 1995) (holding that mere non-compliance with a sales policy does not provide a basis for a DTPA violation where the claimant does not allege problems or defects with the goods purchased); *Roof Systems, Inc. v. Johns Manville Corp.*, 130 S.W.3d 430, 441 (Tex. App.—Houston[14th Dist.] 2004, no pet.) (holding that a refusal to sell goods or services is not a complaint based on the goods or services for purposes of DTPA consumer status because the DTPA claim was not based on any goods or services sought or acquired); *Malone v. E.I. Du Pont De Nemours & Co.* 8 S.W.3d 710, 715 (Tex. App.—Fort Worth 1999, no pet.) ("[A] DTPA plaintiff whose claim is not based on any fault in the goods, but merely complains of the seller's failure to sell as much as the plaintiff wanted to buy, is not a consumer."). Here, Plaintiffs' basis for their DTPA claim is various misrepresentations by Defendants contained in the Contract. These claims do not involve defects or faults in what Plaintiffs purchased from Defendants—a undivided working interest. *Miller v. KFC Corp.*, No. Civ. A. 3:99–CF–1566–D, 1999 WL 820389, at *3–4 (N.D. Tex. Oct. 13, 1999) (holding plaintiffs were not DPTA consumers because the complaint that fast food restaurant defendants made misrepresentations during the negotiations for the franchise was not based on the goods or services they sought from defendants). Moreover, some Plaintiffs testified that the working interests they received were what they were represented to be. *See e.g.,* (Trial Audio, 167–68:18–5, April 11, 2017); (Trial Audio, 18–19: 22–4, 143–44: 7–23, April 12, 2017).

Thus, without deciding whether or not Plaintiffs' purchase of undivided working interests was a good or service, Plaintiffs have failed to demonstrate the existence of a defect or fault in the working interest that serves as the basis for their complaint.

B.       Operator Services

In their Post-trial Brief, Plaintiffs argue that they also purchased services under the DTPA through the provision of management and operating fees. (ECF No. 366, p. 22). The Court does not agree.

The Court held in its Order Denying in Part, Granting in Part, the Defendants' Motion to Dismiss that:

> Plaintiffs . . . argue that their investments included the purchase of services furnished by Alfaro and the Alfaro entities as operators of the wells.
> In response, Defendants direct this Court to a line of cases which hold that a non-operating interest owner is not a "consumer" of goods or services under the DTPA. *See C & C Partners v. Sun Expl. & Prod. Co.*, 783 S.W.2d 707, 711-13 (Tex. App.—Dallas 1989, writ denied); *Hamilton v. Texas Oil & Gas Corp.*, 648 S.W.2d 316 (Tex. App.—El Paso 1982, writ ref'd n.r.e.). In both *C & C* and *Hamilton*, the parties included an operator and a non-operator working interest owner who had entered into a joint operating agreement and the non-operator had sued for alleged deceptive trade practices. *C & C*, 783 S.W.2d at 712; *Hamilton*, 648 S.W.2d at 319. In *C & C*, the Court held that "[a] plaintiff establishes his standing as a consumer in terms of his relationship to a transaction, not by a contractual relationship with the defendant." 783 S.W.2d at 712 (citing *Birchfield v. Texarkana Mem. Hosp.*, 747 S.W.2d 361, 368 (Tex. 1987)). In applying identical facts to the *C & C* case, the court provided the following analysis from the *Hamilton* court in determining that the non-operator working interest owner was not a consumer under the DTPA:
>
>> TXO [the operator] was simply reimbursed for costs incurred on behalf of the operating and non-operating interest owners. [The nonoperator] did not employ TXO. Rather, there was merely a consolidation of interests. TXO was the "front man" incurring the debts for all, for which it was entitled to be reimbursed. That TXO did not intend to make a profit for what it did is a factor to be weighed . . . . The purpose of operating agreements, being to spread the risk of drilling operations among several investors with the operator managing the books and making disbursements from a joint account for the benefit of all involved in the [joint operating agreement], should not be construed, we believe, to create liabilities under the [DTPA]. We hold that under the facts of this case, [the nonoperator], as a matter of law, was not a "consumer" of services as contemplated within the [DTPA] and that the trial court was not in error in disregarding the jury finding to the contrary.

*C & C*, 783 S.W.2d at 712–13 (quoting *Hamilton*, 648 S.W.2d at 322).

In accepting as true all well-plead facts for the Plaintiffs, the Court finds that the allegations do not merely allege that Plaintiffs are non-operator working interest owners in a joint operating agreement. In fact, Plaintiffs allege that previously used joint venture language was removed by Alfaro from the PPMs. In reviewing the entirety of the Complaint, the Court finds that the allegations of the arrangement offered by Defendants is not the same non-operator/operator relationship embodied in customary joint operating agreements. The allegations in the Complaint clearly put Defendants on notice that Plaintiffs allege Defendants offered and sold units of real property interests and services to Plaintiffs. Further, as Plaintiffs correctly note in their Response, the allegations in the Complaint are distinguished from the relationship in *C & C* and *Hamilton* in that Defendants were not simply reimbursed for their costs incurred on behalf of all owners, and Defendants were not simply the "front man" for the investors. Based on these allegations, the Court finds that Plaintiffs have adequately alleged facts to support a finding that Plaintiffs are "consumers" under the DTPA.

(ECF No. 165).

After considering the evidence produced at trial and each party's respective arguments, the Court finds that the activities rendered according the management fee provision does not confer consumer status upon Plaintiffs.

In Texas, a non-operating owner of interest in oil and gas well drilling operation is not a consumer for purposes of the DTPA. *Taylor v. GWR Operating Co.*, 820 S.W.2d 908, 910 (Tex. App.—Houston[1st District] 1991, reh'g denied). Three Texas Courts of Appeals have applied this rule to DTPA claims by a non-operating owner of oil and gas interests as against an operating owner who provided management, supervision, and operational services. *See Taylor*, 820 S.W.2d at 910; *C & C*, 783 S.W.2d at 712–13; *Hamilton*, 648 S.W.2d at 322.

Plaintiffs have attempted to distinguish the facts at hand from that of *C & C* and *Hamilton* by contending that the relationship between Plaintiffs and Defendants was not that of a traditional non-operator/operator relationship embodied in customary joint operating agreements. Specifically, Plaintiffs contend that Defendants were not "'simply reimbursed for costs incurred on

behalf of the operating and non-operating interest owners', but rather took Plaintiffs moneys up front before costs to drill and complete a well were incurred, and additionally charged a stated fee for supervision during operations and thereafter." (ECF No.141, page 13). First, the *C&C* court specifically stated that prebilling for anticipated future costs was not a material fact. *C & C*, 783 S.W.2d at 713 ("There is evidence that C & C was prebilled for its share of some anticipated future costs, as authorized by the joint operating agreements, but we do not view this as a material distinction (if it is indeed a distinction) between this case and the *Hamilton* case.). As such, the fact that Defendants took Plaintiffs money up front before costs to drill and complete a well were incurred is not relevant to the analysis at hand. Second, in both *C & C* and *Hamilton*, both claimants argued on appeal that they were DTPA consumers because they purchased administrative, managerial, and supervisory services from the operator. *C & C*, 783 S.W.2d at 712; *Hamilton*, 648 S.W.2d at 322. Both courts expressly rejected that contention. Here, the Plaintiffs are making the same argument based on the following management fee provision:

> This figure represents a fixed fee to be paid to the Company for its *sponsorship, management and supervision* of the Program and its efforts on behalf of Participants during Operations, and thereafter if the Well is a Commercial Well. Expenses related to this offer and sale of Units, including printing costs, accounting costs, and legal costs will be borne by the Company.

*See e.g.,* Trial Pl. 78 P. 26 (emphasis added). The activities associated with the management fee provision in the Contract are not materially different from those in *C & C* and *Hamilton*.

 *Taylor* also provides the Court with guidance on the issue. In *Taylor*, an operating owner of interest in a well sued a nonoperator for his refusal to pay for his share of costs of drilling a well. 820 S.W.2d at 909. The nonoperator counterclaimed alleging a DPTA violation. *Id*. The trial court granted a partial summary judgment in favor of the operator and the nonoperator appealed contending that *C & C* and *Hamilton* do not establish as a matter of law that the nonoperator is not a consumer under the DTPA. *Id*. at 910. The *Taylor* court found the dispositive similarity

between *C & C, Hamilton*, and the case before it was that the "services rendered by the operator included direction and controlling all operations, paying costs, and providing management, bookkeeping and supervision of the mineral prospects." *See id.* (Here, as in those cases [*C & C* and *Hamilton*], the services rendered by the operator included directing and controlling all operations, paying costs, and providing management, bookkeeping and supervision of the mineral prospects."). Ultimately, the *Taylor* court concluded that a nonoperating interest owner is not a DTPA consumer. *Id.* at 909.

Here, the activities offered by Defendants under the management fee are the same services at issue in *C & C*, *Hamilton*, and *Taylor*—sponsorship, management, supervision, and paying costs. As such, and based on the foregoing analysis, the Court does not agree that the distinctions maintained by Plaintiffs are sufficient for the Court to disagree with uncontroverted Texas law.

Because Plaintiffs have failed to establish they are consumers under the DTPA, Plaintiffs cannot prevail in a claim for DTPA.

## V.        Violation of Texas Securities Laws

Plaintiffs alleged that Defendants violated the Texas Securities Act in three ways: (1) by selling unregistered securities; (2) by failing to register the person selling securities; and (3) by engaging in fraudulent practices in the sale of securities. In support of these allegations, Plaintiffs plead articles 7.A(1) (prohibiting the sale of an unregistered security), 12(A) (prohibiting the sale of securities by an unregistered salesperson), 4.F (defining the terms "fraud" and "fraudulent practices"), 25-1 (authorizing the attorney general to appoint a receiver "to conserve and protect the assets" of a person engaged in a fraudulent practice) and 32.A (authorizing the attorney general to seek remedies against any person who "has engaged, is engaging, or is about to engage in fraud

or a fraudulent practice in connection with the sale of security" at the request of a commissioner).[10]

Plaintiff's Proposed Findings of Fact and Conclusion of Law cite the same authority. Moreover, in the Joint Pretrial Order, Parties agreed the governing law with respect to the Texas Security Act violations are articles 7, 12, 25, and 32 of the Texas Securities Act. Lastly, Plaintiffs Post-Trial Brief in Support of Judgment cite to articles 4.F, 25-1, and 32.A of the Texas Securities Act.

Defendants seek dismissal of Plaintiffs claims on the basis that: (1) the agreements clearly state that the ownership interests in the wells are exempt from registration provided that accredited investors purchase them; (2) all investors were required to attest to their eligibility and qualifications as accredited investors; and (3) Defendants did not engage in any misrepresentations or fraud.

While Plaintiffs have cited to the appropriate provisions that govern seller conduct under the Texas Securities Act, Plaintiffs have not plead a private cause of action under which the Court can grant relief. Here, Plaintiffs seek relief under Tex. Rev. Civ. Stat. Art. 581-32.A which authorizes the Attorney General, on the request of the Commissioner, to "bring an action in the name and on behalf of the State of Texas" against "any person [who]has engaged, is engaging or is about to engage in fraud or a fraudulent practice in connection with the sale of a security[.]" Stated differently, article 32.A. provides a cause of action for the State of Texas against sellers of securities.[11] For the Court to grant relief under the Texas Securities Act, Plaintiff needed to seek relief under Tex. Rev. Civ. Stat. Art. 581-33. As such, because Plaintiffs have not sought relief

---

[10] Plaintiff's Original Verified Petition, First Amended Petition, and Second Amended Petition were all filed in the Bexar County District Court before this action was removed to this Court. Plaintiff filed its Third Amended Complaint and Fourth Amended Complaint in this case. The Court examined all five documents and noted that Plaintiff consistently cited Tex. Rev. Civ. Stat. Art. 581-32.A. in each document to support this cause of action.

[11] Tex. Rev. Civ. Stat. Art. 581-33 provides a private cause of action against the seller of securities whereas article 581-32 provides the State with a cause of action against seller of securities. *See also Shields v. State*, 27 S.W.3d 267, 275 (Tex. App.—Austin 2000, no pet.) (distinguishing between a private cause of action under article 581-33 and the State's cause of action under article 581-32).

under the appropriate provision, the Court finds that Plaintiffs cannot succeed in a cause of action under the Texas Securities Act.

## VI. Conversion

Plaintiffs' base their allegations of conversion on three separate pieces of property: (1) personal property comprising the Screaming Eagle 1H well; (2) the rights to a proportionate right of the production of oil, gas, and other minerals from the Screaming Eagle 1H well; and (3) their own investments in the working interests.

In Texas, "[c]onversion is the unauthorized and unlawful assumption and exercise of dominion and control over the personal property of another which is to the exclusion of, or inconsistent with the owner's rights." *Cass v. Stephens*, 156 S.W.3d 38, 61–62 (Tex. App.—El Paso 2004, pet. denied) (citing *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 446 (Tex. 1971); *Whitaker v. Bank of El Paso*, 850 S.W.2d 757, 760 (Tex. App.—El Paso 1994, no writ)). The elements of a conversion claim are: (1) the plaintiff owned, possessed, or had the right to immediate possession of property; (2) the property was personal property; (3) the defendant wrongfully exercised dominion or control over the property; (4) the plaintiff made a demand for return of the property that the defendant refused; and (5) the plaintiff suffered injury, usually the market value of the converted property. *Lawyer's Title Co. v. J.G. Cooper Dev., Inc.*, 424 S.W.3d 713, 718 (Tex. App.—Dallas 2014, pet. denied). Demand and refusal is not necessary when the possessor's acts manifest a clear repudiation of the plaintiff's rights. *Cass*, 156 S.W.3d at 61.

### A. Personal Property Comprising the Screaming Eagle 1H Well

Plaintiffs allege that they "owned, possessed and had the right to immediate possession of the personal property comprising the Screaming Eagle 1H well" and that "Defendants wrongfully exercised dominion or control over this property." Thus, the Court must determine whether

Plaintiffs "owned, possessed, or had the right to immediate possession" of the personal property comprising the Screaming Eagle 1H well.

At trial, Plaintiffs provided no evidence proving that they owned personal property comprising the Screaming Eagle 1H well. Moreover, Plaintiffs neither alleged nor proved what specific personal property comprised the Screaming Eagle 1H well. At most, the evidence shows that Plaintiffs owned an undivided working interest in the Screaming Eagle 1H well. See *e.g.,* Trial Def. 3 ("The undersigned hereby applies to participate as a Joint Venturer (a "Participant") in the Venture to the extent of 1 (fill in the number of interests), in the amount of $99,888 per Interest and agrees to contribute as initial payment towards capitalization therefore the sum of $26, 722 in cash."). "A working interest is the right to share in well production, subject to the costs of exploration and development." ***Paradigm Oil, Inc. v. Retamco Operating, Inc.***, 372 S.W.3d 177, 180 n.2 (Tex. 2012). In Texas, a working interest is an interest in real property, not personal property. ***Trutec Oil And Gas, Inc. v. W. Atlas Int'l, Inc.***, 194 S.W.3d 580, 583 (Tex. App.—Houston [14th Dist.] 2006). Without evidence of ownership in personal property comprising the Screaming Eagle 1H well, Plaintiffs cannot succeed on a conversion cause of action on this basis.

      B.      Rights to a Proportionate Right of the Production of Oil, Gas, and Other Minerals from the Screaming Eagle 1H well

Plaintiffs also maintain that they owned, possessed, and had the rights to a proportionate right of the production of oil, gas, and other minerals from the wells and Defendants wrongfully exercised dominion or control over this property. This type of ownership interest is not an adequate basis for a conversion cause of action because the second element of a conversion cause of action requires the converted property be personal property. As previously established, Plaintiff's

working interest is a real property interest, not a personal property interest. As such, Plaintiffs cannot succeed on a conversion cause of action on this basis.

C.     Rights to Investments in the Working interests

Lastly, Plaintiffs assert that they were entitled to legal possession of their own investments in the working interests and Alfaro exercised control over their investments in an unlawful and unauthorized manner by selling the Screaming Eagle 1H well in December 2014. Defendant argues that Plaintiffs may not maintain their conversion claims on this basis because the alleged converted property is money and under Texas law, Plaintiffs' investments are not personal property. Defendant argues that, under Texas law, "[w]here money is involved, it is subject to conversion only when it can be described or identified as specific chattel, but not where an indebtedness may be discharged by the payment of money generally."

Without deciding whether the investments are property interests that can be converted, a cause of action for conversion does not exist here either. At trial, Plaintiffs presented no evidence that they owned, possessed, or had the right to immediate possession of their invested monies. On the contrary, the evidence shows that they exchanged ownership of their invested money for ownership of an undivided working interest in the applicable wells. *See e.g.,* Trial Def. 3 ("The undersigned hereby applies to participate as a Joint Venturer (a "Participant") in the Venture to the extent of 1 (fill in the number of interests), in the amount of $99,888 per Interest and agrees to contribute as initial payment towards capitalization therefore the sum of $26, 722 in cash."); Trial Def. 16 ¶ 3 ("the funds tethered herewith shall be considered assets of the Company in payment for the number of Units [of fractional undivided working interests] set forth on the signature page hereof").

Because Plaintiffs have failed to prove that they owned, possessed, or had the right to immediate possession of personal property that was converted, the Court need not address the remaining elements of conversion.

## VII. Texas Uniform Fraudulent Transfer Act Claims

A. Plaintiffs' Texas Uniform Fraudulent Transfer Act Claims

The Plaintiffs' Fourth Amended Complaint states the following cause of action under TUFTA, Tex. Bus. & Comm. Code 24.001 *et seq.*:

> Defendants violated the Texas Uniform Fraudulent Transfer Act, Tex. Bus. & Comm. Code 24.001 et seq., by operating a Ponzi scheme and transferring the profits of the Ponzi scheme directly and indirectly to Mr. Alfaro. Mr. Alfaro then transferred and continues to transfer the profits to fund his lavish lifestyle. Mr. Alfaro also has incurred fraudulent obligations in support of his lifestyle. These transfers and obligations are all fraudulent as to Plaintiff-creditors because Defendant-debtors made said transfers and obligations after or within a reasonable time before Plaintiffs' claims arose. These transfers and obligations are also fraudulent because Defendants made the transfers and obligations with actual intent to hinder, delay or defraud Plaintiffs. Upon information and belief, the property and monies transferred by Mr. Alfaro and the Alfaro Entities, have been transferred to Defendants, Silver Star Resources, LLC, King Minerals, LLC, Kristi Alfaro, the Brian and Kristi Alfaro Living Trust, 430 Assets, LLC, among others.[12]
> Plaintiffs' Fourth Amended Complaint (ECF No. 133, ¶ 113).

The Plaintiffs state in the Joint Pretrial Order (ECF No. 290, p. 3) that:

> Plaintiffs contend that Mr. Alfaro, individually and as the sole member of Alfaro Oil & Gas, LLC and Alfaro Energy LLC transferred investors (sic) moneys to Defendants 430 Assets LLC to purchase a Lamborghini and Range Rover, to SilverStar Resources to purchase an oil and gas asset in Montague County, to Alfaro Energy LLC to pay for expenses related to other offerings, to Kristi Alfaro, and to the Brian and Kristi Alfaro Living Trust to purchase real estate and pay the mortgages, taxes and expenses on such real estate, and upon information and belief, to King Minerals LLC and Ana & Avery's Candy Island LLC to shield investors from getting their investments back.

The Court held in its Order Denying in Part, Granting in Part, the Defendants' Motion to

---

[12] The TUFTA claims against King Minerals, LLC and Ana and Avery's Candy Island, however, have not been specifically plead and the Court dismissed them in its Order Denying in Part, Granting in Part, Defendants' Motion to Dismiss. (ECF No. 165, p. 16).

Dismiss that:

The Texas Uniform Fraudulent Transfer Act ("TUFTA"), Tex. Bus. & Comm. Code §§ 24.001 *et seq.*, is intended "to prevent debtors from prejudicing creditors by improperly moving assets beyond their reach." *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 566 (Tex. 2016) (citing *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 89 (Tex. 2015) ("[TUFTA] is designed to protect creditors from being defrauded or left without recourse due to the actions of unscrupulous debtors.")). The Texas Supreme recently stated that "[u]nder TUFTA, a transfer made with actual or constructive intent to defraud any creditor may be avoided to the extent necessary to satisfy the creditor's claims:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer or incurred the obligation:
> > (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
> > (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor
> > > (A) was engaged or was about to engage in a business transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> > > (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

*Golf Channel*, 487 S.W.3d at 566 (quoting Tex. Bus. & Comm. Code § 24.005(a); *accord id.* § 25.006(a) (transfer is fraudulent as to present creditor if debtor is insolvent or made insolvent by a transfer and debtor did not receive reasonably equivalent value); *see also id.* § 24.008 (creditor remedies for fraudulent transfer)). The Court finds that, although a Ponzi scheme has not been adequately plead, Plaintiffs claims for fraud have been sufficiently plead to withstand Defendant's Motion to Dismiss. Texas Business and Commerce Code § 24.002 defines a "claim" as "a right to payment or property, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." Plaintiffs allege that they currently have an unliquidated right to payment or property as tort claimants pursuant to their fraud claims, which this Court has declined to dismiss. As such, Plaintiffs continue to qualify as claimants under TUFTA.

Further, this Court found that:

In the first ninety-three paragraphs of the Complaint, Plaintiffs make detailed allegations regarding transfers of investor monies to and from dedicated well accounts; Mr. and Mrs. Alfaro; a general Primera account; vendors; stock accounts; and to purchase a number of vehicles, homes, vacations, furnishings, jewelry,

watches and audio-visual equipment. On pages 29-31 of the Complaint, Plaintiffs provide a chart which alleges transfers of specific assets to 430 Assets, LLC and the Brian and Kristi Alfaro Living Trust. The chart also provides allegations that a number of assets were sold. Further, ¶ 87 alleges transfers of assets to Silver Star Resources, LLC. In reviewing the Complaint, the Court therefore finds that the Plaintiffs have specifically alleged transfers to Alfaro, the Alfaro Entities, Silver Star Resources, LLC, 430 Assets, LLC, Kristi Alfaro, and the Brian and Kristi Alfaro Living Trust. As such, the TUFTA claims against those specifically alleged parties shall not be dismissed.

(ECF No. 165, p. 14–16.)

Brian and Kristi Alfaro testified about transfers to Brian Alfaro, the Alfaro Entities, Silver Star Resources, LLC, 430 Assets, Kristi Alfaro, and the Brian and Kristi Alfaro Living Trust.

As noted in the Court's evidentiary summary of all the witnesses, Mrs. Alfaro testified that she and husband had purchased the following items within four years[13] of the State Court Action being filed:

- G-class Mercedes, purchased around 2013 at purchase price of $130,000 and monthly payment of $2,300.

- Orange Lamborghini, purchased around fall of 2014 at purchase price of $400,000, and monthly payment of about $6,000. As well, she stated that she did not know of any other Lamborghinis that her husband may have owned or been driving.

- Porsche purchased for $130,000.

- Cadillac Escalade, purchased March of 2015 and monthly payment of $1,600.

---

[13] (a) Except as provided by Subsection (b) of this section, a cause of action with respect to a fraudulent transfer or obligation under this chapter is extinguished unless action is brought:

(1) under Section 24.005(a)(1) of this code, within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant;

(2) under Section 24.005(a)(2) or 24.006(a) of this code, within four years after the transfer was made or the obligation was incurred;

Tex. Bus. & Comm. Code § 24.010.

- Bentley, purchased within the last two years for $189,000. Kristi Alfaro also stated that her husband did own another Bentley prior to the purchase of the one he owned currently.

- Home at Huntington Place in Bexar County, purchased in December of 2013 and a monthly payment of about $23,000. She did not dispute the Bexar County Appraisal District's record of $2.5 million of value for Huntington Place.

Kristi Alfaro stated that she and her husband created a trust for the benefit of their children on July 28, 2004. Assets held by the trust include a beach home at Cinnamon Shores on Mustang Island and life insurance policies. When asked when the beach home was transferred to the trust, Mrs. Alfaro stated she was not sure, but that she thought it had been a couple of years. Further, she testified that, and the Alfaro's life insurance policies either initially funded the trust or were transferred into the trust at the same time as the home. Mrs. Alfaro stated that the trust was created to protect assets from frivolous suits, and to provide for their children. Kristi Alafaro stated that she and her husband wanted to protect the assets for their children and their children's children.

Brian Alfaro stated that he lived in Shavano Park, Texas and that Bexar County Appraisal District value in 2015 was $2.9 million. The monthly payment for the home was $23,000. Alfaro indicated that when Primera filed for bankruptcy, he also owned a lot in Boerne, but was in the process of selling it. Alfaro agreed that the lot was worth $1.2 million. Alfaro also owned a house at Cinnamon Shores on Mustang Island, Texas and was worth about $926,000.

Alfaro then testified that at the time of the bankruptcy, he owned a Bentley, Ford Mustang, Porsche, G-Class Mercedes, Lamborghini, and was leasing a Cadillac Escalade. Alfaro testified that the monthly payment for the G-Class Mercedes was $2,300. Alfaro stated he purchased a new G-Class Mercedes about the time of the Primera bankruptcy for about $150,000. Alfaro stated that

the lease on the Escalade was $1,600 a month and he made $2,854 monthly payment for the Porsche. Alfaro could not recall the monthly payment was for the Bentley. Alfaro testified that he does not pay cash for the vehicles, but puts nominal cash down and takes a note. Alfaro testified that at the time when he purchased the cars, properties, and San Antonio Spurs tickets, the only job he had was as president of Primera, Alfaro Oil and Gas, and Alfaro Energy and that during this time, his sole income came from the three entities.

Moreover, beginning in March 2016 (after Plaintiffs filed this lawsuit), Alfaro started paying his Silver Star salary and compensation into the Living Trust. (Trial Audio, 198:21–24; 199:23; 200:2, April 17, 2017). Previously, Alfaro had paid his salary and owner draws[14] into a private bank account. (Preliminary Injunction Hearing Audio, 115:14–17, Sept. 1, 2015; Trial Audio, 198:25–199:4, April 17, 2017). Further, Alfaro could not explain why he has transferred at least $732,200 into the Living Trust since Plaintiffs filed this lawsuit against him individually. (Trial Audio, 200:3–25, April 17, 2017); Trial Pl. 133.[15] Although Alfaro denies that this maneuver was intended to make it more difficult for Plaintiffs to recover his personal assets, he provided no credible evidence explaining why after Plaintiffs sued him that he changed his practice of paying his compensation into a personal bank account. In addition to transferring more than $700,000 in compensation into the Trust without explanation, the evidence also establishes that after Plaintiffs filed this lawsuit against Alfaro, he has withdrawn hundreds of thousands of dollars from financial institutions without adequate explanation of how and where those funds were expended. Trial Pl. 134. For example, on December 18, 2015, Alfaro withdrew $100,000 from his Silver Star account.

---

[14] Plaintiffs' Trial Exhibit 131 summarizes all the owner draws Alfaro took from January 2, 2013 – June 1, 2015. Plaintiffs' Trial Exhibit 132 shows the amount of Alfaro draws versus investor receipts.

[15] Plaintiffs' Trial Exhibit 133 shows that from March 31, 2016 to January 25, 2017, that Alfaro made 44 transfers from Silver Star to the Living Trust in the total amount of $732,200.00.

*Id.*; (Trial Audio, 203:3–206:3, April 17, 2017).[16] Alfaro explained that he believed he used those funds to buy acreage, but was not certain: "But so far as withdrawing it and putting it in my pocket, no. I don't think that happened." (*Id.* at 204:5–13). Similarly, on December 23, 2015, Alfaro withdrew $266,000 from his Wells Fargo account. Trial Pl. 134; (*Id.* at 206:8–10). Alfaro attempted to explain that he had to withdraw these funds so they could be deposited into an unidentified person's account at the same bank to buy land. (*Id.* at 206:14–207:25). Alfaro conceded that because there are no records documenting this unusual transaction, the Court will just have to take his word that he in fact used the money as he says he did. (*Id.* at 208:17–22). "But so far as withdrawing it and putting it in my pocket, no. I don't think that happened." (*Id.* at 204:5–13).

As noted herein, Edgar Perez-Mendez ("Perez") worked as the CPA for Primera full time from May 3, 2015 until July 9, 2015. Perez stated that he understood Covington was there for "five years, with a small gap" prior to him. Perez stated that he understood Covington would transfer certain funds from individual well operating accounts into Primera's general operating account, and that some of those funds would be transferred back into well accounts. Further, he understood that vendors were paid from those well accounts, and the general account was for expenses such as salaries, overhead and rent. Perez testified that Megan Blair was his assistant while he was a full time employee in the CPA role.[17]

Perez testified that Alfaro received W-2 employee compensation, as well as frequent draws. As an aside, Perez testified that the frequency of the draws taken by Alfaro appears unusual to him in his experience. Perez testified that in 2013, Alfaro received salary of roughly $880,000

---

[16] Plaintiffs' Trial Exhibit 134 shows that Alfaro withdrew $880,000.00 in checks and withdraws from Silver Star from November 9, 2015 to January 1, 2017.

[17] Plaintiffs' Trial Exhibit 136 shows that from May 14, 2012 to April 10, 2015, Primera Energy, Alfaro Oil & Gas, and Alfaro Energy made 162 inter-company transfers for a total amount of $2,587,677.89.

and in 2014, salary of $1.2 million. In addition to the salary, Perez testified that from January 1, 2013, to December 31, 2014, Alfaro took draws of $3,357,158.00. Perez testified that in total, including draws and salary, Alfaro was paid $5,337,658 in 2013 to 2014.

Perez testified that in 2013 and 2014, the Screaming Eagle 3H and 4H wells collected a total of $18.6 million in investor contributions. From that, Perez testified that he divided the $3.2 million that Alfaro received in owner draws to determine that Alfaro took 18% of the investment funds collected in draws. Perez stated that on the money raised in the Screaming Eagle 3H and 4H, 29% went to Alfaro in compensation or draws.

As to draws, Perez testified that it would be consistent with Perkins's report that from January 1, 2013, to June 1, 2015, there were 113 instances of Alfaro taking 10% or nearly 10% of investor contributions. As to splits with sales persons, Perez testified that there were another 166 instances of Alfaro and another sales representative together taking 10% or nearly 10% of investment contributions.

Perez stated that he understood that Primera generated income by selling working well interests to investors, and that Primera possibly could have retained working interests in the well itself. Perez testified that in 2013 to 2014, 90–95% of Primera's income came from investor contributions. Perez agreed that because 90–95% of Primera's revenue came from investor contributions, any draws that Alfaro took during that period also came from investor contributions. Similarly, in 2015, Perez testified that probably all of the revenue Primera received was investor contributions. Perez stated that during the time that he was at Primera as its CPA, he noticed Primera customarily paid Alfaro and other sales representatives ten percent of the monies they brought in from investors. Further, Perez testified that when he began work full time as Primera's CPA, there were many vendors who had not been paid, or even had their invoices entered into the

accounting system yet.

Perez stated that he understood the actual cost of the wells to be approximately 60% of the amount reflected in the AFE, leaving a 40% profit margin. Perez testified that he did not know whether that 40% margin was in the AFE, but that that was what Primera netted regardless. Further, Perez stated that when Primera filed bankruptcy, it had over $6 million in total liabilities, despite netting 40% of investor contributions.

Direct evidence of a fraudulent transfer may not be possible under TUFTA. As such, TUTA recognizes that a fraudulent transfer may be shown through "badges of fraud". In *In re SMTC Mfg. of Texas* 421 B.R. 251, 298–99 (Bankr. W.D. Tex. 2009), this Court stated:

> Circumstantial evidence of actual fraudulent intent under TUFTA, "commonly known as 'badges of fraud' " are codified in a non-exclusive list set forth in § 24.005(b) of TUFTA. *In re Soza*, 542 F.3d 1060, 1066 (5th Cir. 2008). That section provides:
>
>> In determining actual intent under Subsection (a)(1) of this section, consideration may be given, among other factors, to whether:
>>
>>> (1) the transfer or obligation was to an insider;
>>> (2) the debtor retained possession or control of the property transferred after the transfer;
>>> (3) the transfer or obligation was concealed;
>>> (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
>>> (5) the transfer was of substantially all the debtor's assets;
>>> (6) the debtor absconded;
>>> (7) the debtor removed or concealed assets;
>>> (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
>>> (9) the debtor was insolvent or became insolvent shortly after a substantial debt was incurred;
>>> (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
>>> (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.
>
> Tex. Bus. & Com.Code Ann. § 24.005(b).

Section 24.003 of TUFTA defines insolvency as:

> (a) A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.
> (b) A debtor who is generally not paying the debtor's debts as they become due is presumed to be insolvent.
> (c) Repealed by Acts 2013, 83rd Leg., ch. 9 (S.B. 847), § 11.
> (d) Assets under this section do not include property that has been transferred, concealed, or removed with intent to hinder, delay, or defraud creditors or that has been transferred in a manner making the transfer voidable under this chapter.
> (e) Debts under this section do not include an obligation to the extent it is secured by a valid lien on property of the debtor not included as an asset.

Additionally, this Court found in *In re SMTC Mfg. of Texas* that "Proof that assets were transferred and an assessment of their value are essential to sustaining a fraudulent conveyance action." *Id*. at 279. (citations omitted). The Court found that "The intent that is required is not the same intent that is necessary to support an action for fraud." *Id*. at 299, (citing *Nobles v. Marcus,* 533 S.W.2d 923 (Tex.1976) (Fraud and fraudulent transfer are distinct causes of action.)). Under TUFTA, the intent that is required is simply the intent to hinder, delay or defraud a creditor by putting assets beyond that creditor's reach. *Id*. (citation omitted). "Further, the statute expressly authorizes avoidance of any transfer made with intent to hinder, delay or defraud "any creditor" of the debtor." *Id*., (citing Tex. Bus. & Com. Code Ann. § 24.005(a)(1)). The Trustee (or, in this case the Plaintiffs) bears the burden of proof to show, by a preponderance of evidence, that the transfers in question were made by the Defendants with the actual intent to hinder, delay or defraud any creditor of Defendants. *Id*. Moreover, "Plaintiffs may prove intent through either direct evidence or circumstantial evidence—i.e., by establishing sufficient badges of fraud that the factfinder is satisfied that the requisite intent has been shown." *Id*.

The party seeking to avoid a transfer must establish, by a preponderance of the evidence, the presence of multiple badges of fraud. *Id*. "Once that occurs, the burden shifts to the defendant to show, again by a preponderance of the evidence, that the defendant had a legitimate purpose in

making the transfer." *Id*. (citing *Kelly v. Armstrong*, 141 F.3d 799, 802–03 (8th Cir.1998)). Additionally, the presence of many badges of fraud "will always make out a strong case of fraud." *Id*. at 300 (citation omitted). Texas state courts have determined that proof of four to five badges of fraud is sufficient. *Id*. (citing *Mladenka v. Mladenka*, 130 S.W.3d 397, 407 (Tex.App.— Houston [14th Dist.] 2004, no pet.); *Tel Equip. Network, Inc. v. TA/Westchase Place, Ltd*., 80 S.W.3d 601, 609 (Tex.App.—Houston [1st Dist.] 2002 no pet.)).

The Court finds that Plaintiffs have proven the following badges of fraud by a preponderance of the evidence:

(1) The transfer was to an insider. Plaintiffs have shown that from 2014 until after the State Court Action was filed that Alfaro took investor money and used it to purchase personal items, such as vehicles; and took owner draws, salary, and management fees that were transferred to Alfaro's personal accounts or his related business entities in which he was the sole director/manager/member. As such, the Plaintiffs proved this badge of fraud.

(2) The Defendants retained possession or control of the property transferred after the transfer. Plaintiffs demonstrated that Alfaro's draws, salary, and management fees were almost entirely from investor funds and subsequently placed in the Alfaro Entities—Silver Star Resources, LLC, 430 Assets, LLC, Kristi Alfaro, and the Brian and Kristi Alfaro Living Trust. Defendants did not present evidence that they relinquished possession of the property transferred. As such, the Plaintiffs proved this badge of fraud.

(3) The transfer or obligation was concealed. In this case, Plaintiffs demonstrated through their testimony that none of them knew or would have approved Alfaro taking their investments for Alfaro's personal use. As such, the Plaintiffs proved this badge of fraud.

(4) Before the transfer was made or obligation was incurred, Defendants had been sued or

threatened with suit. Plaintiffs filed their State Court Action in summer of 2015. Plaintiffs demonstrated that Alfaro took his earnings from Primera and Silver Star and placed them in the Living Trust after the State Court Action was filed. Plaintiffs have also demonstrated that Alfaro took their investments in Primera after suit was filed and transferred the funds to another Defendant. As such, the Plaintiffs proved this badge of fraud.

(5) The transfer was substantially all of the debtor's assets. There is no evidence that the transfer was substantially all of Defendant's assets.

(6) The Debtor absconded. There is no proof that Defendant absconded.

(7) The Debtor removed or concealed assets. There is not proof that Primera itself removed or concealed assets, but Alfaro as the sole owner of Primera did. The evidence is clear that when Alfaro sold Screaming Eagle well No. 1 for $60,000.00 that he did not inform the investors for well No. 1 and he did not remit the sale proceeds back to the investors to compensate them for their lost investment. As such, the Plaintiffs proved this badge of fraud.

(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred. There is no proof as to whether the value of consideration received by Defendant was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation incurred. The Court heard testimony from Edgar Perez-Mendez that Primera was not paying its vendors prior to filing bankruptcy. Moreover, Alfaro continued to pay himself while vendors went unpaid. At least one of the vendors filed suit to collect on its unpaid account. The Court finds that at the time Primera filed bankruptcy, it had little ongoing operations, could not restructure its debt, and was insolvent given the amount of unpaid vendor claims and unsecured

debt. As such, the Plaintiffs proved this badge of fraud.

(10) The transfer occurred shortly before or after a substantial debt was incurred. There is evidence of substantial vendor debt being incurred prior to Primera's bankruptcy. As noted herein, Alfaro paid himself and then transferred his income to the other Defendants while Primera was unable to pay vendor claims or invoices. The Court also notes that by the time this case was filed, Primera was a defendant in at least seven other state court cases. As such, the Plaintiffs proved this badge of fraud.

(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor. There is no proof of this badge of fraud.

The Court finds that Plaintiffs have demonstrated by a preponderance of the evidence seven badges of fraud. As such, Plaintiffs have met their burden under § 24.005(b) of TUFTA. *See **In re Cipolla***, 541 F. App'x 473, 479 (5th Cir. 2013) (affirming the bankruptcy court's finding of actual intent to defraud under TUFTA based on the presence of four badges of fraud).

The Fifth Circuit has held that TUFTA does not include transfers of property to the extent that such property is encumbered by a security interest that would be effective against a subsequent judicial lien. ***Mullins v. TestAmerica, Inc.***, 564 F.3d 386, 414 (5th Cir. 2009) (citing Tex. Bus. & Com. Code § 24.002, .0005). According to Plaintiffs Fourth Amended Complaint (ECF No. 133, p. 29–30), Alfaro used investor funds to pay for the following items:

(1) Huntington Place house – purchased in 2013 with monthly mortgage payment of $23,000.00/month.

(2) G-Class Mercedes – purchased in 2013 for price of $130,000 with a monthly payment of $2,300.00.

(3) Orange Lamborghini – purchased in Fall 2014 for $400,000.00 with a monthly payment

of $6,300.00. This asset was placed in 430 Assets, LLC.

(4) Porsche – purchased in Spring 2015 for $130,000 with a monthly payment of $6,250.00.

(5) Bentley – purchased within the last two years with a purchase price of $189,000.00.

(6) Cadillac purchased in May 2013 for $33,705.

(7) Over $700,000 was placed in the Brian and Kristi Alfaro Living Trust.

Items 1-5 are clearly encumbered. Plaintiffs have offered no evidence as to whether or not Alfaro maintains equity in these encumbered assets. On the contrary, with respect to the vehicles, Alfaro testified that he does not pay cash for the vehicles, but puts nominal cash down and takes a note (Trial Audio, 33:19–24, April 17, 2017). As such, the court finds that the following are deemed fraudulent transfers:

(1) Salary and compensation transferred to the Living Trust beginning March 2016.

(2)  Withdrawal of $100,000 from Silver Star account on December 18, 2015

(3) Withdrawal of $266,000 from Wells Fargo account on December 23, 2015.

(5) Bentley – purchased within the last two years with a purchase price of $189,000.00.

(6) Cadillac purchased in May 2013 for $33,705.

With respect to the beach home on Mustang Island worth approximately $926,000, Plaintiffs have not satisfied their burden of proving that this transfer was made within the last four years of the State Court Action being filed. When asked when the beach home was transferred to the trust, Mrs. Alfaro stated she was not sure, but that she thought it had been a couple of years. Further, she testified that, and the Alfaro's life insurance policies either initially funded the trust or were transferred into the trust at the same time as the home. Such testimony is not definitive enough to establish that the transfer occurred within the requisite time frame.

B.       Plaintiff's TUFTA Remedies

The parties' Joint Pretrial Order (ECF No. 290, p. 6) states:

Plaintiffs further seek the imposition of a constructive trust and equitable lien with respect to assets of any kind obtained through the fraudulent scheme, including, but not limited to, assets fraudulently transferred to third parties.

Section 24.008 of TUFTA states that:

(a) In an action for relief against a transfer or obligation under this chapter, a creditor, subject to the limitations in Section 24.009 of this code, may obtain:
    (1) avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;
    (2) an attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the applicable Texas Rules of Civil Procedure and the Civil Practice and Remedies Code relating to ancillary proceedings; or
    (3) subject to applicable principles of equity and in accordance with applicable rules of civil procedure:
        (A) an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;
        (B) appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or
        (C) any other relief the circumstances may require.[18]

Under Texas law, as under section 9 of the Uniform Fraudulent Conveyance Act, a creditor's action under the state law amounts to a suit for the debtor's wrongfully transferred or secreted property, which, when found, may be seized and executed upon as though the debtor had never attempted to transfer it. *See* **Texas Sand**, *supra,* 381 S.W.2d at 55; Unif. Fraudulent Conveyance Act § 9 (1918) (a creditor may petition to have the conveyance set aside or may "[d]isregard [it] and attach or levy execution upon the property conveyed"). The basic principle of a fraudulent transfers act, according to one court, is that "[a]s to the creditors, the property continues in the debtor, and it or its proceeds are liable to the creditors' demands." *Hallack v. Hawkins,* 409 F.2d 627, 630 (6th Cir.1969) (construing the Unif. Fraudulent Conveyance Act).

**In re Mortgage America**, 714 F.2d 1266, 1273 (5th Cir. 1983).

Recovery of property is a fundamental remedy under TUFTA. **Sargeant III et al v. Al Saleh**, 512 S.W.3d 399, 413 (Tex. App.—Corpus Christi 2016, orig. proceeding [mand. denied]).

---

[18] Defendants did not plead any of the defenses under §24.009 of TUFTA.

Further, under TUFTA a claim for fraudulent transfer contemplates the issuance of an injunction. *Id*. "Section 24.009 … provides that when a transfer is voidable, the creditor may recover judgment for the value of the asset transferred, and the judgment may be rendered against "the first transferee of the asset or the person for whose benefit the transfer was made" or "any subsequent transferee other than a good faith transferee who took for value or from any subsequent transferee." *Id*. (citation omitted). Moreover, the Plaintiffs' claim does not need to be against Primera the Debtor, but can also be against the transferee of an asset or the person for whose benefit the transfer was made. *Id*. at 414. (citations omitted).

1.    Constructive Trust

Under Texas law, a constructive trust is an equitable remedy that may be imposed if there is: (1) actual or constructive fraud; (2) unjust enrichment of the wrongdoer; and (3) tracing of the property over which the trust is placed to some identifiable res in which the plaintiff has an interest. *American Cancer Soc. v. Cook*, 675 F.3d 524, 529–30 (5th Cir. 2012). "The decision to resort to this remedy, however, is entrusted to the discretion of the court." *Id*. The imposition of a constructive trust requires the court to identify whether a wrongful taking has occurred. *KCM Fin. LLC, et al. v. Bradshaw*, 457 S.W. 3d 70, 87–88 ((Tex. 2015) (citing *Wheeler v. Blacklands Prod. Credit Ass'n*, 627 S.W.2d 846, 851 (Tex.App.—Fort Worth 1982, no writ) ("The very nature of a constructive trust presupposes a wrongful taking by B of property owned equitably or legally by A, or to which A has some claim of right."); *Thompson v. Mayes*, 707 S.W.2d 951, 954 (Tex.App.—Eastland 1986, writ ref'd n.r.e.) (noting a suit to impose a constructive trust "is an action in equity to prevent unjust enrichment of a person who has wrongfully acquired property").

> The very nature of a constructive trust presupposes a wrongful taking by B of property owned equitably or legally by A, or to which A has some claim of right. In such a situation, the law imposes a constructive trust on that property and any proceeds from the sale thereof, or revenues therefrom, for the benefit of A. There

must of necessity be specific property, the subject of the inequitable transaction, before a constructive trust may be imposed. Definitive, designated property, wrongfully withheld from another, is the very heart and soul of the constructive trust theory.

*Wheeler*, 627 S.W.2d at 851.

As previously stated, the Court finds that Plaintiffs have demonstrated by a preponderance of the evidence seven badges of fraud thereby meeting their burden under § 24.005(b) of TUFTA. As such, the first requirement of a constructive trust is met. Thus, the Court must examine the second and third requirements of a constructive trust to determine whether such imposition is proper.

With respect to the second requirement, unjust enrichment, the Court finds that Plaintiffs have demonstrated that Alfaro has received benefits which would be unjust for him to retain ought to make restitution. Unjust enrichment is not an independent cause of action, but merely a theory of recovery. *Amoco Prod. Co. v. Smith*, 946 S.W.2d 162, 164 (Tex.App.—El Paso 1997, no writ); *see also Oxford Fin. Co., Inc. v. Velez*, 807 S.W.2d 460, 465 (Tex.App.—Austin 1991, writ denied); *City of Corpus Christi v. Heldenfels Bros., Inc.*, 802 S.W.2d 35, 40 (Tex.App.—Corpus Christi 1990), aff'd, 832 S.W.2d 39 (Tex.1992). "It can be applied where there is a failure to make restitution of benefits received under circumstances which give rise to an implied or quasi-contractual obligation to repay, that is, where a benefit was wrongfully secured or passively received which would be unconscionable for the receiving party to retain." *Mowbray v. Avery*, 76 S.W.3d 663, 679 (Tex. App.—Corpus Christi 2002, pet. denied) (citations omitted). The unjust enrichment doctrine applies the principles of restitution to disputes where there is no actual contract, and is based on the equitable principle that one who receives benefits which would be unjust for him to retain ought to make restitution. *Id.* (first citing *Amoco*, 946 S.W.2d at 164; then citing *Bransom v. Standard Hardware*, 874 S.W.2d 919, 927 (Tex.App.—Fort Worth 1994, writ

170

denied). Unjust enrichment is not a proper remedy "merely because it might appear expedient or generally fair that some recompense be afforded for an unfortunate loss to the claimant, or because the benefits to the person sought to be charged amount to a windfall." *Id*. at 679–80 (quoting *Heldenfels*, 802 S.W.2d at 40.

Here, there is no dispute that Alfaro is a member or participant of Primera, 430 Assets, Silver Star, and the Living Trust—all defendants in this litigation. By transferring assets to and/or from these entities, Alfaro placed the assets out of Plaintiffs' reach thereby (1) preventing Plaintiffs from recovering any on a judgment resulting from their underlying claims; and (2) permitting Defendants to retain possession of the property transferred. Accordingly, Defendants are unjustly enriched at Plaintiff's expense.

The third requirement of a constructive trust requires a tracing of the property over which the trust is placed to some identifiable res in which the plaintiff has an interest. With respect to tracing, the Texas Supreme Court recently stated:

> "Definitive, designated property, wrongfully withheld from another, is the very heart and soul of the constructive trust theory." Imposition of a constructive trust is not simply a vehicle for collecting assets as a form of damages. And the tracing requirement must be observed with "reasonable strictness." That is, the party seeking a constructive trust on property has the burden to identify the particular property on which it seeks to have a constructive trust imposed.

*Longview Energy Co. v. Huff Energy Fund LP*, No. 15-0968, 2017 WL 2492004, at *5 (Tex. June 9, 2017), reh'g denied (Dec. 8, 2017) (citing *KCM Fin. LLC*, 457 S.W.3d at 88).

After review of the evidence and testimony, the Court has determined that Plaintiffs have met the requisite burden with respect to the following property:

(1) Salary and compensation transferred to the Living Trust beginning March 2016.

(2) Bentley – purchased within the last two years with a purchase price of $189,000.00.

(3) Cadillac purchased in May 2013 for $33,705.

As to the December 18 and 23 withdrawals, Alfaro testified that on December 18, 2015, Alfaro withdrew $100,000 from his Silver Star account. *Id.*; (Trial Audio, 203:3–206:3, April 17, 2017).[19] Alfaro explained that he believed he used those funds to buy acreage, but was not certain: "But so far as withdrawing it and putting it in my pocket, no. I don't think that happened." (*Id.* at 204:5–13). Similarly, on December 23, 2015, Alfaro withdrew $266,000 from his Wells Fargo account. Trial Pl. 134; (*Id.* at 206:8–10). Alfaro attempted to explain that he had to withdraw these funds so they could be deposited into an unidentified person's account at the same bank to buy land. (*Id.* at 206:14–207:25). Alfaro conceded that because there are no records documenting this unusual transaction, the Court will just have to take his word that he in fact used the money as he says he did. (*Id.* at 208:17–22). "But so far as withdrawing it and putting it in my pocket, no. I don't think that happened." (*Id.* at 204:5–13).

While Plaintiffs have established that Alfaro made the withdrawals, the Court finds that Plaintiffs have not met the requisite burden of specifically identifying what particular property on which it seeks to have a constructive trust imposed. The only evidence provided to the Court is that the withdrawals were made; the Court has no definitive evidence of what specific property was purchased with the withdrawals. As such, the Court declines to impose a constructive trust on any property acquired with the cash withdrawn.

Defendants are ordered to provide an accounting to Plaintiffs of all the following:

(1) Salary and compensation transferred to the Living Trust beginning March 2016.

(2) Bentley – purchased within the last two years with a purchase price of $189,000.00.

(3) Cadillac purchased in May 2013 for $33,705.

2.        Equitable Lien

---

[19] Plaintiffs' Trial Exhibit 134 shows that Alfaro withdrew $880,000.00 in checks and withdraws from Silver Star from November 9, 2015 to January 1, 2017.

Plaintiffs seek in their prayer for relief the imposition of an equitable lien. Further, as discussed herein, Plaintiffs seek the imposition of a constructive trust. The Court has found that an equitable lien is a remedy that may be used in conjunction with the imposition of a constructive trust. This Court noted that:

> The fundamental element necessary to the creation of an equitable lien is the existence of an express or implied contract. *Id*. The agreement to create the security interest must be an absolute right to security and not a promise based upon a conditional future event. *Klesch & Co., Ltd. v. Nauru Phosphate Royalties (Honolulu), Inc. (In re "RONFIN" Series C Bonds Sec. Interest Lit.)*, 182 F.3d 366, 374–75 (5th Cir. 1999).

*In re Douglass*, 413 B.R. 573, 582 (Bankr. W.D. Tex. 2009). The Fifth Circuit has found that an equitable lien may arise when circumstances indicate that the parties intended specific property to secure payment on a debt. *In re Daves*, 770 F.2d 1363, 1367 (5th Cir. 1985) (citations omitted). The court observed that the fundamental element necessary to create an equitable lien is the existence of an express or implied contract. *Id*. (citation omitted). Further, the court determined that there are three elements that must be satisfied for a court to grant an equitable lien: "(1) that there exists an express or implied agreement between the parties demonstrating a clear intent to create a security interest in order to secure an obligation between them; (2) that the parties intended specific property to secure the payment; (3) and that there is no adequate remedy at law." *Klesch & Co. Ltd. v. Naura Phosphate Royalties (Houston) Inc.*, 182 F.3d 366, 371 (5th Cir. 1999). In *Klesch*, the Fifth Circuit focused on the second element—that specific property was intended to secure payment—finding that the property must be identified with reasonable certainty and that the property must be distinguished from the general assets of the debtor. *Id*. (citations omitted).

Additionally, the Fifth Circuit considered whether an equitable lien was necessary where a plaintiff had an adequate remedy at law. *Id*. at 373. (citing *Seymour v. Freer*, 75 U.S. 202, 215 (1868)). Specifically, the court considered whether a court in equity should not act when the

moving party has an adequate remedy at law. *Id*. (citation omitted). The court found that a constructive trust or an equitable lien was unnecessary where a plaintiff has an adequate legal remedy for money damages. *Id*. (citation omitted). Additionally, the court stated that the fact that a defendant may be insolvent is not grounds for finding that there is not an adequate remedy at law. *Id*. at 374.

Plaintiffs' assertion that they are entitled to an equitable lien lacks merit. To begin with, Plaintiffs offer no argument as to why they should be granted an equitable lien other than it is in their prayer. They simply rely on the Court to fashion a remedy without explaining why Plaintiffs should have one. Further, under the ***Klesch*** test, Plaintiffs have not demonstrated that there was an implied or express agreement to designate property to secure a debt. Moreover, Defendants resisted any attempt by Plaintiffs to attach any property in satisfaction of their claims. Finally, this Court has found that Plaintiffs have claims for relief on fraud; as such, Plaintiffs do have an adequate remedy at law.

## VIII.  Unjust Enrichment

Unjust enrichment is not an independent cause of action, but merely a theory of recovery. ***Amoco***, 946 S.W.2d at 164; *see also* ***Oxford Fin. Co., Inc.***, 807 S.W.2d at 465; ***Heldenfels***, 802 S.W.2d at 40. "It can be applied where there is a failure to make restitution of benefits received under circumstances which give rise to an implied or quasi-contractual obligation to repay, that is, where a benefit was wrongfully secured or passively received which would be unconscionable for the receiving party to retain." ***Mowbray***, 76 S.W.3d at 679 (citations omitted). The unjust enrichment doctrine applies the principles of restitution to disputes where there is no actual contract, and is based on the equitable principle that one who receives benefits which would be unjust for him to retain ought to make restitution. *Id*. (first citing ***Amoco***, 946 S.W.2d at 164; then

citing *Bransom v. Standard Hardware*, 874 S.W.2d 919, 927 (Tex.App.—Fort Worth 1994, writ denied). Unjust enrichment is not a proper remedy "merely because it might appear expedient or generally fair that some recompense be afforded for an unfortunate loss to the claimant, or because the benefits to the person sought to be charged amount to a windfall." *Id.* at 679–80 (quoting *Heldenfels*, 802 S.W.2d at 40).

Plaintiffs have plead unjust enrichment as a separate cause of action; unjust enrichment, however, is not an independent cause of action but rather a theory of recovery. Accordingly, the Court finds Plaintiffs cannot prevail under this cause of action.

## IX.    Money Had and Received

Plaintiffs allege that Alfaro, Silver Star, King, Kristi Alfaro, the Living Trust, and 430 Assets obtained money from the investors either by fraud, duress, or undue advantage and that such money, in equity and good conscious, belongs from investors. Specifically, Plaintiffs allege that Alfaro held and received money because Primera received revenue from investor contributions and proceeds from selling the Screaming Eagle 1H well. Moreover, Plaintiffs maintain that such money in equity and good conscious belongs to Plaintiffs and such funds should be rightfully returned. Defendants argue that Plaintiffs have not proved money had and received.

"Money had and received is a category of general assumpsit to restore money where equity and good conscience require refund." *MGA Ins. Co. v. Charles R. Chestnutt, P.C.*, 358 S.W.3d 808, 813 (Tex. App.—Dallas 2012, no pet.). "A cause of action for money had and received is not premised on wrongdoing, but 'looks only to the justice of the case and inquires whether the defendant has received money which rightfully belongs to another.'" *Id.* (quoting *Amoco*, 946 S.W.2d at 164).

For the equitable cause of action of money had and received, "[a]ll the plaintiff need show

is that defendant holds money which in equity and good conscience belongs to him." ***Staats v. Miller***, 243 S.W.2d 686, 687 (Tex. 1951). "It aims at the abstract justice of the case, and looks solely to whether the defendant holds money which belongs to the plaintiff." *Id.* at 687–88.

First, according to Defendants, Plaintiffs testified that their money was paid to Primera, not Alfaro and ask such, if a claim for money had and money received existed, the claim would be against Primera, not Alfaro. Second, Defendants maintain that they received exactly what they paid for—working interests in a respective well. Morever, the fact that the investment did not produce returns is a function of the risky nature of such investments and their own actions in derailing Primera by filing the state-court lawsuit and forcing Primera into Bankruptcy. Lastly, Defendants submit that Plaintiffs have not identified any funds that that Defendants hold which in equity and good conscious belongs to Plaintiffs.

Defendants object to Plaintiffs' claim for money had and received on the basis that Defendants allege Plaintiffs paid the money voluntarily, with full knowledge and without fraud or duress. The voluntary payment rule states that money which is "'voluntarily paid on a claim of right, with full knowledge of all the facts, in the absence of fraud, deceptions, duress, or compulsion, cannot be recovered back merely because the party at the time of payment was ignorant of or mistook the law as to his liability.'" ***BMG Direct Mktg., Inc. v. Peake***, 178 S.W.3d 763, 768 (Tex. 2005) (quoting ***Pennell v. United Ins. Co.***, 243 S.W.2d 572, 576 (Tex. 1951)).

As previously discussed, Plaintiffs are entitled to recovery under fraud. Accordingly, a finding that Plaintiffs are entitled to recovery under a money had and money received cause of action is not necessary.

## X.    Civil Conspiracy

"The essential elements of a civil conspiracy are: (1) two or more persons; (2) an object to be

accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result." *Backes v. Misko*, 486 S.W.3d 7, 27 (Tex. App.—Dallas 2015, pet. denied) (citing *Anderton v. Cawley*, 378 S.W.3d 38, 60 (Tex. App.—Dallas 2012, no pet.)). The object to be accomplished must be either an unlawful purpose or a lawful purpose to be achieved by unlawful means. *Id.* A defendant's liability for conspiracy depends on "participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable." *Id.* (citing *Cotton v. Weatherford Bancshares*, 187 S.W.3d 687, 701 (Tex. App.—Fort Worth 2006, pet. denied)). Recovery for civil conspiracy is not based on the conspiracy but on the underlying tort. *Id.* (citing *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996)). A civil conspiracy claim may be proved by circumstantial evidence and reasonable inferences from parties' actions. *Id.* (citing *In re Lipsky*, 411 S.W.3d 530, 549 (Tex. App.—Fort Worth 2013, orig. proceeding)).

Plaintiffs allege that Brian and Kristi Alfaro agreed to divert Plaintiffs' moneys from them under the causes of action alleged above. Defendants argue that Plaintiffs have not set forth any facts that any of the Defendants were engaged in a conscious plan or scheme, arrived at through a meeting of their minds, to conduct illegal activities or to conduct any legal activities by illegal means.

The Court agrees with Defendants. Plaintiffs have not provided any evidence that either of the Defendants, specifically Kristi Alfaro, participated or was complicit in a scheme to conduct illegal activities or to conduct any legal activities by illegal means. On the contrary, the only testimony regarding Kristi Alfaro's role was at the Preliminary Injunction Hearing. She testified that she dealt primarily with the day-to-day finances of the household, which included paying loans or

notes that the couple had on various assets that they owned. The Court finds Kristi Alfaro was a

credible witness.

## REMEDIES

The Court Finds that Defendants are liable for the following causes of action:

1. Common law fraud
2. Fraud in the inducement
3. Fraud in the real estate transaction
4. Negligent Misrepresentation
5. TUFTA

Plaintiffs seek recovery for both past and future damages in the form of a judgment against

Defendants. Specifically, Plaintiffs seek the following:

(a)    Out of pocket damages;
(b)    Actual damages;
(c)    Benefit of the bargain damages;
(d)    Damages for mental anguish pursuant to § 17.50(a)(3) of the Texas Business and Commerce Code;
(e)    Treble damages pursuant to § 17.50(b)(1) of the Texas Business and Commerce Code;
(f)    Exemplary damages;
(g)    Attorneys' fees, expert witness fees, costs for copies of depositions and costs of court pursuant to § 27.01 of the Texas Business and Commerce Code;
(h)    Pre- and post-judgment interest;
(i)    Restitution;
(j)    Disgorgement;
(k)    Equitable relief;
(l)    Appropriate injunctive relief;
(m)    Constructive trust;
(n)    Receivership; and
(o)    Such other and further relief to which Plaintiffs may be entitled at law or in equity.

A.    Damages

The ordinary measure of damages in a fraud case is the actual amount of the plaintiff's loss that

directly and proximately results from the defendant's fraudulent conduct. ***Tilton v. Marshall***, 925

S.W.2d 672, 680 (Tex. 1996). As such, Plaintiffs are entitled to their actual damages, which is the

value of their investment. Plaintiffs have provided these values in their Proposed Findings of Fact

and Conclusion of Law, (ECF No. 296), which the Court hereby adopts:

- Rick Reiley
  - Screaming Eagle 2H: $49,944.00
  - Screaming Eagle 3H: $99,888.00
  - Total: $149,832.00
- Betty Reiley
  - Screaming Eagle 2H: $49,944.00
  - Screaming Eagle 3H: $61,455.22
  - Total: $111,399.22
- Vincent J. Gillette
  - Screaming Eagle 2H: $99,888.00
  - Screaming Eagle 3H: $122,910.44
  - Screaming Eagle 4H: $101,446.00
  - Total:  $324,244.44
- Sharon Walls
  - Screaming Eagle 2H: $99,888.00
  - Screaming Eagle 3H: $122,910.44
  - Screaming Eagle 4H: $101,446.00
  - Blackhawk Buda: $25,811.00
  - Total: $350,055.44
- Rick Griffey
  - Screaming Eagle 4H: $101,446.00
  - Screaming Eagle 6H: $108,966.00
  - Total: $210,412.00
- Thomas J. Gillette
  - Screaming Eagle 2H: $124,860.00
  - Screaming Eagle 3H: $153,638.05
  - Screaming Eagle 4H: $50,723.00
  - Blackhawk Buda: $50,000.00
  - Total: $379,221.05
- DC Oil Company, Inc. (Richard David Collins)
  - Screaming Eagle 4H: $209,776.00
  - Screaming Eagle 6H: $221,044.00
  - Total: $430,820.00
- James Buford Salmon
  - Montague Legacy 1: $371,501.10
  - Montague Legalcy 2: $592,570.00
  - Screaming Eagle 1H: $528,480.00
  - Screaming Eagle 2H: $998,880.00
  - Screaming Eagle 3H: $998,880.00
  - Screaming Eagle 4H: $998,880.00
  - Screaming Eagle 6H: $943,104.00
  - Blackhawk Buda: $ 575,886.00

- o   Total: $6,008,181.10
- David Davalos
  - o   Screaming Eagle 4H: $25,361.50
  - o   Total: $25,361.50

Therefore, the Court finds actual damages shall be awarded as follows:

| Plaintiff | Damages Awarded |
|---|---|
| Rick Reiley | $149,832.00 |
| Betty Reiley | $111,399.22 |
| Vincent J. Gillette | $324,244.44 |
| Sharon Walls | $350,055.44 |
| Rick Griffey | $210,412.00 |
| Thomas J. Gillette | $379,221.05 |
| DC Oil Company | $430,820.00 |
| James Buford Salmon | $6,008,181.10 |
| David Davalos | $25,361.50 |
| **Total** | **$7,989,526.75** |

Moreover, because the above-identified Plaintiffs prevailed in their claim for fraud in the real estate transaction, such Plaintiffs are entitled to attorneys' fees, expert witness fees, costs for copies of depositions and costs of court pursuant to § 27.01 of the Texas Business and Commerce Code. Motions for such costs and objections to such costs shall be filed and served in accordance with Local Rule 7054.

B.      Constructive Trust

As previously established, the Court has determined that a constructive trust shall be imposed

on the following property:

1. Salary and compensation transferred to the Living Trust beginning March 2016.
2. Bentley – purchased within the last two years with a purchase price of $189,000.00.
3. Cadillac purchased in May 2013 for $33,705.

## CONCLUSION

Based on the foregoing, the Court concludes the following regarding Plaintiffs' claims:

1. Plaintiffs' common law fraud claim prevails.

2. Plaintiffs' fraud in the inducement claim prevails.

3. Plaintiffs' fraud in the real estate transaction claim prevails.

4. Plaintiffs' negligent misrepresentation claim prevails.

5. Plaintiffs' DTPA claim fails because Plaintiffs did not establish themselves as DTPA consumers.

6. Plaintiffs' violation of Texas Securities Laws fails because Plaintiffs have not plead a private cause of action under which the Court can grant relief.

7. Plaintiffs' conversion claim fails because Plaintiffs did not prove that the property converted was personal property.

8. Plaintiffs' Texas Uniform Fraudulent Transfer Act claim prevails and a constructive trust will be imposed on the following:

   a. Salary and compensation transferred to the Living Trust beginning March 2016.

   b. Bentley – purchased within the last two years with a purchase price of $189,000.00.

   c. Cadillac purchased in May 2013 for $33,705.

9. Plaintiffs' unjust enrichment claim fails because Plaintiffs plead this claim as a separate cause of action rather than a basis for recovery.

10. Plaintiffs' money had and money received claim fails because Plaintiffs are recovering under common law fraud.

11. Plaintiffs' civil conspiracy claim fails because Plaintiffs did not produce evidence that Defendants participated or was complicit in a scheme to conduct illegal activities or to conduct any legal activities by illegal.

A separate Final Judgment will be entered in conformity with this Memorandum Opinion.

All relief not granted herein is DENIED.

IT IS SO ORDERED.

###